# EXHIBIT 4A

# EXHIBIT A

EXECUTION VERSION

CREDIT AGREEMENT

Dated as of December 27, 2016

among

PETRÓLEOS DE VENEZUELA, S.A.
as Borrower,

PDVSA PETRÓLEO, S.A.
as Guarantor,

GE CAPITAL EFS FINANCING, INC.
as Agent

and

THE LENDERS PARTY HERETO



# TABLE OF CONTENTS

**Page**

ARTICLE I      DEFINITIONS AND ACCOUNTING TERMS ........................................... 1

  1.01    Defined Terms ........................................................................... 1

  1.02    Other Interpretive Provisions .................................................. 15

  1.03    Accounting Terms ................................................................... 16

ARTICLE II     COMMITMENT AND LOANS ................................................ 17

  2.01    Loans ...................................................................................... 17

  2.02    Disbursement of Loans .......................................................... 18

  2.03    Optional Prepayment .............................................................. 18

  2.04    Scheduled Repayments .......................................................... 18

  2.05    Interest .................................................................................... 19

  2.06    Computation of Interest and Fees .......................................... 19

  2.07    Evidence of Debt .................................................................... 19

  2.08    Payments Generally ............................................................... 20

  2.09    Sharing of Payments by Lenders ........................................... 20

  2.10    Redistribution of Payments ................................................... 21

  2.11    Recovering Lender's Rights ................................................... 21

  2.12    Reversal of Redistribution ..................................................... 21

  2.13    Exceptions .............................................................................. 21

ARTICLE III    TAXES, YIELD PROTECTION AND ILLEGALITY ................................ 22

  3.01    Taxes ...................................................................................... 22

  3.02    Illegality ................................................................................. 24

  3.03    Increased Costs ...................................................................... 24

  3.04    No Premium or Penalty .......................................................... 25

  3.05    Mitigation Obligations ........................................................... 25

  3.06    Survival .................................................................................. 25

ARTICLE IV    CONDITIONS PRECEDENT ................................................... 26

  4.01    Conditions to Commitment .................................................... 26

  4.02    Conditions to Disbursements ................................................. 28

  4.03    Satisfaction of Conditions ...................................................... 29

# TABLE OF CONTENTS
### (continued)

**Page**

| | | |
|---|---|---|
| 4.04 | Termination of the Agreement due to Non-Occurrence of Effective Date | 29 |
| ARTICLE V | REPRESENTATIONS AND WARRANTIES OF THE LOAN PARTIES | 29 |
| 5.01 | Organization; Qualification and Power | 30 |
| 5.02 | Authorization; No Contravention | 30 |
| 5.03 | Enforceability | 30 |
| 5.04 | Governmental Approvals; Other Consents | 30 |
| 5.05 | Financial Statements | 30 |
| 5.06 | No Material Adverse Change | 31 |
| 5.07 | Title to Properties; Liens; Possession Under Leases | 31 |
| 5.08 | Subsidiaries | 31 |
| 5.09 | Litigation; Compliance with Laws | 32 |
| 5.10 | Agreements; No Default | 32 |
| 5.11 | Investment Company Act | 32 |
| 5.12 | Federal Reserve Regulations and Federal Power Act | 32 |
| 5.13 | Foreign Assets Control Regulation | 33 |
| 5.14 | Tax Returns | 33 |
| 5.15 | No Material Misstatements | 33 |
| 5.16 | Employee Benefit Plans | 33 |
| 5.17 | Environmental Matters | 34 |
| 5.18 | Insurance | 34 |
| 5.19 | Labor Matters | 34 |
| 5.20 | Solvency | 35 |
| 5.21 | Legal Form | 35 |
| 5.22 | Ranking | 35 |
| 5.23 | Anti-Bribery and Anti-Corruption Laws | 35 |
| 5.24 | U.S. Anti-Terrorism Laws | 36 |
| 5.25 | Senior Indebtedness | 36 |
| 5.26 | Availability and Transfer of Foreign Currency | 36 |



# TABLE OF CONTENTS
### (continued)

Page

| | | | |
|---|---|---|---|
| 5.27 | Commercial Activities; Absence of Immunity | | 36 |
| 5.28 | FATCA | | 37 |
| ARTICLE VI | AFFIRMATIVE COVENANTS | | 37 |
| 6.01 | Maintenance of Corporate Existence | | 37 |
| 6.02 | Insurance | | 37 |
| 6.03 | Maintenance of Governmental Approvals | | 37 |
| 6.04 | Financial Statements, Reports, etc | | 38 |
| 6.05 | Maintaining Records | | 38 |
| 6.06 | Compliance with Laws | | 39 |
| 6.07 | ERISA | | 39 |
| 6.08 | Use of Proceeds | | 39 |
| 6.09 | Further Assurances | | 40 |
| ARTICLE VII | NEGATIVE COVENANTS | | 40 |
| 7.01 | Liens | | 40 |
| 7.02 | Mergers, Consolidations, Sales of Assets and Acquisitions | | 40 |
| 7.03 | FATCA | | 42 |
| ARTICLE VIII | EVENTS OF DEFAULT AND REMEDIES | | 42 |
| 8.01 | Events of Default | | 42 |
| 8.02 | Remedies Upon Event of Default | | 44 |
| 8.03 | Rescission | | 45 |
| 8.04 | Application of Funds | | 45 |
| 8.05 | Cross-Event of Default | | 45 |
| ARTICLE IX | INTRALENDER PROVISIONS | | 46 |
| 9.01 | Appointment of the Agent | | 46 |
| 9.02 | Instructions | | 46 |
| 9.03 | Duties of the Agent | | 47 |
| 9.04 | No Fiduciary Duties | | 47 |
| 9.05 | Business with the Group | | 48 |
| 9.06 | Rights and Discretions | | 48 |

# TABLE OF CONTENTS
(continued)

<strong>Page</strong>

| | | |
|---|---|---|
| 9.07 | Responsibility for Documentation | 49 |
| 9.08 | No Duty to Monitor | 50 |
| 9.09 | Exclusion of Liability | 50 |
| 9.10 | Lenders' Indemnity to the Agent | 51 |
| 9.11 | Resignation of the Agent | 52 |
| 9.12 | Replacement of the Agent | 53 |
| 9.13 | Confidentiality | 53 |
| 9.14 | Relationship with the Lenders | 53 |
| 9.15 | Credit Appraisal by the Lenders | 54 |
| 9.16 | Deduction from Amounts Payable by the Agent | 54 |
| 9.17 | Conduct of Business by the Lenders | 55 |
| ARTICLE X | GUARANTEE | 55 |
| 10.01 | Guarantee | 55 |
| 10.02 | Guarantee of Payment | 55 |
| 10.03 | No Discharge or Diminishment of Guarantee | 56 |
| 10.04 | Defenses Waived | 56 |
| 10.05 | Rights of Subrogation | 57 |
| 10.06 | Reinstatement | 57 |
| 10.07 | Release | 57 |
| ARTICLE XI | MISCELLANEOUS | 57 |
| 11.01 | Waivers; Amendments | 57 |
| 11.02 | Notices; Effectiveness; Electronic Communication | 58 |
| 11.03 | Expenses; Indemnity; Damage Waiver | 58 |
| 11.04 | Payments Set Aside | 61 |
| 11.05 | Successors and Assigns | 61 |
| 11.06 | Confidentiality | 65 |
| 11.07 | Right of Setoff | 65 |
| 11.08 | Counterparts; Integration; Effectiveness | 65 |
| 11.09 | Survival of Agreement | 66 |

## TABLE OF CONTENTS
### (continued)

**Page**

11.10  Severability ................................................................ 66

11.11  Governing Law; Jurisdiction; Etc ................................................ 66

11.12  Lender Action .............................................................. 68

11.13  USA PATRIOT Act Notice .................................................... 68

11.14  Use of English Language ..................................................... 68

11.15  Payment Suspension or Cessation ............................................. 68

11.16  Interest Rate Limitation ...................................................... 69

11.17  Entire Agreement ........................................................... 69


SCHEDULE 2.01    LENDER COMMITMENT; DISBURSEMENT DATES AND AMOUNTS; AMORTIZATION SCHEDULES

SCHEDULE 5.08    SUBSIDIARIES

SCHEDULE 5.09    LITIGATION

SCHEDULE 5.17    ENVIRONMENTAL MATTERS

SCHEDULE 11.02   NOTICE DETAILS

EXHIBIT A        COVERED PURCHASE ORDERS

EXHIBIT B        FORM OF ASSIGNMENT AGREEMENT



This CREDIT AGREEMENT (this "Agreement") is entered into as of December 27, 2016 among PETRÓLEOS DE VENEZUELA, S.A., a capital stock corporation (*sociedad anónima*) organized under the laws of the Bolivarian Republic of Venezuela (the "Borrower"), PDVSA PETRÓLEO, S.A., a capital stock corporation (*sociedad anónima*) organized under the laws of the Bolivarian Republic of Venezuela (the "Guarantor"), GE CAPITAL EFS FINANCING, INC., a Delaware corporation, as administrative agent (together with its successors and assigns in such capacity, the "Agent") and each lender from time to time party hereto (collectively, the "Lenders" and each a "Lender").

RECITALS:

WHEREAS, the Borrower hereby requests that the Lenders extend credit in the form of loans in an aggregate principal amount not to exceed $96,942,347.19 (ninety-six million nine hundred forty-two thousand three hundred forty-seven Dollars and nineteen cents), the proceeds thereof to be used solely to finance the acquisition of certain equipment and spare parts to be purchased from time to time by Bariven, S.A., a capital stock corporation (*sociedad anónima*) organized under the laws of the Bolivarian Republic of Venezuela, either directly or through a procurement agent or an affiliate or subsidiary thereof (including PDVSA Services, Inc., a Delaware corporation, PDVSA Services, B.V., and PDVSA Services China) and certain other purchasing entities (collectively, the "Purchaser"), each an Affiliate or Subsidiary of the Borrower, from Nuovo Pignone S.p.A., a capital stock corporation organized under the laws of Italy (the "Seller"); and

WHEREAS, in order to (a) provide payment to the Seller under the Commercial Contract and the Covered Purchase Orders, by having the Borrower satisfy the Purchaser's payment obligations under such Commercial Contract and Covered Purchase Orders, (b) enable the Seller to collect receivables under the Commercial Contract and Covered Purchase Orders, and (c) facilitate future sales by the Seller to the Purchaser under the Commercial Contract, the Lenders are prepared to extend credit to the Borrower upon the terms and conditions set forth herein.

NOW, THEREFORE, in consideration of the premises and the agreements, provisions and covenants herein contained, the Parties agree as follows:

ARTICLE I

DEFINITIONS AND ACCOUNTING TERMS

1.01    **Defined Terms**.  As used in this Agreement, the following terms shall have the meanings set forth below:

"Accrued Amounts" has the meaning specified in Section 11.05(f).

"Affiliate" means, when used with respect to a specified Person, another Person that directly, or indirectly through one or more intermediaries, Controls or is Controlled by or is under common Control with the Person specified; provided, however, that the term "Affiliate" shall also include any Person that directly or indirectly owns 5% or more of any class of Equity Interests of the Person specified or that is an officer or director of the Person specified.  The



Agent, the Lenders and any Affiliate thereof shall not be deemed to be an "Affiliate" of any Loan Party for purposes of this Agreement.

"Agent" has the meaning specified in the introductory paragraph hereof.

"Agreement" has the meaning specified in the introductory paragraph hereof.

"Anti-Bribery and Anti-Corruption Laws" means the U.S. Foreign Corrupt Practices Act, 1977, 15 U.S.C. §§ 78m, 78dd-1 through 78dd-3 and 78ff, *et seq.*, as amended from time to time, and other reasonably applicable laws and regulations addressing prohibitions against the receipt or acceptance of improper payments and bribes involving officers, directors, employees, agents and affiliates of Governmental Authorities.

"Assignment Agreement" means an agreement substantially in the form set out in Exhibit B as the same may be amended as agreed between the relevant assignor and assignee.

"Board of Directors" means, as to any Person, the board of directors, management committee or similar governing body of such Person or any duly authorized committee thereof.

"Borrower" has the meaning specified in the introductory paragraph hereof.

"Business Day" means each day that is both (a) a Caracas Business Day and (b) a New York Business Day; provided that, in the event that there are more than three consecutive days that are Unscheduled Holidays, the day immediately following the third Unscheduled Holiday that would have been a Business Day but for such Unscheduled Holiday, and each consecutive Unscheduled Holiday thereafter (if any), shall, notwithstanding such Unscheduled Holidays, constitute a Business Day hereunder.

"Caracas Business Day" shall mean any day other than a Saturday, Sunday or day on which banks are authorized or required by law to close in Caracas, Venezuela.

"Change in Law" means the occurrence, after the Signing Date, of any of the following: (a) the adoption or taking effect of any law, rule, regulation or treaty, (b) any change in any law, rule, regulation or treaty or in the administration, interpretation or application thereof by any Governmental Authority or (c) compliance by any Lender with any request, guideline or directive (whether or not having the force of law) of any Governmental Authority made or issued after the Signing Date.

"Change of Control" means any of the following:

(a)      the failure at any time of Venezuela to (i) legally and beneficially own and control, directly or indirectly, 100% of the issued and outstanding Equity Interests of the Borrower or (ii) have the ability to elect (and to have actually elected) and Control all of the members of the Board of Directors of the Borrower; or

(b)      the failure at any time of the Borrower to (i) legally and beneficially own and control, directly or indirectly, 100% of the issued and outstanding Equity Interests of the

- 2 -



Guarantor or (ii) have the ability to elect (and to have actually elected) and Control all of the members of the Board of Directors of the Guarantor.

"Charges" has the meaning specified in Section 11.16.

"Citgo Group" means CITGO Petroleum Corporation and its Subsidiaries.

"Commercial Contract" means the Blanket Purchase Agreement 4620004964 (BU00) & 4620004965 (BE00), dated as of November 7, 2016, by and between the Purchaser, duly represented in certain aspects of the implementation of the Commercial Contract by PDVSA Services, Inc., acting as procurement agent on behalf of and for the account of the Purchaser, and the Seller.

"Commitment" means, with respect to each Lender, the amount set forth in Part 1 of Schedule 2.01 under the heading "Commitment" opposite such Lender's name in respect of the Loans, or in the Assignment Agreement pursuant to which such Lender purchased and assumed its Assigned Interest (as defined in the respective Assignment Agreement), as applicable, as such amount may be reduced or increased from time to time pursuant to assignments by or to such Lender in accordance with Section 11.05.

"Control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ownership of voting securities, by contract or otherwise, and the term "Controlled" shall have a meaning correlative thereto.

"Covered Purchase Orders" means the covered purchase orders to which the Commercial Contract applies, including those that are identified in Exhibit A.

"Default" means any event or condition that, with the giving of any notice, the lapse of time, or both, would be an Event of Default.

"Default Rate" means the Interest Rate plus 2.00% per annum.

"Defaulting Lender" means, at any time, a Lender with respect to whom (a) such Lender or its Parent Company is insolvent, or is generally unable to pay its debts as they become due, or admits in writing its inability to pay its debts as they become due, or makes a general assignment for the benefit of its creditors or (b) such Lender or its Parent Company is the subject of a bankruptcy, insolvency, reorganization, liquidation or similar proceeding, or a receiver, trustee, conservator, intervenor or sequestrator or the like has been appointed for such Lender or its Parent Company, or such Lender or its Parent Company has taken any action in furtherance of or indicating its consent to or acquiescence in any such proceeding or appointment.

"Designated Person" means a Person:

     (a)    listed in the annex to, or otherwise targeted by the provisions of, the Executive Order;



      (b)    named as a "Specially Designated National and *Blocked Person*" *on the* most current list published by OFAC at its official website or any replacement website or other replacement official publication of such list;

      (c)    to the best of any Loan Party's knowledge, with which any Loan Party is prohibited from dealing or otherwise engaging in any transaction by any Economic Sanctions Laws; or

      (d)    owned (meaning 50% or greater ownership interest) or otherwise (directly or indirectly) controlled by a person identified in (a)-(c) above.

"Disbursement" has the meaning specified in Section 2.01(a).

"Disbursement Amount" has the meaning specified in Section 2.01(b).

"Disbursement Date" means, with respect to a Loan, the date on which the Disbursement constituting such Loan is made, which date, with respect to the first Disbursement, shall be December 29, 2016, and with respect to the second, third and fourth Disbursements shall be each one of the dates indicated as Disbursement Dates in Part 2 of Schedule 2.01 hereto; provided, however, if any such date is not a Business Day, then such Disbursement Date shall automatically be adjusted to be the first Business Day occurring after such date.

"Dollar", "US$" and "$" means lawful money of the United States.

"Economic Sanctions Laws" shall mean the Executive Order, the International Emergency Economic Powers Act (50 U.S.C. §§ 1701 et seq.), the Trading with the Enemy Act (50 U.S.C. App. §§ 1 et seq.), any other law or regulation promulgated thereunder from time to time and administered by OFAC, the United States State Department, the United States Department of Commerce or the United States Department of the Treasury, and any similar law enacted in the United States after the date of this Agreement, in each case as the same may be amended from time to time.

"Effective Date" means the date on which the Agent confirms in writing (through any means of communication in written form, including through e-mail communication) to the Borrower, the Guarantor and the Lender party hereto as of the Signing Date, that all of the conditions precedent specified in Section 4.01 have been satisfied (or waived) by each such Lender. For purposes of confirming the occurrence of the Effective Date, the Agent commits to provide the confirmation in writing referenced here promptly upon confirming the satisfaction (or waiver) of such conditions precedent, through any means of communication in written form, including through an e-mail communication, to be sent by any of the President, Vice President, Secretary, Assistant Secretary, Treasurer, Assistant Treasurer or in-house counsel of the Agent acting alone. "Eligible Institution" means any financial institution or any branch thereof (a) eligible for the then current lowest statutory rate of Venezuelan income Tax withholding from time to time generally applicable to non-Venezuelan financial institutions, or (b) in the event a statutory rate described in clause (a) does not generally apply, organized under the laws of a country subject to a double-taxation treaty with Venezuela.



"Environmental Laws" means all former, current and future Venezuelan national, state, local and foreign laws (including common law), treaties, regulations, rules, ordinances, codes, decrees, judgments, directives, orders (including consent orders), and agreements in each case, relating to protection of the environment, natural resources, human health and safety or the presence, Release of, or exposure to, Hazardous Materials, or the generation, manufacture, processing, distribution, use, treatment, storage, transport, recycling or handling of, or the arrangement for such activities with respect to, Hazardous Materials.

"Environmental Liability" means all liabilities, obligations, damages, losses, claims, actions, suits, judgments, orders, fines, penalties, fees, expenses and costs (including administrative oversight costs, natural resource damages and remediation costs), whether contingent or otherwise, arising out of or relating to (a) compliance or non-compliance with any Environmental Law, (b) the generation, use, handling, transportation, storage, treatment or disposal of any Hazardous Materials, (c) exposure to any Hazardous Materials, (d) the Release of any Hazardous Materials or (e) any contract, agreement or other consensual arrangement pursuant to which liability is assumed or imposed with respect to any of the foregoing.

"Equity Interests" means shares of capital stock, partnership interests, membership interests in a limited liability company, beneficial interests in a trust or other equity interests in any Person, and any option, warrant or other right entitling the holder thereof to purchase or otherwise acquire any such equity interest.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended, or any successor statute or statutes thereto.

"ERISA Affiliate" means any trade or business (whether or not incorporated) that, together with the Borrower, is treated as a single employer under Section 414(b) or (c) of the Internal Revenue Code or, solely for the purposes of Section 302 of ERISA and Section 412 of the Internal Revenue Code, is treated as a single employer under Section 414 of the Internal Revenue Code.

"Event of Default" has the meaning specified in Section 8.01.

"Excluded Taxes" means, (a) with respect to the Agent, any Lender or any other recipient of any payment to be made by or on account of any Obligation hereunder, (i) income or franchise Taxes imposed on (or measured by) its net income by the United States, or by the jurisdiction under the laws of which such recipient is organized or in which its principal office is located or, in the case of any Lender, in which its applicable Lending Office is located, and (ii) any branch profits Taxes imposed by the United States or any similar Tax imposed by any other jurisdiction described in clause (i) above, and (b) any portion of withholding Tax, if any, that exceeds 4.95% (or the then current lowest rate of Venezuelan income Tax withholding from time to time generally applicable to an Eligible Institution) of the amount subject to the withholding Tax.

"Executive Order" means the United States Executive Order No. 13224 on Blocking Property and Prohibiting Transactions with Persons who Commit, Threaten to Commit, or Support Terrorism. "FATCA" means (a) Sections 1471 through 1474 of the Internal Revenue Code, as of the date of this Agreement (or any amended or successor version that is substantively

- 5 -



comparable and not materially more onerous to comply with), any current or future regulations or official interpretations thereof and any agreement entered into pursuant to Section 1471(b)(1) of the Internal Revenue Code, (b) any treaty, law or regulation of any other jurisdiction, or relating to an intergovernmental agreement between the US and any other jurisdiction, which (in either case) facilitates the implementation of any law or regulation referred to in (a) above, or (c) any agreement pursuant to the implementation of any treaty, law or regulation referred to in paragraphs (a) or (b) above with the US Internal Revenue Service, the US government or any governmental or taxation authority in any other jurisdiction.

"Federal Reserve Board" means the Board of Governors of the Federal Reserve System of the United States.

"First Currency" has the meaning specified in Section 11.03(d).

"Governmental Authority" means any federal, national, state or local court or governmental agency, ministry, authority, instrumentality or regulatory body of any jurisdiction or territory.  For the avoidance of doubt, none of the Loan Parties or any of their respective Subsidiaries, shall constitute a Governmental Authority for the purposes of this Agreement.

"Group" means the Borrower and its Subsidiaries.

"Guarantee" means the guarantee of the Obligations of the Borrower made by the Guarantor pursuant to Article X.

"Guarantee Obligations" of or by any Person shall mean any obligation, contingent or otherwise, of such Person guaranteeing or having the economic effect of guaranteeing any Indebtedness or other obligation of any other Person (the "primary obligor") in any manner, whether directly or indirectly, and including any obligation of such Person, direct or indirect, (a) to purchase or pay (or advance or supply funds for the purchase or payment of) such Indebtedness or other obligation or to purchase (or to advance or supply funds for the purchase of) any security for the payment of such Indebtedness or other obligation, (b) to purchase or lease property, securities or services for the purpose of assuring the owner of such Indebtedness or other obligation of the payment of such Indebtedness or other obligation or (c) to maintain working capital, equity capital or any other financial statement condition or liquidity of the primary obligor so as to enable the primary obligor to pay such Indebtedness or other obligation; *provided*, *however*, that the term "Guarantee Obligations" shall not include endorsements for collection or deposit in the ordinary course of business.

"Guaranteed Obligations" has the meaning specified in Section 10.01.

"Guarantor" has the meaning specified in the introductory paragraph hereof.

"Hazardous Materials" means (a) any petroleum products or byproducts and all other hydrocarbons, coal ash, radon gas, asbestos, urea formaldehyde foam insulation, polychlorinated biphenyls, chlorofluorocarbons and all other ozone-depleting substances and (b) any chemical, material, substance or waste that is prohibited, limited or regulated by or pursuant to any Environmental Law.

- 6 -



INDEX NO. 651006/2019

RECEIVED NYSCEF: 02/15/2019

Case 1:19-cv-02523-PKC   Document 26-4   Filed 04/11/19   Page 15 of 73

"Hedging Agreement" means any interest rate protection agreement, foreign currency exchange agreement, commodity price protection agreement, credit default swap agreement or other interest or currency exchange rate or commodity price or credit risk hedging arrangement.

"IFRS" means the International Financial Reporting Standards promulgated from time to time by the International Accounting Standards Board or any successor institution ("IASB") (which includes standards and interpretations approved by the IASB and International Accounting Standards issued under its previous constitutions), together with its pronouncements thereon from time to time, to the extent applicable to the relevant financial statements.

"Impaired Agent" means the Agent at any time when:

      (a)     it has failed to make (or has notified a Party that it will not make) a payment required to be made by it under this Agreement by the due date for payment;

      (b)     the Agent otherwise rescinds or repudiates this Agreement;

      (c)     (if the Agent is also a Lender) it is a Defaulting Lender; or

      (d)     the Agent is insolvent;

unless, in the case of paragraph (a) above:

      (i)     its failure to pay is caused by administrative or technical error and payment is made within three Business Days of its due date: or

      (ii)     the Agent is disputing in good faith whether it is contractually obliged to make the payment in question.

"Indebtedness" means any obligation (whether present or future, actual or contingent and including any Guarantee Obligation) for the payment or repayment of money which has been borrowed or raised, excluding, for the avoidance of doubt, the issuance of Equity Interests constituting common stock or ordinary shares.

"Indemnified Taxes" means Taxes other than Excluded Taxes.

"Indemnitee" has the meaning specified in Section 11.03(c).

"Ineligible Transferee" means any Person that is (a) a Venezuelan Person, (b) a Venezuelan financial institution, (c) a Venezuelan branch of a non-Venezuelan financial institution, (d) a state, political subdivision or government, or any agency, instrumentality, ministry, department or other authority (including the central bank) thereof (a "Sovereign"), (e) established by treaty or other arrangement between two or more Sovereigns and includes, without limiting the foregoing, the International Monetary Fund, European Central Bank, International Bank for Reconstruction and Development, European Bank for Reconstruction and Development and International Finance Corporation or (f) a Designated Person.

"Information" has the meaning specified in Section 11.06.

- 7 -



Case 1:19-cv-02523-PKC   Document 26-4   Filed 04/11/19   Page 16 of 73

"Interest Period" for a Loan means initially the period, in the case of the first Disbursement hereunder, from the respective Disbursement Date of that Disbursement, and, in the case of the second, third and fourth Disbursements, from the date which is 90 days from the respective Disbursement Date of the relevant Disbursement, and until the first Interest Repayment Date with respect to such Loan, and thereafter, each period from the immediately preceding Interest Repayment Date and until the subsequent Interest Repayment Date with respect to such Loan; provided, however, that (i) if an Interest Period would end on a day other than a Business Day, such Interest Period shall be extended to the next succeeding Business Day, and (ii) in no case shall any Interest Period for a Loan end after the Loan Final Maturity Date for such Loan, unless such Loan Final Maturity Date falls on a day other than a Business Day, in which case such Interest Period shall end on the next succeeding Business Day.

"Interest Rate" means, with respect to an Interest Period, 7.50% per annum.

"Interest Repayment Date" means, with a respect to a Loan, a date set forth in Part 3 of Schedule 2.01 hereto as a Repayment Date on which interest is to be paid with respect to such Loan; provided, however, that if an Interest Repayment Date would fall on a day other than a Business Day, such Interest Repayment Date shall automatically be adjusted to be the first Business Day occurring after such date.

"Internal Revenue Code" means the United States Internal Revenue Code of 1986, as amended.

"Lender" and "Lenders" have the meanings specified in the introductory paragraph hereof.

"Lending Office" means, the office of a Lender set forth in Part 1 of Schedule 2.01, or such other office or offices as such Lender may from time to time specify to the Agent and the Borrower by written notice in accordance with the terms hereof as the office by which such Lender's share in the Loan is to be made and/or maintained.

"Lien" means, with respect to any asset, (a) any mortgage, deed of trust, lien, pledge, encumbrance, charge or security interest in or on such asset, (b) the interest of a vendor or a lessor under any conditional sale agreement, capital lease or title retention agreement (or any financing lease having substantially the same economic effect as any of the foregoing) relating to such asset and (c) in the case of securities, any purchase option, call or similar right of a third party with respect to such securities.

"Loan" has the meaning specified in Section 2.01.

"Loan Final Maturity Date" means, with respect to a Loan, the date falling the number of days after the respective Disbursement Date of the respective Loan, as such number of days is set forth in Part 2 of Schedule 2.01 hereto as "Number of Days to Loan Final Maturity Date".

"Loan Parties" means, collectively, the Borrower and the Guarantor and "Loan Party" means each of them.



"Majority Lenders" means a Lender or Lenders whose Commitments aggregate more than 66⅔ per cent. of the total Commitments or, if the total Commitments have been reduced to zero, whose outstanding Loans aggregate more than 66⅔ per cent. of all of the outstanding Loans.

"Material Adverse Effect" means (a) a materially adverse effect on the business, assets, liabilities, operations or condition (financial or otherwise) of the Borrower, the Guarantor and their respective Subsidiaries, taken as a whole, which has resulted, or could reasonably be expected to result, without the occurrence of any other event or effect, in an event described in clause (b) or (c) of this definition, (b) a material impairment of the ability of any Loan Party to perform any of its obligations under this Agreement or (c) a material impairment of the rights and remedies of or benefits available to the Agent or the Lenders under this Agreement.

"Maximum Rate" has the meaning specified in Section 11.16.

"Multiemployer Plan" means a multiemployer plan as defined in Section 4001(a)(3) of ERISA.

"New York Business Day" means any day other than a Saturday, Sunday or other day on which commercial banks in New York City are authorized or required by law to close.

"Note Agreements" means any and all Note Agreements, whether presently in effect or hereafter effective, originally entered into or currently in effect between, *inter alia*, the Borrower, as issuer, and GE Capital EFS Financing, Inc., in any capacity, and "Note Agreement" means each such agreement. As of the Signing Date, the Note Agreements are:

(a)    the Note Agreement, dated as of March 27, 2015, among the Borrower, as issuer, the Guarantor, as guarantor, GE Capital EFS Financing, Inc. (as successor to General Electric Capital Corporation), as initial noteholder and administrative agent, and Union Capital Group, as lead arranger; and

(b)    the Note Agreement, dated as of May 13, 2016, among the Borrower, as issuer, the Guarantor, as guarantor, and GE Capital EFS Financing, Inc., as initial noteholder and administrative agent.

"Notes" means the initial notes and any promissory note or notes issued in exchange or replacement thereof pursuant to any of the Note Agreements.

"Obligated Party" has the meaning specified in Section 10.02.

"Obligations" means all obligations of every nature of each Loan Party from time to time owed to the Agent and/or the Lenders or any of them, under this Agreement, whether for principal, interest, fees, expenses, indemnification or otherwise.

"OFAC" means the Office of Foreign Assets Control of the United States Department of the Treasury (or any successor thereto).



Case 1:19-cv-02523-PKC   Document 26-4   Filed 04/11/19   Page 18 of 73

"Other Taxes" means any and all present or future stamp or documentary Taxes or any other excise or property Taxes, charges or similar levies arising from any payment made under this Agreement or from the execution, delivery or enforcement of, or otherwise with respect to, this Agreement, other than Excluded Taxes.

"Parent Company" means, with respect to a Lender, the bank holding company (as defined in Federal Reserve Board Regulation Y), if any, of such Lender and/or any Person owning, beneficially or of record, directly or indirectly, a majority of the shares of such Lender.

"Party" means any party to this Agreement.

"PBGC" means the Pension Benefit Guaranty Corporation.

"Permitted Liens" means the following types of Liens:

(a)    Liens for Taxes, assessments or governmental charges or claims either (i) not delinquent (taking into account all available extensions) or (ii) contested in good faith by appropriate proceedings and as to which a Loan Party or any of its Subsidiaries shall have set aside on its books such reserves to the extent required pursuant to IFRS;

(b)    statutory Liens of landlords and Liens of carriers, warehousemen, mechanics, suppliers, materialmen, repairmen and other Liens imposed by law or pursuant to customary reservations or retentions of title incurred in the ordinary course of business for sums not yet delinquent or being contested in good faith, if such reserve or other appropriate provision, if any, to the extent required by IFRS shall have been made in respect thereof;

(c)    Liens incurred or deposits made in the ordinary course of business in connection with workers' compensation, unemployment insurance and other types of social security, or to secure public or statutory obligations, the performance of tenders, statutory obligations, surety and/or appeal bonds, bids, leases, government contracts, performance and return-of-money bonds and other similar obligations (exclusive of obligations for the payment of borrowed money), including any Lien securing letters of credit issued in the ordinary course of business in connection therewith;

(d)    any judgment Lien not giving rise to an Event of Default;

(e)    easements, rights-of-way, zoning restrictions and other similar charges or encumbrances in respect of real property not interfering in any material respect with the ordinary conduct of the business of a Loan Party or any of its Subsidiaries;

(f)    any interest or title of a lessor under any capitalized lease obligation; provided that such Liens do not extend to any property or assets which are not leased property subject to such capitalized lease obligation;

(g)    Liens granted upon or with respect to any assets hereafter acquired by a Loan Party or any of its Subsidiaries to secure the acquisition costs of such assets or to secure Indebtedness incurred solely for the purpose of financing the acquisition of such assets, including any Lien existing at the time of the acquisition of such assets as long as the maximum amount so



secured shall not exceed the aggregate acquisition costs of all such assets or the aggregate Indebtedness incurred solely for the acquisition of such assets, as the case may be;

(h)     Liens upon specific items of inventory or other goods and proceeds of any Person securing such Person's obligations in respect of bankers' acceptances issued or created for the account of such Person to facilitate the purchase, shipment or storage of such inventory or other goods;

(i)     Liens securing reimbursement obligations with respect to commercial letters of credit which encumber documents and other property relating to such letters of credit and products and proceeds thereof;

(j)     Liens arising in the ordinary course of business in connection with Indebtedness maturing not more than one year after the date on which such Indebtedness was originally incurred and which are related to the financing of export, import or other trade transactions;

(k)     Liens encumbering deposits made to secure obligations arising from statutory, regulatory, contractual, or warranty requirements of a Loan Party or any of its Subsidiaries, including rights of offset and setoff;

(l)     Liens securing Hedging Agreements otherwise permitted under this Agreement;

(m)     Liens existing on any asset or on any stock of any Subsidiary of a Loan Party prior to the acquisition thereof by such Loan Party or any of such Loan Party's Subsidiaries as long as such Lien is not created in anticipation of such acquisition;

(n)     Liens existing as of the Signing Date;

(o)     Liens securing any unsubordinated senior indebtedness of a Loan Party or any of its Subsidiaries;

(p)     Liens in favor of a Loan Party or any of its Subsidiaries;

(q)     Liens on property of a Person existing at the time such Person is merged with or into or consolidated with a Loan Party or any of its Subsidiaries or becomes a Subsidiary thereof; provided that such Liens were in existence prior to the contemplation of such merger or consolidation and do not extend to any other assets owned by such Loan Party or such Subsidiary;

(r)     Liens in favor of customs and revenue authorities arising as a matter of law to secure payment of customs duties in connection with the importation of goods or other Liens on inventory and goods to facilitate the purchase, shipment, or storage of such inventory or goods;

(s)     Liens on assets that are the subject of a direct or indirect arrangement relating to property now owned or hereafter acquired whereby a Loan Party or any of its

- 11 -



Subsidiaries transfers such property to another Person and such Loan Party or such Subsidiary leases it from such Person;

(t)     Liens arising by operation of law;

(u)     Liens arising solely by virtue of any statutory or common law provisions relating to banker's Liens, rights of setoff or similar rights and remedies as to deposit accounts or other funds maintained with a depositary institution;

(v)     Liens on the receivables or inventory of a Loan Party or any of its Subsidiaries securing obligations under or in connection with any lines of credit or working capital facilities;

(w)     leases, licenses, subleases or sublicenses granted to others in the ordinary course of business that do not interfere in any material respect with the business of a Loan Party and its Subsidiaries;

(x)     Liens in favor of the Venezuelan government or any agency or instrumentality thereof to secure payments under any agreement entered into between such entity and a Loan Party or any of its Subsidiaries;

(y)     Liens to secure obligations of a Loan Party or any of its Subsidiaries under agreements that provide for indemnification, adjustment of purchase price or similar obligations, in each case, incurred in connection with the disposition of any business, assets or Subsidiary; provided that the maximum aggregate liability in respect of all such Liens will at no time exceed the gross proceeds actually received by such Loan Party and its Subsidiaries in connection with such disposition;

(z)     Liens over any Qualifying Asset relating to a project financed by, and securing Indebtedness incurred in connection with, the Project Financing of such project by the Borrower, any of its Subsidiaries or any consortium or other venture in which the Borrower has any ownership or similar interest; and

(aa)     Liens in respect of Indebtedness the principal amount of which in the aggregate, together with all Liens not otherwise qualifying as a Loan Party's Permitted Liens pursuant to this definition, does not exceed 15% of the Borrower's consolidated total assets (as determined in accordance with IFRS) at any date as at which the Borrower's balance sheet is prepared and published as provided herein.

"Person" means an individual, partnership, corporation, limited partnership, company, limited liability company, unincorporated organization, trust or joint venture, or a Governmental Authority or political subdivision thereof or other entity.

"Plan" means any employee pension benefit plan (other than a Multiemployer Plan) subject to the provisions of Title IV of ERISA or Section 412 of the Internal Revenue Code or Section 307 of ERISA, and in respect of which a Loan Party or any ERISA Affiliate is (or, if such plan were terminated, would under Section 4069 of ERISA be deemed to be) an "employer" as defined in Section 3(5) of ERISA.

- 12 -



"Principal Repayment Date" means, with respect to a Loan, a date set forth in Part 3 of Schedule 2.01 hereto as a Repayment Date on which principal is to be repaid with respect to such Loan; provided, however, that if a Principal Repayment Date would fall on a day other than a Business Day, such Principal Repayment Date shall automatically be adjusted to be the first Business Day occurring after such date.

"Process Agent" means Corporation Service Company, having its offices on the date hereof at 1180 Avenue of the Americas, Suite 210, New York, NY 10036-8401.

"Project Financing" of any project shall mean the incurrence of Indebtedness relating to the exploration, development, expansion, renovation, upgrade or other modification or construction of such project pursuant to which the providers of such Indebtedness or any trustee or other intermediary on their behalf or beneficiaries designated by any such provider, trustee or other intermediary are granted security over one or more Qualifying Assets relating to such project for repayment of principal, premium and interest or any other amount in respect of such Indebtedness.

"Purchaser" has the meaning specified in the recitals hereof.

"Qualifying Asset" in relation to any Project Financing shall mean:

(a)     any concession, authorization or other legal right granted by any Governmental Authority to the Borrower or any of its Subsidiaries, or any consortium or other venture in which the Borrower or any of its Subsidiaries has any ownership or other similar interest;

(b)     any drilling or other rig, any drilling or production platform, pipeline, marine vessel, vehicle or other equipment or any refinery, oil or gas field, processing plant, real property (whether leased or owned), right of way or plant or other fixtures or equipment;

(c)     any revenues or claims that arise from the operation, failure to meet specifications, failure to complete, exploitation, sale, loss or damage to, such concession, authorization or other legal right or such drilling or other rig, drilling or production platform, pipeline, marine vessel, vehicle or other equipment or refinery, oil or gas field, processing plant, real property, right of way, plant or other fixtures or equipment or any contract or agreement relating to any of the foregoing or the project financing of any of the foregoing (including insurance policies, credit support arrangements and other similar contracts) or any rights under any performance bond, letter of credit or similar instrument issued in connection therewith;

(d)     any oil, gas, petrochemical or other hydrocarbon-based products produced or processed by such project, including any receivables or contract rights arising therefrom or relating thereto and any such product (and such receivables or contract rights) produced or processed by other projects, fields or assets to which the lenders providing the project financing required, as a condition therefore, recourse as security in addition to that produced or processed by such project; and

(e)     shares, rights or other ownership interest in, and any subordinated debt rights owing to the Borrower by, a special purpose company or vehicle formed solely for the



development of a project, and whose principal assets and business are constituted by such project and whose liabilities solely relate to such project.

"Recovered Amount" has the meaning specified in Section 2.09.

"Recovering Lender" has the meaning specified in Section 2.09.

"Redistributed Amount" has the meaning specified in Section 2.12(a).

"Register" has the meaning specified in Section 11.05(g).

"Related Parties" means, with respect to any Person, such Person's Affiliates and the partners, directors, trustees, officers, employees, agents and advisors of such Person and of such Person's Affiliates.

"Release" shall mean any release, spill, emission, leaking, dumping, injection, pouring, deposit, disposal, discharge, dispersal, leaching or migration into or through the environment or within or upon any building, structure, facility or fixture.

"Repayment Date" means, with respect to a Loan, the dates set forth as Repayment Dates with respect to such Loan in Part 3 of Schedule 2.01 hereto; provided, however, that if a Repayment Date would fall on a day other than a Business Day, such Repayment Date shall automatically be adjusted to be the first Business Day occurring after such date.

"Reportable Event" means any of the events set forth in Section 4043(c) of ERISA or the regulations thereunder, with respect to a Plan as to which the PBGC has not by regulation waived the requirement of Section 4043(a) of ERISA that it be notified within 30 days of the occurrence of that event.  However, with respect to any Plan, a failure to meet the minimum funding standard of Section 412 of the Internal Revenue Code or Section 302 of ERISA shall be a reportable event for the purposes of this definition regardless of the issuance of any waiver.

"Reserved Payments" has the meaning specified in Section 11.15.

"Second Currency" has the meaning specified in Section 11.03(d).

"Securities Act" means the Securities Act of 1933, as amended, and the rules and regulations of the U.S. Securities and Exchange Commission promulgated thereunder.

"Seller" has the meaning specified in the recitals hereof.

"Sharing Lenders" has the meaning specified in Section 2.10.

"Sharing Payment" has the meaning specified in Section 2.09(c).

"Significant Subsidiary" means a subsidiary of any Loan Party constituting a "Significant Subsidiary" of the company in accordance with Rule 1-02(w) of Regulation S-X under the Securities Act.

"Signing Date" means the date of this Agreement.

- 14 -



"Subsidiary" means, with respect to any Person (herein referred to as the "parent"), any corporation, partnership, limited liability company, association or other business entity (a) of which securities or other ownership interests representing more than 50% of the equity or more than 50% of the ordinary voting power or more than 50% of the general partnership interests are, at the time any determination is being made, owned, Controlled or held, or (b) that is, at the time any determination is made, otherwise Controlled, by the parent or one or more subsidiaries of the parent or by the parent and one or more subsidiaries of the parent.

"Sum" has the meaning specified in Section 11.03(d)(i).

"Taxes" means any and all present or future taxes, levies, imposts, duties, deductions, charges or withholdings imposed by any Governmental Authority.

"Threshold Amount" means, in respect of any Event of Default, the lesser of (a) $100,000,000 or (b) any lower threshold amount set out in any Indebtedness of the Borrower, the Guarantor or any of the Significant Subsidiaries in respect of an analogous event.

"Transaction Documents" means this Agreement, the Commercial Contract and the Covered Purchase Orders.

"Transfer Date" means, in relation to an assignment, the Effective Date (as defined in the respective Assignment Agreement) of that assignment.

"Unfunded Vested Liability" means, relative to any Plan, including any Multiemployer Plan, at any time, the excess (if any) of (a) the present value of all vested nonforfeitable benefits under such Plan or such Multiemployer Plan, as the case may be, over (b) the fair market value of all Plan assets or Multiemployer Plan assets, as the case may be, allocable to such benefits, all determined as of the then most recent valuation date for such Plan or such Multiemployer Plan, as the case may be, but only to the extent that such excess represents a potential liability of a Loan Party to the PBGC, such Plan or such Multiemployer Plan under Title IV of ERISA.

"United States" and "U.S." mean the United States of America.

"Unscheduled Holiday" shall mean a day that is not a Caracas Business Day and with respect to which the market was not made aware of such fact (by means of a public announcement or other publicly available information) until a time later than 9:00 a.m. local time in Caracas five Caracas Business Days prior to such Unscheduled Holiday.

"USA PATRIOT Act" means the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (Title II of Pub. L. No. 107-56 (signed into law October 26, 2001)), as amended.

"Venezuela" means the Bolivarian Republic of Venezuela.

"Welfare Plan" means a "welfare plan" as such term is defined in Section 3(1) of ERISA.

1.02    **Other Interpretive Provisions.**



(a)     With reference to this Agreement, unless otherwise specified herein: The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined.   Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms.   The words "include," "includes" and "including" shall be deemed to be followed by the phrase "without limitation."   The word "will" shall be construed to have the same meaning and effect as the word "shall."   Unless the context requires otherwise, (i) any definition of or reference to any agreement, instrument or other document shall be construed as referring to such agreement, instrument or other document as from time to time amended, supplemented or otherwise modified (subject to any restrictions on such amendments, supplements or modifications set forth herein), (ii) any reference herein to any Person shall be construed to include such Person's successors and permitted assigns, (iii) the words "herein," "hereof" and "hereunder," and words of similar import when used in this Agreement, shall be construed to refer to this Agreement in its entirety and not to any particular provision thereof, (iv) all references in this Agreement to Articles, Sections, Exhibits and Schedules shall be construed to refer to Articles and Sections of, and Exhibits and Schedules to, this Agreement, (v) any reference to any law shall include all statutory and regulatory provisions consolidating, amending, replacing or interpreting such law and any reference to any law or regulation shall, unless otherwise specified, refer to such law or regulation as amended, modified or supplemented from time to time, (vi) the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights and (vii) all terms of an accounting or financial nature shall be construed in accordance with IFRS, as in effect on the Signing Date and consistent with financial statements delivered pursuant to Section 5.05.

(b)     In the computation of periods of time from a specified date to a later specified date, the word "from" means "from and including;" the words "to" and "until" each mean "to but excluding;" and the word "through" means "to and including."

(c)     Article, Section and subsection headings herein are included for convenience of reference only and shall not affect the interpretation of this Agreement.

(d)     This Agreement shall be considered, for all legal purposes, to be the "Financing Agreement" referenced in the Commercial Contract. Consequently, any and all references made in the Commercial Contract to said "Financing Agreement" shall be understood to refer to this Agreement.

1.03     **Accounting Terms.**   Except as otherwise provided in this Agreement, all accounting terms used herein shall be interpreted, all accounting determinations hereunder shall be made, and all financial statements required to be delivered hereunder shall be prepared on a consolidated basis in accordance with, IFRS, applied on a basis consistent (except for changes confirmed by the independent accountants of the relevant person) with the most recent audited financial statements of the Borrower delivered to the Lenders on or prior to the Signing Date.



## ARTICLE II

## COMMITMENT AND LOANS

2.01    **Loans.**

(a)    Subject to the terms and conditions of this Agreement and in reliance upon the representations and warranties of the Loan Parties set forth herein, the Lenders hereby agree, severally and not jointly, to make disbursements (each, a "Disbursement" and, collectively, the "Disbursements", and each such Disbursement, when made, constituting a "Loan" in the principal amount actually disbursed by the Lenders), with four such Disbursements to be made on the applicable Disbursement Dates and in the applicable Disbursement Amounts, provided, however that the aggregate principal amount of the Disbursements shall not exceed the Commitment. Any amount borrowed under this Section 2.01 and subsequently repaid or prepaid may not be reborrowed.

(b)    (i)    The amount of each Disbursement (the "Disbursement Amount") shall be as follows: (A) the amount of the first and the second Disbursements shall be the respective amount identified as such and set forth in Part 2 of Schedule 2.01 hereto; and (B) the amount of the third and fourth Disbursements shall be determined by the Seller and set forth in a notice (a "Disbursement Notice") completed and signed by an authorized officer of the Seller, delivered by the Seller to the Agent, the Purchaser and the Borrower on or before the day which is five (5) Business Days prior to the relevant Disbursement Date. The Disbursement Amount of the third and fourth Disbursements shall be the aggregate value of the equipment and spare parts (A) already delivered by the Seller to the Purchaser and not intended to be paid for with the proceeds of a prior Disbursement hereunder, plus (B) the aggregate value of the equipment and spare parts anticipated to be delivered by the Seller to the Purchaser prior to the end of the calendar quarter in which the Disbursement Date occurs and not intended to be paid for with the proceeds of a prior Disbursement hereunder, in each case in accordance with the Commercial Contract and as covered by Covered Purchase Orders; provided, however that the Disbursement Amount with respect to the third and fourth Disbursements shall not exceed the maximum Disbursement Amount set forth under the heading "Maximum Disbursement Amount" opposite such Disbursement in Schedule 2.01 hereto; and provided, further, that if any prior Disbursement was in an amount less than such Maximum Disbursement Amount, the Disbursement Amount for subsequent Disbursements may be increased such that the aggregate amount of the Disbursements made hereunder shall not, on any Disbursement Date, exceed the amount set forth under the heading "Maximum Aggregate Disbursement" opposite such Disbursement Date in Schedule 2.01 hereto.

(ii)    If the Seller fails to deliver to the Purchaser the equipment and spare parts to be paid for with the proceeds of the second, third or fourth Disbursements in accordance with the Commercial Contract and the Covered Purchase Orders, for reasons attributable to the Seller, by the beginning of the Interest Period applicable to the first Interest Payment Date of the respective Disbursement, then: (a) the amount of the respective Loan payable by the Borrower hereunder with respect to the respective Disbursement shall be reduced by the amount of the value in Dollars of the equipment or spare parts not so delivered, and (b) the Borrower shall be released from the obligation to repay to the Lenders such amount of the

- 17 -

value in Dollars of the equipment or spare parts not so delivered and which reduced the amount of the Loan with respect to such Disbursement. The Seller agrees to pay to the Lenders, as a separate and distinct obligation under this Agreement in accordance with the terms and provisions hereunder, the amount in Dollars corresponding to the reduction of the Disbursement Amount of the respective Disbursement as per the immediately preceding sentence on this Section 2.01(b)(ii), provided, however, that any failure by the Seller to make such payment shall not affect the amounts to be repaid by the Borrower under this Agreement.

        (c)      Each Disbursement shall be made by the Lenders directly to the Seller, by way of transfer of funds to the account designated by the Seller, and notified to the Lenders, the Borrower and the Purchaser as the account for receipt of such Disbursements. Solely for this purpose, the Borrower hereby irrevocably instructs the Lenders to make each Disbursement to the Seller.

        (d)      Each Disbursement made by the Lenders directly to the Seller under this Agreement shall be deemed to be a payment and discharge of the current and/or future payment obligations (as applicable) of the Purchaser to the Seller under the Commercial Contract and the Covered Purchase Orders, in the amount of the respective Disbursement.

        (e)      The commitment to make Loans and Disbursements under this Agreement shall commence on the date on which the conditions set forth in Section 4.01 are satisfied or waived, and shall terminate immediately and without further action on the earlier of (i) the date which is one year after the conditions precedent to the first Disbursement have been fulfilled, (ii) the date on which the unutilized portion of the aggregate Commitment is reduced to zero, and (iii) the date on which the Commercial Contract is terminated for any reason whatsoever.

        2.02      **Disbursement of Loans.**  Upon satisfaction or waiver of the applicable conditions set forth in Section 4.01 and Section 4.02, no later than 11:00 a.m. (New York City time) on each Disbursement Date, each Lender shall make available, through its Lending Office to the Agent, such Lender's portion of the applicable Disbursement, in Dollars and in immediately available funds, and the Agent will promptly transfer the aggregate of the amounts so made available by the Lenders, in Dollars and in immediately available funds, to the Seller in accordance with Section 2.01.

        2.03      **Optional Prepayment.**  The Borrower shall have the right to prepay any one or more of the Loans in whole or in part at any time after not less than five (5) Business Days' notice by the Borrower to the Agent. All such prepayments shall be applied in the inverse order of the maturity of the installments of principal due under the applicable Loan or Loans to be prepaid.

        2.04      **Scheduled Repayments.**  With respect to a Loan, the Borrower shall pay to the Agent, for the account of the Lenders, on each applicable Principal Repayment Date, a principal amount equal to one-sixth ($^1/_6$) of the amount of the relevant Loan; provided, however, that on the Loan Final Maturity Date with respect to such Loan, the Borrower shall pay to the Agent, for the account of the Lenders, the principal amount of such Loan outstanding on such date. Each repayment of principal of any Loan and each payment of interest on any Loan received by the Agent, for the account of the Lenders, shall be allocated in the following order:

(a)    first, in or towards payment *pro rata* of any unpaid amount owing to the Agent under this Agreement;

(b)    second, in or towards payment *pro rata* of any accrued interest or fee due but unpaid under this Agreement;

(c)    third, in or towards payment *pro rata* of any principal due but unpaid under this Agreement; and

(d)    fourth, in or towards payment *pro rata* of any other sum due but unpaid under this Agreement.

2.05    **Interest.**

(a)    Interest in respect of the unpaid principal amount of a Loan shall accrue from the Disbursement Date until the Loan Final Maturity Date at the Interest Rate, subject to the provisions of <u>Sections 2.05(b)</u> and <u>2.05(d)</u>.

(b)    Any amount of principal of or interest in respect of a Loan or any other amount payable by the Borrower under this Agreement that is not paid when due (without regard to any applicable grace periods), whether at stated maturity, by acceleration or otherwise, shall thereafter bear interest at an interest rate per annum which is equal to the Default Rate, with such interest to be payable upon demand.

(c)    Interest on a Loan shall be due and payable in arrears, subject to <u>Section 2.05(d)</u> below, on each Interest Repayment Date, each other date on which any payment of principal is made on the Loan and such earlier date on which such interest becomes due and payable (whether by acceleration or otherwise) and shall be paid to the Agent, for the account of the Lenders, in accordance with <u>Section 2.08</u>.  Interest hereunder shall be due and payable in accordance with the terms hereof before as well as after judgment, and before as well as after the commencement of any proceeding under any bankruptcy or insolvency law.

(d)    No interest shall accrue or be payable for the first 90 days of the first Interest Period of each of the second, third and fourth Disbursements.

2.06    **Computation of Interest and Fees.**  All computations of interest and fees shall be made on the basis of a 360-day year and the actual number of days elapsed in the period for which such interest or fee is payable.  Interest shall accrue on each disbursement of a Loan for the day on which such disbursement is made, and shall not accrue on a Loan, or any portion thereof, for the day on which such disbursement of a Loan or such portion is paid.  Each determination by the Agent of an interest rate or fee hereunder shall be conclusive and binding for all purposes, absent manifest error.

2.07    **Evidence of Debt.**

(a)    Each of the Loans shall be evidenced by the Register maintained by the Agent in the ordinary course of business in accordance with <u>Section 11.05(g)</u>.  The Register maintained by the Agent shall be conclusive absent manifest error of the amount of the Loans

made by the Lenders to the Borrower and the interest and payments thereon. Any failure to so record or any error in doing so shall not, however, limit or otherwise affect the obligation of the Borrower hereunder to pay any amount owing with respect to the Obligations.

(b)    In any litigation or arbitration proceedings arising out of or in connection with this Agreement, the entries made in the accounts maintained by a Lender or the Agent are prima facie evidence of the matters to which they relate.

2.08    **Payments Generally**.

(a)    General.  All payments to be made by a Loan Party shall be made without deduction for any counterclaim, defense, recoupment or setoff, including, with respect to any Lender.  All payments of principal, interest and other amounts to be made to the Agent and the Lenders under this Agreement shall be paid to the Agent.  Each payment of principal, interest, fees, indemnities, Taxes, costs and expenses hereunder shall be paid solely and exclusively in Dollars.  Each payment by a Loan Party shall be made in immediately available funds not later than 11:00 a.m. (New York City time) on the date specified herein.  All payments received by the Agent after 11:00 a.m. (New York City time) shall be deemed received on the next succeeding New York Business Day, and any applicable interest or fee shall continue to accrue. Except as otherwise provided herein, if any payment to be made by a Loan Party shall become due and payable on a day other than a Business Day, payment shall be made on the next following Business Day, and such extension of time shall be reflected in computing interest or fees, as the case may be.

(b)    All amounts received by the Agent by 11:00 a.m. (New York City time) on a Principal Repayment Date or an Interest Repayment Date, shall be immediately made available to the Lenders in accordance with the terms hereof.

(c)    The Agent shall not be responsible for interest on, or make any investment of, any funds held by it under this Agreement.

2.09    **Sharing of Payments by Lenders**.  If a Lender (a "Recovering Lender") receives or recovers any amount from a Loan Party other than in accordance with Section 2.08 (a "Recovered Amount") and applies that amount to a payment due under this Agreement then:

(a)    the Recovering Lender shall, within three Business Days, notify details of the receipt or recovery, to the Agent;

(b)    the Agent shall determine whether the receipt or recovery is in excess of the amount the Recovering Lender would have been paid had the receipt or recovery been received or made by the Agent and distributed in accordance with Section 2.08, without taking account of any Tax which would be imposed on the Agent in relation to the receipt, recovery or distribution; and

(c)    the Recovering Lender shall, within three Business Days of demand by the Agent, pay to the Agent an amount (the "Sharing Payment") equal to such receipt or recovery less any amount which the Agent determines may be retained by the Recovering Lender as its share of any payment to be made, in accordance with the following:

- 20 -

   (i)  If the Agent receives a payment for application against amounts due in respect of this Agreement that is insufficient to discharge all the amounts then due and payable by a Loan Party under this Agreement, the Agent shall apply that payment towards the obligations of a Loan Party under this Agreement in the following order:

    (A)  first, in or towards payment *pro rata* of any unpaid amount owing to the Agent under this Agreement;

    (B)  secondly, in or towards payment *pro rata* of any accrued interest or fee due but unpaid under this Agreement;

    (C)  thirdly, in or towards payment *pro rata* of any principal due but unpaid under this Agreement; and

    (D)  fourthly, in or towards payment *pro rata* of any other sum due but unpaid under this Agreement.

   (ii)  The Agent shall, if so directed by the Majority Lenders, vary the order set out in Sections 2.09(c)(i)(B) to (D) above.

   (iii)  Sections 2.09(c)(i) and 2.09(c)(ii) above will override any appropriation made by a Loan Party.

2.10  **Redistribution of Payments**.  The Agent shall treat the Sharing Payment as if it had been paid by the relevant Loan Party and distribute it between the Lenders (other than the Recovering Lender) (the "Sharing Lenders") in accordance with Section 2.09(c) towards the obligations of such Loan Party to the Sharing Lenders.

2.11  **Recovering Lender's Rights**.  On a distribution by the Agent under Section 2.10 of a payment received by a Recovering Lender from a Loan Party, as between the relevant Loan Party and the Recovering Lender, an amount of the Recovered Amount equal to the Sharing Payment will be treated as not having been paid by such Loan Party.

2.12  **Reversal of Redistribution**.  If any part of the Sharing Payment received or recovered by a Recovering Lender becomes repayable and is repaid by such Recovering Lender, then:

   (a)  each Sharing Lender shall, upon request of the Agent, pay to the Agent for the account of that Recovering Lender an amount equal to the appropriate part of its share of the Sharing Payment (together with an amount as is necessary to reimburse that Recovering Lender for its proportion of any interest on the Sharing Payment which that Recovering Lender is required to pay) (the "Redistributed Amount"); and

   (b)  as between the relevant Loan Party and each relevant Sharing Lender, an amount equal to the relevant Redistributed Amount will be treated as not having been paid by that Loan Party.

2.13  **Exceptions**.

Case 1:19-cv-02523-PKC   Document 26-4   Filed 04/11/19   Page 30 of 73

(a)      Sections 2.09 through this Section 2.13 shall not apply to the extent that the Recovering Lender would not, after making any payment pursuant to such Sections, have a valid and enforceable claim against the relevant Loan Party.

(b)      A Recovering Lender is not obliged to share with any other Lender any amount which the Recovering Lender has received or recovered as a result of taking legal or arbitration proceedings, if:

(i)      it notified the other Lenders of the legal or arbitration proceedings; and

(ii)      the other Lenders had an opportunity to participate in those legal or arbitration proceedings but did not do so as soon as reasonably practicable having received notice and did not take separate legal or arbitration proceedings.

## ARTICLE III

## TAXES, YIELD PROTECTION AND ILLEGALITY

3.01      **Taxes.**

(a)      Payments Free of Taxes.  Any and all payments by or on account of any Obligations of any Loan Party hereunder shall be made free and clear of and without deduction for any Indemnified Taxes or Other Taxes; provided that, if the Borrower or any other Loan Party shall be required to deduct any Indemnified Taxes or Other Taxes from such payments, then (i) the sum payable shall be increased as necessary so that after making all required deductions (including deductions applicable to additional sums payable under this Section) the Agent and each Lender (as the case may be) receives an amount equal to the sum it would have received had no such deductions been made, (ii) the Borrower or such Loan Party shall make such deductions and (iii) the Borrower or such Loan Party shall pay the full amount deducted to the relevant Governmental Authority in accordance with applicable law. Each of the Lenders agrees that, as soon as practicable, it will deliver to the Borrower or any Loan Party, at the address or contact details included in Schedule 11.02, a certificate of tax residency issued by the jurisdiction in which it is tax resident, and upon the Borrower's or any Loan Party's reasonable request, it will provide any additional documentation prescribed by applicable laws as a basis for claiming exemption from or a reduction in withholding tax on any payment due to such Lender under this Agreement. Each Lender further agrees that the Borrower or any Loan Party shall not have any obligation to increase payments as per Article III for any withholdings or deductions that are imposed as a result of the Lender's failure to provide documentation as required by this Article III.

(b)      Payment of Other Taxes by Loan Parties.  Without limiting the provisions of Section 3.01(a), the Borrower shall pay any Other Taxes to the relevant Governmental Authority in accordance with applicable law.

(c)      Indemnification by Loan Parties.  Each Loan Party shall indemnify the Lenders and the Agent, if applicable, within 10 days after written demand therefor, for the full amount of any Indemnified Taxes or Other Taxes (including Indemnified Taxes or Other Taxes

imposed or asserted on or attributable to amounts payable under this Section 3.01), payable or paid by the Lenders (or required to be withheld or deducted from a payment to a Lender) on or with respect to any payment by or on account of any obligation of such Loan Party hereunder and any liability (including reasonable out-of-pocket expenses) arising therefrom or with respect thereto, whether or not such Indemnified Taxes or Other Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority. A certificate setting forth in reasonable detail the basis and the amount of such payment or liability delivered to the Borrower by a Lender or the Agent, as applicable, shall be prima facie evidence of such amount absent manifest error.

(d)    Evidence of Payments. As soon as practicable after any payment of Indemnified Taxes or Other Taxes by a Loan Party to a Governmental Authority but no later than 90 days after payment, such Loan Party shall deliver to the Lenders and, if applicable, the Agent, the original or a copy of either a receipt issued by such Governmental Authority evidencing such payment, a copy of the return reporting such payment (provided that such copy shall be delivered to the applicable Lender within 90 days of filing), or other evidence of such payment reasonably satisfactory to the Lenders and/or the Agent. If a Lender is not an Eligible Institution, notwithstanding any other provision of this Agreement, each Loan Party shall be entitled to deduct and setoff from the payments due to such Lender under this Agreement all amounts that are paid by either of such Loan Parties to a Governmental Authority for Excluded Taxes of the type that are described in clause (b) of the definition of Excluded Taxes set forth in Section 1.01, provided that, in addition to any evidence of payment to a Governmental Authority of Indemnified Taxes or Other Taxes in the preceding sentence, the Borrower also shall deliver to the applicable Lender and, if applicable, the Agent, evidence of any payment to a Governmental Authority of Excluded Taxes, which shall meet the criteria set forth in the preceding sentence with respect to the payment to a Governmental Authority of Indemnified Taxes or Other Taxes.

(e)    Treatment of Certain Refunds. If any Lender determines, in its sole discretion exercised in good faith, that it has received a refund of any Taxes as to which it has been indemnified by a Loan Party or with respect to which a Loan Party has paid additional amounts pursuant to this Section 3.01, it shall pay to such Loan Party an amount equal to such refund (but only to the extent of indemnity payments made, or additional amounts paid, by such Loan Party under this Section 3.01 with respect to the Taxes giving rise to such refund), net of all out-of-pocket expenses of such Lender and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund), provided that each Loan Party, upon the request of any such Lender, agrees to repay the amount paid over to such Loan Party (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) to such Lender in the event such Lender is required to repay such refund to such Governmental Authority. Notwithstanding anything to the contrary in this Section 3.01(e), in no event will any Lender be required to pay any amount to any Loan Party pursuant to this Section 3.01(e) the payment of which would place the Lender in a less favorable net after-Tax position than the Lender would have been in if the Tax subject to indemnification and giving rise to such refund had not been deducted, withheld or otherwise imposed and the indemnification payments or additional amounts with respect to such Tax had never been paid. This Section 3.01(e) shall not be construed to require any Lender to make available its tax returns (or any other information relating to its taxes that it deems confidential) to any Loan Party or any other Person.

3.02    **Illegality**. If any Lender reasonably determines that it is unlawful, or that any Governmental Authority has asserted that it is unlawful, for such Lender or its applicable Lending Office to make, maintain or fund the Loans, then, on notice thereof by such Lender to the Borrower, any obligation of such Lender to make or maintain the Loan shall be suspended until such Lender notifies the Borrower that the circumstances giving rise to such determination no longer exist. Upon receipt of such notice, the Borrower shall, upon demand from such Lender, prepay all amounts of the Loans then outstanding held by such Lender, either on the last day of the Interest Period therefor, if such Lender may lawfully continue to maintain such Loans to such day, or immediately, if such Lender may not lawfully continue to maintain such Loans. Upon any such prepayment, the Borrower shall also pay accrued interest on the amount so prepaid.

3.03    **Increased Costs.**

(a)    <u>Increased Costs Generally</u>. If any Change in Law shall:

(i)    impose, modify or deem applicable any reserve, special deposit, compulsory loan, insurance charge or similar requirement against assets held by, deposits or other liabilities in or for the account of, disbursements, loans or other credit extended or participated in by, a Lender;

(ii)    subject a Lender to any Tax (other than Indemnified Taxes or Other Taxes covered by <u>Section 3.01</u>, and Excluded Taxes) of any kind whatsoever with respect to this Agreement or its loans, loan principal, letters of credit, or other obligations, or its deposits, reserves or other liabilities or capital attributable thereto; or

(iii)    impose on a Lender any other condition, cost or expense affecting this Agreement or the Loan made by such Lender;

and the result of any of the foregoing shall be to increase the cost to such Lender of making or maintaining the Loans (or of maintaining its obligation to make the Loans), or to reduce the amount of any sum received by such Lender hereunder (whether of principal, interest or any other amount) then, upon notice to the Borrower from such Lender, the Borrower shall be obligated to pay to such Lender, within 10 Business Days of its demand pursuant to clause (c) below, such additional amount or amounts as will compensate such Lender on an after-tax basis for such additional costs incurred or reduction suffered.

(b)    <u>Capital Requirements</u>. If any Lender reasonably determines that any Change in Law affecting such Lender or such Lender's holding company, if any, regarding capital requirements has or would have the effect of reducing the rate of return on such Lender's capital or on the capital of such Lender's holding company, if any, as a consequence of this Agreement, the Commitment or the Loans made by such Lender, to a level below that which such Lender or such Lender's holding company could have achieved but for such Change in Law (taking into consideration such Lender's policies and the policies of such Lender's holding company with respect to capital adequacy) by an amount deemed by such Lender to be material, then from time to time the Borrower will pay to such Lender such additional amount or amounts

Case 1:19-cv-02523-PKC   Document 26-4   Filed 04/11/19   Page 33 of 73

as will compensate such Lender or such Lender's holding company for any such reduction suffered.

(c)    <u>Certificates for Reimbursement</u>.   A certificate of a Lender specifying the basis on which such additional amounts are claimed, in accordance with such Lender's customary practice in respect of similarly situated borrowers, and the amount or amounts necessary to compensate such Lender or its holding company, as the case may be, as specified in <u>Sections 3.03(a)</u> or <u>(b)</u> and delivered to the Borrower shall be prima facie evidence of such amount absent manifest error.   The Borrower shall pay such Lender the amount shown as due on any such certificate within 10 Business Days after receipt thereof.

(d)    <u>Delay in Requests</u>.   Failure or delay on the part of a Lender to demand compensation pursuant to the foregoing provisions of this <u>Section 3.03</u> shall not constitute a waiver of such Lender's right to demand such compensation; <u>provided</u> that the Borrower shall not be required to compensate a Lender pursuant to the foregoing provisions of this <u>Section 3.03</u> for any increased costs incurred or reductions suffered more than 9 months prior to the date that such Lender notifies the Borrower of the Change in Law giving rise to such increased costs or reductions and of such Lender's intention to claim compensation therefor (except that, if the Change in Law giving rise to such increased costs or reductions is retroactive, then the nine-month period referred to above shall be extended to include the period of retroactive effect thereof).

3.04    **No Premium or Penalty**.   All repayments made pursuant to <u>Section 2.04</u> or prepayments permitted pursuant to <u>Section 2.03</u> shall be without premium or penalty.

3.05    **Mitigation Obligations**.   If any Lender requests compensation under <u>Section 3.03</u>, or a Loan Party is required to pay any additional amount to a Lender or any Governmental Authority for the account of such Lender pursuant to <u>Section 3.01</u>, or if any Lender gives a notice pursuant to <u>Section 3.02</u>, then such Lender shall use reasonable efforts to designate a different Lending Office for funding or booking its share in the Loans hereunder or to assign its rights and obligations hereunder to another of its offices, branches or Affiliates, if, in the judgment of such Lender, such designation or assignment (i) would eliminate or reduce amounts payable pursuant to <u>Section 3.01</u> or <u>3.03</u>, as the case may be, in the future, or eliminate the need for the notice pursuant to <u>Section 3.02</u>, as applicable, and (ii) in each case, would not subject such Lender to any un-reimbursed cost or expense and would not otherwise be disadvantageous to such Lender.   The Borrower hereby agrees to pay all reasonable costs and expenses incurred by any Lender in connection with any such designation or assignment.

3.06    **Survival**.   All of the Loan Parties' obligations under this <u>Article III</u> shall survive termination of the Commitment and repayment of all other Obligations hereunder or the resignation and/or removal of the Agent.



# ARTICLE IV

## CONDITIONS PRECEDENT

4.01     **Conditions to Commitment.**  The obligation of the Lenders to make Loans and Disbursements under this Agreement shall not be effective until each of the following conditions precedent has been satisfied, in each case as determined (or waived or, if subject to a time limitation, extended) by each Lender:

(a)     Agreement.  This Agreement shall have been duly executed and delivered to the Agent and the Lenders by the Loan Parties on the Signing Date.

(b)     Commercial Contract and Covered Purchase Orders.  The Commercial Contract and the Covered Purchase Orders shall have been duly issued and/or executed and be in full force and effect, and a copy thereof shall have been delivered to the Agent and the Lenders by the Loan Parties on or prior to the Signing Date or within one (1) Caracas Business Day from the Signing Date.

(c)     No Default.  At the time of and immediately after the Signing Date, and within the immediately subsequent one (1) Caracas Business Day from the Signing Date, no Default or Event of Default shall have occurred and be continuing.

(d)     Legal Opinions.  The Agent and each Lender shall have received within one (1) Caracas Business Day from the Signing Date: (i) a written opinion of Curtis, Mallet-Prevost, Colt & Mosle LLP, New York counsel for the Borrower and the Guarantor, and (ii) a written opinion of the General Counsel of the Borrower, as Venezuela counsel for the Borrower and the Guarantor, in each case (A) dated the Effective Date, (B) addressed to the Agent and each Lender party hereto as of the Signing Date, and (C) covering such matters relating to this Agreement as the Lenders shall reasonably request and in form and substance reasonably satisfactory to the Lenders, and the Borrower and the Guarantor hereby request such counsel to deliver such opinions.

(e)     Financial Statements.  The Agent and each Lender shall have received within one (1) Caracas Business Day from the Signing Date the financial statements and report referred to in clause (ii) of each of Section 5.05(a) and Section 5.05(b), which shall not demonstrate a change in the financial condition of the Borrower or the Guarantor from the financial condition of the Borrower or the Guarantor reflected in (and shall not otherwise be materially inconsistent with) the financial statements as of and for the fiscal year ended December 31, 2015, which has had or could reasonably be expected to result in a Material Adverse Effect.

(f)     Opinion of the Central Bank.  The Agent and the Lender shall have received within one (1) Caracas Business Day from the Signing Date evidence that the Borrower (for itself and the Guarantor) has obtained the prior favorable opinion of the Central Bank of Venezuela to hold funds in foreign currency outside of Venezuela, pursuant to Exchange Agreement No. 9 (*Convenio Cambiario No. 9*), published in Official Gazette No. 39,239 dated August 11, 2009, between the Central Bank of Venezuela and the Ministry of the People's Power



for Economy and Finance (currently the Ministry of the People's Power for Banking and Finance), and a certificate from the Borrower to the effect that such authorization remains in full force and effect as of the date on which such evidence is being received by the Agent and the Lender.

(g)    <u>Documentary Conditions Precedent</u>.  The Agent and each Lender shall have received copies of the following documents within one (1) Caracas Business Day from the Signing Date:

(i)    Last amendment to the Articles of Incorporation and By-laws of the Borrower, the Guarantor and the other Subsidiaries of the Borrower that are a party to the Transaction Documents.

(ii)    A Certificate of the secretary of each of the Borrower, the Guarantor and the other Subsidiaries of the Borrower that are a party to the Transaction Documents certifying as to the resolution of the Board of Directors of each of the Borrower, the Guarantor and the other Subsidiaries of the Borrower that are a party to the Transaction Documents (A) approving the terms of, and the transactions contemplated by, the Transaction Documents to which it is a party and resolving that it execute the Transaction Documents to which it is a party, (B) authorizing a specified person or persons to execute the Transaction Documents to which it is a party on its behalf, and (C) authorizing a specified person or persons, on its behalf, to sign all documents and notices to be signed by it under or in connection with the Transaction Documents to which it is a party.

(iii)    Evidence of the payment capacity of the Borrower and the Guarantor, in the form of the publication of a certification of debt of the Borrower and the Guarantor, as required by Article 101 of the Organic Law on the Financial Administration of the Public Sector, published in Extraordinary Official Gazette No. 6.210 dated December 30, 2015.

(iv)    The most recent minutes of the shareholders of each of the Borrower, the Guarantor, and the other Subsidiaries of the Borrower that are a party to the Transaction Documents appointing the members of its Board of Directors.

(v)    A signature and incumbency certificate of each of the Borrower, the Guarantor, and the other Subsidiaries of the Borrower that are a party to the Transaction Documents, of the person or persons authorized to execute the Transaction Documents to which it is a party.

(vi)    A certificate of an authorized signatory of each of the Borrower, the Guarantor and the other Subsidiaries of the Borrower that are a party to the Transaction Documents, certifying that each copy of a document delivered pursuant to this <u>Section 4.01(g)</u> is true, correct, complete and in full force and effect as of the date of this Agreement.

(vii)    A certificate of an authorized signatory of each of the Borrower, the Guarantor and the other Subsidiaries of the Borrower that are a party to the



Transaction Documents, dated the Effective Date, certifying that the conditions specified in Sections 4.01(c) and 4.01(h) have been fulfilled.

(viii)  Evidence that each Loan Party has irrevocably appointed the Process Agent to receive service of process under this Agreement.

(h)  Consents.  All requisite Governmental Authorities and third parties shall have approved, authorized or consented to the Loans and the other transactions contemplated by the Transaction Documents to the extent required, all applicable appeal periods shall have expired and there shall not be any pending or threatened litigation, governmental, administrative or judicial action that could reasonably be expected to restrain, prevent or impose burdensome conditions on the Loans or the other transactions contemplated by the Transaction Documents.

(i)  No Material Adverse Change.  In the reasonable judgment of the Agent and the Lenders, there shall have been no change or development since June 30, 2016 involving a prospective material adverse change in (i) the United States, Venezuelan or international financial, banking, political or economic conditions, (ii) the political, social, economic or financial condition of Venezuela, (iii) the currency exchange rates or controls imposed by any Governmental Authority in Venezuela applicable to Dollars which affects the Borrower's or the Guarantor's ability to perform their respective obligations under the Transaction Documents, (iv) any legislation, rules, regulations or other conditions affecting financial transactions of the same nature as the one reflected by the Transaction Documents, or (v) the capital markets with respect to Venezuelan and/or Latin American issuers, and neither the Agent nor the Lenders shall have received any notice from the Borrower that there has been any such material adverse change or development.

(j)  Regulatory Documentation.  The Agent and each Lender shall have received, within one (1) Caracas Business Day from the Signing Date and to the extent requested by the Lenders, all documentation and other information required by regulatory authorities under applicable "know your customer" and anti-money laundering rules and regulations, including the USA PATRIOT Act.

4.02  **Conditions to Disbursements**.  The obligations of the Lenders to make disbursements of the Loans on each respective Disbursement Date are subject to prior or concurrent satisfaction (or waiver by each of the Lenders) of each of the following conditions precedent:

(a)  Representations and Warranties.  The representations and warranties contained herein and in the other Transaction Documents shall be true and correct in all material respects on and as of the applicable Disbursement Date to the same extent as though made on and as of that date, except to the extent such representations and warranties specifically relate to an earlier date, in which case such representations and warranties shall have been true and correct in all material respects on and as of such earlier date; provided that, if a representation and warranty is qualified as to materiality, the materiality qualifier set forth above shall be disregarded with respect to such representation and warranty for purposes of this condition.

- 28 -



(b)      No Default.  At the time of and immediately after such Disbursement, no Default or Event of Default shall have occurred and be continuing.

(c)      Material Adverse Change.  In the opinion of the Lenders, between the Signing Date and such Disbursement Date no event has occurred which has or shall have a Material Adverse Effect.

(d)      Commercial Contract and Covered Purchase Orders.  At the time of and immediately after such Disbursement, no event shall have occurred and be continuing which could give rise to (i) a right of termination pursuant to Article 2.3 of the Commercial Contract or to the applicable terms (if any) of the Covered Purchase Orders, or (ii) a right of suspension pursuant to Article 2.4 of the Commercial Contract or to the applicable terms (if any) of the Covered Purchase Orders, and the Commercial Contract and the Covered Purchase Orders shall be in full force and effect.

(e)      Officer's Certificate.  Each Lender and the Agent shall have received a certificate of an authorized signatory of the Borrower, dated the Disbursement Date, certifying that the conditions specified in Sections 4.02(a), 4.02(b) and 4.02(d) have been fulfilled.

4.03      **Satisfaction of Conditions.**  The conditions specified in Section 4.01 shall only be deemed satisfied (or waived), and therefore the Effective Date will occur, if and when the Agent provides a confirmation in writing (through any means of communication in written form, including through e-mail communication) to the Borrower, the Guarantor and the Lender party hereto as of the Signing Date, that all of such conditions have been so satisfied (or waived) by such Lender, such confirmation to be sent by any of the President, Vice President, Secretary, Assistant Secretary, Treasurer, Assistant Treasurer or in-house counsel of the Agent acting alone. For purposes of determining the satisfaction (or waiver) of the conditions specified in Section 4.02, each Lender as of the Signing Date and each Disbursement Date shall be deemed to have consented to, approved or accepted or to be satisfied with, each document or other matter required hereunder to be consented to or approved by or acceptable or satisfactory to such Lender unless the Agent shall have received written notice from such Lender prior to the respective  Disbursement Date specifying its objection thereto.

4.04      **Termination of the Agreement due to Non-Occurrence of Effective Date.** Notwithstanding any provision to the contrary hereunder, this Agreement shall automatically terminate, without the need for any further instrument, document, notice or action on the part of any of the Parties, if the Effective Date does not occur within one (1) Caracas Business Day from the Signing Date (unless such time limitation is extended at the discretion of the Lenders) for any reason whatsoever.


# ARTICLE V

# REPRESENTATIONS AND WARRANTIES OF THE LOAN PARTIES

Each Loan Party represents and warrants to the Agent and each Lender, as of the Signing Date, as of the Effective Date, and as of each Disbursement Date, that:

5.01     **Organization; Qualification and Power**.  Such Loan Party and each of its Subsidiaries that is party to a Transaction Document (i) is duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization, (ii) has all requisite power and authority to own its property and assets and to carry on its business as now conducted and as proposed to be conducted, (iii) is qualified to do business in, and is in good standing in, every jurisdiction where such qualification is required, except where the failure so to qualify could not reasonably be expected to result in a Material Adverse Effect, and (iv) has the power and authority to execute, deliver and perform its obligations under each of the Transaction Documents and each other agreement or instrument contemplated thereby to which it is or will be a party.

5.02     **Authorization; No Contravention**.  The execution, delivery and performance by such Loan Party and its relevant Subsidiaries of each Transaction Document to which it is a party, and (in the case of the Borrower) the incurrence of the Loans hereunder, (i) have been duly authorized by all requisite corporate and, if required, stockholder action and (ii) will not (A) violate (a) any provision of law, statute, rule or regulation, or of the certificate or articles of organization or other constitutive documents or by-laws of such Loan Party or such Subsidiary, (b) any order of any Governmental Authority or (c) any provision of any indenture, agreement or other instrument to which any Loan Party or applicable Subsidiary is a party or by which any of them or any of their property is or may be bound, (B) be in conflict with, result in a breach of or constitute (alone or with notice or lapse of time or both) a default under, or give rise to any right to accelerate or to require the prepayment, repurchase or redemption of any obligation under any such indenture, agreement or other instrument or (C) result in the creation or imposition of any Lien upon or with respect to any property or assets now owned or hereafter acquired by any Loan Party or applicable Subsidiary.

5.03     **Enforceability**.  Each Transaction Document to which such Loan Party or any of its Subsidiaries is a party has been duly executed and delivered by such Loan Party or Subsidiary, as applicable, and constitutes, and each other Transaction Document to which it or such Subsidiary is a party, when executed and delivered by each other party thereto will constitute, a legal, valid and binding obligation of such Loan Party or Subsidiary, as applicable, enforceable against such Loan Party or Subsidiary, as applicable, in accordance with its terms (except, in any case, as such enforcement may be limited by applicable bankruptcy, insolvency, reorganization or similar laws affecting creditors' rights generally and by principles of equity).

5.04     **Governmental Approvals; Other Consents**.  No action, consent, authorization or approval of, registration or filing with or any other action by any Governmental Authority is or will be required in connection with the execution, delivery or performance by such Loan Party of any Transaction Document to which it is a party, except for such as have been made or obtained and are in full force and effect.

5.05     **Financial Statements**.

(a)     The Borrower has heretofore furnished to the Lenders (i) its annual consolidated financial statements (including the notes thereof) as of and for the fiscal year ended December 31, 2015, prepared in accordance with IFRS and presented in the English language, together with a report thereon by the Borrower's certified independent accountants, and (ii) its

semi-annual unaudited consolidated financial statements as of and for the six-month period ending June 30, 2016, prepared in accordance with IFRS and presented in the English language. Such financial statements and all other financial statements delivered in accordance with Section 4.01(e) hereof present fairly the financial condition of the Borrower and its consolidated Subsidiaries as of such dates and for such periods, and, to the extent required by IFRS, disclose all material liabilities, direct or contingent, of the Borrower and its consolidated Subsidiaries as of the date thereof.

(b)      The Guarantor has heretofore furnished to the Lenders its annual consolidated financial statements (including the notes thereof) as of and for the fiscal year ended December 31, 2015, prepared in accordance with IFRS and presented in the English language, together with a report thereon by the Guarantor's certified independent accountants, prepared in accordance with IFRS and presented in the English language. Such financial statements and all other financial statements delivered in accordance with Section 4.01(e) hereof present fairly the financial condition of the Guarantor as of such dates and for such periods, and, to the extent required by IFRS, disclose all material liabilities, direct or contingent, of the Guarantor.

5.06      **No Material Adverse Change.**  No Material Adverse Effect has occurred since June 30, 2016.

5.07      **Title to Properties; Liens; Possession Under Leases.**

(a)      Each of the Loan Parties has good and marketable title to, or valid leasehold interests in, all its material properties and assets, and each of their respective Subsidiaries has good and marketable title to, or valid leasehold interests in, all its material properties and assets, except to the extent such failure of a Subsidiary (other than the Guarantor) to have good and marketable title or a valid leasehold interest could not reasonably be expected to result in a Material Adverse Effect.  All such material properties and assets are free and clear of Liens, other than Permitted Liens.

(b)      Each of the Loan Parties has complied with all obligations under all material leases to which it is a party and all such leases are in full force and effect, and each of their respective Subsidiaries has complied with all obligations under all material leases to which it is a party and all such leases are in full force and effect, except to the extent such failure of a Subsidiary (other than the Guarantor) to comply could not reasonably be expected to result in a Material Adverse Effect.  Each of the Loan Parties enjoys peaceful and undisturbed possession under all such material leases, and each of their respective Subsidiaries enjoys peaceful and undisturbed possession under all such material leases, except to the extent such possession by a Subsidiary (other than the Guarantor) could not reasonably be expected to result in a Material Adverse Effect.

5.08      **Subsidiaries.**  Schedule 5.08 sets forth as of the Signing Date a list of all Subsidiaries of the Loan Parties and the percentage ownership interest of the Borrower or the Guarantor therein.  The shares of capital stock or other ownership interests so indicated on Schedule 5.08 are fully paid and non-assessable and are owned by the Borrower or the Guarantor, directly or indirectly, free and clear of all Liens.



5.09    **Litigation; Compliance with Laws**.

(a)    Except as set forth on <u>Schedule 5.09</u>, there are no actions, suits or proceedings at law or in equity or by or before any Governmental Authority now pending or, to the knowledge of the Loan Parties, threatened against or affecting the Borrower, the Guarantor or any Subsidiary or any business, property or rights of any such Person (A) that involve any Transaction Document to which it is a party, or (B) as to which there is a reasonable possibility of an adverse determination and that, if adversely determined, could reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect. As of each Disbursement Date, there has been no change in the status of the matters disclosed on <u>Schedule 5.09</u> that, individually or in aggregate, has resulted in, or could reasonably be expected to result in, a Material Adverse Effect.

(b)    None of the Loan Parties or any of their Subsidiaries or any of their respective material properties or assets is in violation of, nor will the continued operation of their material properties and assets as currently conducted or the entry into or performance of its obligations under any Transaction Document violate, any law, rule or regulation (including any tax law, disclosure or reporting requirement, securities laws and regulations, zoning, building, Environmental Law, ordinance, code or approval or any building permits), or is in default with respect to any judgment, writ, injunction, decree or order of any Governmental Authority, where such violation or default could reasonably be expected to result in a Material Adverse Effect.

5.10    **Agreements; No Default**.

(a)    None of the Loan Parties or any of their respective Subsidiaries is a party to any agreement or instrument or subject to any corporate restriction that has resulted or could reasonably be expected to result in a Material Adverse Effect.

(b)    None of the Loan Parties or any of their respective Subsidiaries is in default in any manner under any provision of any indenture or other agreement or instrument evidencing Indebtedness, or any other material agreement or instrument to which it is a party or by which it or any of its properties or assets are or may be bound, where such default could reasonably be expected to result in a Material Adverse Effect.

5.11    **Investment Company Act**.  None of the Borrower, the Guarantor or any of their respective Subsidiaries is an "investment company" as defined in, or subject to regulation under, the Investment Company Act of 1940.

5.12    **Federal Reserve Regulations and Federal Power Act**.

(a)    None of the Loan Parties or any of their respective Subsidiaries is engaged principally, or as one of its important activities, in the business of extending credit for the purpose of buying or carrying margin stock (within the meaning of Regulation U and Regulation X issued by the Federal Reserve Board).  No part of the proceeds of the Loans will be used, whether directly or indirectly, and whether immediately, incidentally or ultimately, for any purpose that entails a violation of, or that is inconsistent with, the regulations of the Federal Reserve Board, including Regulation T, U or X issued by the Federal Reserve Board.

(b)    None of the Borrower, the Guarantor or any of their respective Subsidiaries is a "public utility" within the meaning of, or subject to regulation under, the United States Federal Power Act of 1920 (16 U.S.C. §§791 *et. seq.*).

5.13    **Foreign Assets Control Regulation**.  None of the Loan Parties or any of their respective Subsidiaries (i) is a Designated Person, (ii) will use the proceeds of the Loans for purposes other than as specified in <u>Section 6.08</u>, or (iii) will directly or indirectly through any Subsidiary use any part of the Loans on behalf of any Designated Person or in connection with any investment in, or any transactions or dealings with, any Designated Person.

5.14    **Tax Returns**.  Each of the Loan Parties and their respective Subsidiaries has filed or caused to be filed all foreign and Venezuelan federal, national, state and local tax returns or materials required to have been filed by it, except any for which failure to file which could not reasonably be expected to result in a Material Adverse Effect, and has paid or caused to be paid all Taxes due and payable by it and all assessments received by it, except Taxes that are being contested in good faith by appropriate proceedings and for which the Borrower, the Guarantor or such Subsidiary, as applicable, shall have set aside on its books adequate reserves.

5.15    **No Material Misstatements**.  No information, report, financial statement, certificate, exhibit, schedule or other information furnished (whether in writing or orally) by or on behalf of the Borrower or the Guarantor to the Agent or the Lenders in connection with the Loans and the negotiation of any Transaction Document or included therein or delivered pursuant thereto (in each case, as modified or supplemented by other information so furnished) contained, contains or will contain any material misstatement of fact or omitted, omits or will omit to state any material fact necessary to make the statements therein, in the light of the circumstances under which they were, are or will be made, not misleading; <u>provided</u> that to the extent any such information, report, financial statement, certificate, exhibit or schedule was based upon or constitutes a forecast or projection, the Borrower represents only that it acted in good faith and utilized reasonable assumptions (based upon accounting principles consistent with the historical audited financial statements of the Borrower and the Guarantor, as applicable) and due care in the preparation of such information, report, financial statement, certificate, exhibit or schedule.

5.16    **Employee Benefit Plans**.

(a)    None of the Borrower, the Guarantor or any ERISA Affiliate (other than any member of the Citgo Group) has during the past five (5) years maintained, contributed to or had an obligation to contribute to any Plan, Multiemployer Plan or has any present intention to do so.

(b)    In respect of the Citgo Group:

(i)    each Plan complies in all material respects with all requirements of law except to the extent that noncompliance could not reasonably be expected to have a Material Adverse Effect;



(ii)     no Reportable Event has occurred, or is reasonably likely to occur, with respect to any Plan which could result in any member of the Citgo Group incurring a liability or obligation in excess of $50,000,000;

(iii)     no steps have been taken to terminate any Plan which could result in any member of the Citgo Group making a contribution, or incurring a liability or obligation, to such Plan in excess of $50,000,000, and no steps have been taken to appoint a receiver or trustee to administer any such Plan;

(iv)     there is no Unfunded Vested Liability with respect to any Plan that would reasonably be expected to have, in the event of termination of such Plan, a Material Adverse Effect;

(v)     no Plan is determined to be, or is expected to be, in at-risk status (within the meaning of Title IV of ERISA);

(vi)     no contribution failure has occurred with respect to any Plan sufficient to give rise to a Lien under ERISA or the Internal Revenue Code;

(vii)     no condition exists or event or transaction has occurred with respect to any Plan which would reasonably be expected to have a Material Adverse Effect;

(viii)     no member of the Citgo Group has any contingent liability with respect to any post-retirement benefit under a Welfare Plan, other than liability for continuation coverage described in Part 6 of Title I of ERISA, that would reasonably be expected to have a Material Adverse Effect; and

(ix)     no member of the Citgo Group has during the past five years maintained, contributed to or had an obligation to contribute to any Multiemployer Plan or has any present intention to do so.

5.17     **Environmental Matters**.  Except as set forth in <u>Schedule 5.17</u> and except with respect to any other matters that, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect, none of the Borrower, the Guarantor or any of their respective Subsidiaries (a) has failed to comply with any Environmental Law applicable to it or to obtain, maintain or comply with any permit, license or other approval required under any Environmental Law applicable to it, (b) has become subject to any Environmental Liability, (c) has received notice of any claim with respect to any Environmental Liability or (d) knows of any basis for any Environmental Liability.

5.18     **Insurance**.  The Borrower and its Subsidiaries maintain insurance to such extent and against such risks required pursuant to <u>Section 6.02</u> of this Agreement.

5.19     **Labor Matters**.  As of the Signing Date, there are no strikes, lockouts or slowdowns against the Borrower, the Guarantor or any Subsidiary pending or, to the knowledge of the Borrower or the Guarantor, threatened which could reasonably be expected to result in a Material Adverse Effect.  The hours worked by and payments made to employees of the

- 34 -



Borrower, the Guarantor and their respective Subsidiaries have not been in violation of applicable Venezuelan national, state, local or foreign law dealing with such matters. All payments due from the Borrower, the Guarantor or any Subsidiary, or for which any claim may be made against it, on account of wages and employee health and welfare insurance and other benefits, have been paid or, to the extent required by IFRS, accrued as a liability on the books of the Borrower, the Guarantor or such Subsidiary. The consummation of the transactions contemplated by the Transaction Documents to which the Borrower and/or the Guarantor and/or any of the Subsidiaries of the Borrower is a party, will not give rise to any right of termination or right of renegotiation on the part of any union under any collective bargaining agreement to which the Borrower, the Guarantor or any Subsidiary is bound.

5.20 **Solvency**. Immediately following the making of each Disbursement and after giving effect to the application of the proceeds of such Disbursement, (a) the assets of each of the Borrower and the Guarantor, at a fair valuation, are in excess of the total amount of its debts (including contingent liabilities), (b) the present fair saleable value of each of the Borrower and Guarantor's assets is greater than its probable liability on its existing debts as such debts become absolute and matured, (c) each of the Borrower and the Guarantor is then able and expects to be able to pay its debts (including contingent liabilities and other commitments) as they mature, (d) each of the Borrower and Guarantor has capital sufficient to carry on its business as conducted and as proposed to be conducted, and (e) each of the Borrower and the Guarantor is in compliance with each applicable solvency standard under the laws of the jurisdiction where it is organized, domiciled, resident or otherwise located. For purposes of this Section, the amount of any contingent liability shall be computed as the amount that, in light of all the facts and circumstances existing at such time, represents the amount that can reasonably be expected to become an actual or matured liability.

5.21 **Legal Form**. The Transaction Documents to which each of the Loan Parties and each of the relevant Subsidiaries is a party are in proper legal form under the laws of New York and Venezuela for enforcement in the courts of New York and Venezuela, as applicable, save for any official translation to Spanish required to be submitted to the courts and/or another Governmental Authority in Venezuela.

5.22 **Ranking**. The payment obligations under this Agreement to which each of the Borrower and Guarantor is a party rank at least *pari passu* with all of their other unsecured, unsubordinated senior indebtedness, except for obligations in respect of Taxes or in favor of employees which obligations are mandatorily preferred under the Venezuelan Organic Tax Code (*Código Orgánico Tributario*) and the Venezuelan Organic Law on Labour and Male and Female Workers (*Ley Orgánica del Trabajo, los Trabajadores y las Trabajadoras*), respectively, or obligations mandatorily preferred by law applying to companies generally.

5.23 **Anti-Bribery and Anti-Corruption Laws**. Each of the Borrower, the Guarantor and their respective Subsidiaries, and, to the best of the Borrower's and the Guarantor's knowledge, each of the persons acting on any of their behalf with respect to activities performed under the Transaction Documents have not taken any action in connection with the acquisition of the assets pursuant to the Commercial Contract, or in connection with the negotiation, execution and delivery of the Transaction Documents, that is in violation of the Anti-Bribery and Anti-Corruption Laws.

5.24 **U.S. Anti-Terrorism Laws**. Each of the Borrower, the Guarantor and their respective Subsidiaries, and, to the best of the Borrower's and the Guarantor's knowledge, any Persons acting on any of their behalf with respect to activities to be performed under the Transaction Documents, (a) is not a Designated Person, and (b) will not use any part of the equipment and spare parts to be purchased under the Commercial Contract and the Covered Purchase Orders on behalf of any Designated Person or will otherwise use, directly by it or indirectly through any Subsidiary, such equipment and spare parts in connection with any investment in, or any transactions or dealings with, any Designated Person. The Borrower, the Guarantor and the Subsidiaries of the Borrower will not use any of the equipment or spare parts to be purchased under the Commercial Contract and the Covered Purchase Orders for purposes other than the use of such equipment and spare parts in the ordinary course of business of the Borrower, the Guarantor or such Subsidiaries of the Borrower, as applicable, and, directly or indirectly, will not use any of such equipment and spare parts for, or with the proceeds of, (i) business activities relating to Crimea, Cuba, Sudan, Iran, Syria or North Korea, or (ii) business activities that are or which become subject to sanctions, restrictions or embargoes imposed by the United Nations, the European Union, the State Secretariat for Economic Affairs of Switzerland or the Swiss Directorate of International Law, OFAC, HM Treasury of the United Kingdom, the Hong Kong Monetary Authority and/or the Monetary Authority of Singapore. This includes, in particular (but without limitation) business activities involving Persons or entities subject to any such sanctions or named on any sanctions lists issued by any of the aforementioned bodies and entities owned or controlled by such listed Persons or entities.

5.25 **Senior Indebtedness**. The Obligations constitute senior indebtedness that is entitled to the benefits of the subordination provisions, if any, relating to all other Indebtedness of the Borrower and its Subsidiaries and the Guarantor and its Subsidiaries.

5.26 **Availability and Transfer of Foreign Currency**. Each of the Borrower and the Guarantor is subject to the Law on the Central Bank of Venezuela (*Ley del Banco Central de Venezuela*), published in Extraordinary Official Gazette No. 6,211 dated December 30, 2015, and Exchange Agreement No. 9 (*Convenio Cambiario No. 9*), published in Official Gazette No. 39,239 dated August 11, 2009, between the Central Bank of Venezuela and the Ministry of the People's Power for Economy and Finance (currently the Ministry of the People's Power for Banking and Finance), which grants the Borrower and the Guarantor the right to (i) maintain the proceeds received by the Borrower and the Guarantor derived from the export of hydrocarbons, in foreign currency outside of Venezuela, and (ii) apply such proceeds in foreign currency outside of Venezuela to the repayment of the Loans and comply with its obligations pursuant to the terms of this Agreement. There are no other foreign exchange controls issued or, to the knowledge of the Borrower or the Guarantor, threatened to be issued by Venezuela or any Venezuelan Governmental Authority that would hinder the ability of the Borrower, the Guarantor or any of the Subsidiaries to comply with its obligations under the Transaction Documents. Each of the Borrower and the Guarantor has the ability to lawfully pay any and all amounts due under this Agreement solely and exclusively in Dollars.

5.27 **Commercial Activities; Absence of Immunity**. Each of the Borrower, the Guarantor and the Subsidiaries of the Borrower is subject to civil and commercial law in Venezuela with respect to its obligations under the Transaction Documents. The execution and delivery by each of the Borrower, the Guarantor and the Subsidiaries of the Borrower of each of

the Transaction Documents to which it is a party and the performance of its *obligations* thereunder constitute private and commercial acts rather than public or governmental acts under the laws of Venezuela. Neither the Borrower, the Guarantor nor any Subsidiaries of the Borrower, nor any of their respective properties, assets or revenues is entitled to any right of immunity in any jurisdiction from suit, court jurisdiction, judgment, attachment (whether before or after judgment), set-off or execution of a judgment or from any other legal process or remedy relating to the obligations of the Borrower or the Guarantor under any of the Transaction Documents to which they are a party except for the mandatory notice required pursuant to Article 111 of the Law of the Office of the Attorney General of Venezuela (*Ley Orgánica de la Procuraduría General de la República*).

5.28 **FATCA.** None of the Borrower or the Guarantor (a) is currently resident for tax purposes in the United States of America, or (b) will report or take a position that any payment made under this Agreement by or on behalf of any of the Borrower or Guarantor is from sources within the United States of America for U.S. federal income tax purposes (provided, however, that for the avoidance of doubt, this Section 5.28 does not apply to the Agent).

## ARTICLE VI

## AFFIRMATIVE COVENANTS

So long as any Lender shall have its Commitment or any portion thereof or a Loan or any other Obligation hereunder shall remain unpaid or unsatisfied, each of the Borrower and the Guarantor shall, and shall (except in the case of the covenants set forth in Section 6.04) cause each of their respective Subsidiaries, to:

6.01 **Maintenance of Corporate Existence.** Except as permitted pursuant to Section 7.02, maintain in effect its and their corporate existence and all rights, privileges, titles to property, licenses, franchises and the like necessary in connection with the normal conduct of its and their business, activities or operations; provided, however, that the Borrower shall not be required to, and shall not be required to cause its Subsidiaries (other than the Guarantor) to maintain any such rights, privileges, titles to property, licenses or franchises if the Borrower determines in good faith that the maintenance thereof is no longer necessary in the conduct of the business of the Borrower and its Subsidiaries as a whole, and the failure to so maintain any such rights, privileges, titles to property, licenses or franchise is not disadvantageous in any material respect to the Lenders.

6.02 **Insurance.** Maintain insurance with reputable insurance companies and in such amounts and covering such risks as are believed by the Borrower and the Guarantor to be usually carried by companies engaged in similar businesses and owning and/or operating properties similar to those owned and/or operated by the Borrower or the Guarantor, as the case may be, in the same general areas in which the Borrower or the Guarantor owns and/or operates its properties.

6.03 **Maintenance of Governmental Approvals.** Maintain in full force and effect all approvals, consents, licenses and authorizations of any Governmental Authority which may

be necessary or the Borrower and the Guarantor may deem appropriate under any applicable law or regulation for the conduct of its business or for the performance of its obligations under the Transaction Documents, as the case may be, except to the extent failure to do so would not be reasonably expected to have a Material Adverse Effect.

6.04     **Financial Statements, Reports, etc.** Furnish to the Agent and each Lender:

(a)     within 180 days following the end of each fiscal year of the Borrower after the Signing Date, (i) the annual consolidated financial statements (including the notes thereto) of the Borrower, prepared in accordance with IFRS and presented in the English language, (ii) a report thereon by the Borrower's certified independent accountants, and (iii) a "management discussion and analysis" or other report of management providing an overview in reasonable detail of the results of operations and financial condition of the Borrower and its Subsidiaries;

(b)     within 180 days following the end of the second fiscal quarter in each fiscal year of the Borrower beginning with the second fiscal quarter ending after the Signing Date, (i) the semi-annual consolidated financial statements of the Borrower, prepared in accordance with IFRS and presented in the English language, and (ii) a "management discussion and analysis" or other report of management providing an overview in reasonable detail of the results of operations and financial condition of the Borrower and its Subsidiaries;

(c)     promptly upon obtaining knowledge thereof, written notice of the occurrence and continuance of any Event of Default or Default, specifying the nature and extent thereof and the corrective action (if any) taken or proposed to be taken with respect thereto;

(d)     promptly after the request by a Lender, all documentation and other information that such Lender reasonably requests in order to comply with its ongoing obligations under applicable "know your customer" and anti-money laundering rules and regulations, including the USA PATRIOT Act;

(e)     promptly, from time to time, such other information regarding the operations, business affairs and financial condition of the Borrower, the Guarantor or any of their respective Subsidiaries, or compliance with the terms of this Agreement, as the Agent or the Majority Lenders may reasonably request; and

(f)     promptly after the request by a Lender, all documentation and other information that such Lender reasonably requests in order to assure itself that the Borrower and the Guarantor are in compliance with all applicable laws.

Any reports furnished by the Loan Parties to the Agent (but not including notice delivered pursuant to Section 6.04(c)) shall be considered for informational purposes only and the Agent's receipt of such reports shall not constitute notice or actual knowledge of any information contained therein or determinable from information contained therein, including the Loan Parties' compliance with any of their covenants hereunder (as to which the Agent is entitled to rely exclusively on a written notice from a Lender or a Loan Party).

6.05     **Maintaining Records.** Maintain books, accounts and other records in accordance with IFRS in all material respects, and the Borrower shall cause the Significant

Subsidiaries organized under laws of any other jurisdiction to maintain their books and records in accordance with the generally accepted accounting principles of the applicable jurisdiction in all material respects.

6.06 **Compliance with Laws.** Use reasonable best efforts to comply at all times with all laws applicable to the Borrower and the Guarantor, their respective business or the Loans (including, without limitation, all US Anti-Terrorism Laws, as set forth in <u>Section 5.24</u> of this Agreement, Anti-Bribery and Anti-Corruption Laws, tax laws, disclosure and reporting requirements and securities laws and regulations), except where (a) the Borrower or the Guarantor determines in good faith that the failure by it to so comply would not have a Material Adverse Effect or (b) the necessity of compliance therewith is being contested by the Borrower or the Guarantor in good faith by appropriate proceedings.

6.07 **ERISA.** In respect of the Citgo Group, for so long as the Citgo Group is treated as a single employer with the Borrower under Section 414 of the Internal Revenue Code, or is within the same "controlled group" (as defined in ERISA) as the Borrower, the Borrower shall cause the Citgo Group to:

(a) ensure any material liability imposed on it pursuant to Title IV of ERISA is paid and discharged when due;

(b) ensure that no Plan is terminated under Section 4041 of ERISA, except as would not reasonably be expected to result in a Material Adverse Effect;

(c) not adopt an amendment to a Plan requiring the provision of security under ERISA or the Internal Revenue Code without the prior consent of the Lenders, except as would not reasonably be expected to result in a Material Adverse Effect; and

(d) ensure that no member of the Citgo Group engages in a complete or partial withdrawal, within the meaning of Sections 4203 and 4205 of ERISA, from any Multiemployer Plan without the prior consent of the Lenders, except as would not reasonably be expected to result in a Material Adverse Effect.

6.08 **Use of Proceeds.** The Borrower shall use the proceeds of the Loans solely (a) to finance the acquisition of certain equipment and spare parts to be purchased from time to time by the Purchaser from the Seller in accordance with the Commercial Contract and the Covered Purchase Orders, and (b) to pay fees, expenses and costs in connection with this Agreement as and when due; <u>provided</u> that the Loans shall not be repaid with the proceeds of (i) business activities that are or which become subject to sanctions, restrictions or embargoes imposed by OFAC, the United Nations Security Council, the U.S. Department of Commerce, the U.S. Department of State, the European Union, the State Secretariat for Economic Affairs of Switzerland or the Swiss Directorate of International Law, Her Majesty's Treasury of the United Kingdom, the Hong Kong Monetary Authority and/or the Monetary Authority of Singapore or any similar sanctions imposed by any governmental body to which the Borrower or any of its Subsidiaries is subject (collectively, "<u>Sanctions</u>"); or (ii) business activities in/with a country or territory that is the subject of Sanctions (including, without limitation, Cuba, Iran, North Korea, Sudan and Syria) ("<u>Sanctioned Country</u>"); or (iii) business activities involving Persons or entities

subject to or target of any such Sanctions or named on any Sanctions lists issued by any of the aforementioned bodies and entities owned or controlled by such listed Persons or entities.

6.09 **Further Assurances**. Subject to the terms, provisions and limitations set forth in the Transaction Documents, upon the reasonable request of the Agent (acting at the direction of the Majority Lenders) in writing, promptly execute and deliver or cause to be executed and delivered, at the cost and expense of the Borrower and the Guarantor, such further instruments as may be appropriate to maintain the valid existence of this Agreement and the arrangements contemplated by this Agreement.

**ARTICLE VII**

**NEGATIVE COVENANTS**

Each Loan Party covenants and agrees that, so long as any Lender shall have its Commitment or any portion thereof or a Loan or any other Obligation hereunder shall remain unpaid or unsatisfied:

7.01 **Liens**. It will not, and will not cause or permit any of their respective Subsidiaries to incur, permit or suffer to exist any Lien, other than Permitted Liens (which Permitted Liens shall not be considered Liens for purposes of the application of any of the provisions hereinafter set forth in this Section 7.01), of any kind against or upon any property or assets of the Borrower, the Guarantor or any of their respective Subsidiaries whether owned on the Signing Date or acquired after the Signing Date, to secure any Indebtedness, unless it has made or will make effective provision whereby (a) the Agent and the Lenders will be secured by such Lien equally and ratably with (or prior to, in the event such Indebtedness is subordinated in right of payment to the Obligations) all other Indebtedness of the Borrower, the Guarantor or any of their respective Subsidiaries secured by such Lien and (b) if such Lien secures obligations subordinated to the Obligations in right of payment, such Lien shall be subordinated to a Lien securing the Obligations in the same property as that securing such Lien to the same extent as such subordinated obligations are subordinated to the Obligations. Any Lien created for the benefit of the Agent and the Lender pursuant to the preceding sentence shall provide by its terms that such Lien will be automatically and unconditionally released and discharged upon release and discharge of the initial Lien.

7.02 **Mergers, Consolidations, Sales of Assets and Acquisitions**. It will not, in one or a series of transactions, consolidate or amalgamate with or merge into any corporation or convey, lease or transfer substantially all of its properties, assets or revenues to any Person or entity (other than a direct or indirect Subsidiary) or permit any Person (other than a direct or indirect Subsidiary) to merge with or into it unless:

(a) either it is the continuing entity or the Person (the "successor company") formed by the consolidation or into which it is merged or that acquired or leased the property or assets will assume (jointly and severally with it unless it will have ceased to exist as a result of that merger, consolidation or amalgamation), by a supplemental agreement, all of its obligations under this Agreement;

Case 1:19-cv-02523-PKC Document 26-4 Filed 04/11/19 Page 49 of 73

(b)     the successor company (jointly and severally with it, unless it will have ceased to exist as part of the merger, consolidation or amalgamation) agrees to indemnify the Agent and the Lenders against any Tax, assessment or governmental charge thereafter imposed on the Agent and the Lenders solely as a consequence of the consolidation, merger, conveyance, transfer or lease with respect to the payment of principal or interest of the Obligations;

(c)     immediately after giving effect to the transaction, no Default or Event of Default has occurred and is continuing; and

(d)     it has delivered to the Agent and each of the Lenders a certificate of its secretary or assistant secretary and a favorable written opinion of counsel, each stating that the transaction complies with the terms of this Section 7.02 and that all conditions precedent provided for in this Section 7.02 and relating to the transaction have been complied with;

Notwithstanding anything herein to the contrary, so long as no Default or Event of Default under this Agreement will have occurred and be continuing at the time of the proposed transaction or would result from the transaction:

(i)     a Loan Party may merge, amalgamate or consolidate with or into, or convey, transfer, lease or otherwise dispose of all or substantially all of its properties, assets or revenues to its direct or indirect Subsidiary in cases when such Loan Party is the surviving entity in the transaction and the transaction would not have a Material Adverse Effect, it being understood that if such Loan Party is not the surviving entity, such Loan Party will be required to comply with the requirements set forth in paragraphs (a) through (c) above; or

(ii)     any direct or indirect Subsidiary of a Loan Party may merge or consolidate with or into, or convey, transfer, lease or otherwise dispose of assets to, any Person (other than such Loan Party or any of its Subsidiaries or Affiliates) in cases when the transaction would not have a Material Adverse Effect; or

(iii)     any direct or indirect Subsidiary of a Loan Party may merge or consolidate with or into, or convey, transfer, lease or otherwise dispose of assets to, any other direct or indirect Subsidiary of such Loan Party; or

(iv)     any direct or indirect Subsidiary of a Loan Party may liquidate or dissolve if such Loan Party determines in good faith that the liquidation or dissolution is in the best interests of such Loan Party, and would not result in a Material Adverse Effect and if the liquidation or dissolution is part of a corporate reorganization of such Loan Party; or

(v)     a Loan Party may omit to comply with any term, provision or condition set forth in certain covenants or any term, provision or condition of this Agreement, if before the time for the compliance the Majority Lenders waive the compliance, but no waiver can operate except to the extent expressly waived, and, until a waiver becomes effective, such Loan Party's obligations and the duties of the Agent as set forth in this Agreement in respect of any such term, provision or condition will remain in full force and effect.

7.03     **FATCA.** It will not report or take a position that any payment made under this Agreement by or on behalf of a Loan Party is a payment from sources within the United States for U.S. federal income tax purposes. For the avoidance of doubt, this Section 7.03 does not apply to the Agent.

## ARTICLE VIII

## EVENTS OF DEFAULT AND REMEDIES

8.01     **Events of Default**. Any of the following events shall constitute an Event of Default (each, an "Event of Default"):

(a)     Non-payment of Principal. The failure to pay principal of any Loan, when such principal becomes due and payable, by acceleration or otherwise, and such failure continues for a period of 3 days after written notice thereof has been given to the Borrower; or

(b)     Non-payment of Interest. The failure to pay any interest on any Loan or any other amount payable hereunder when the same becomes due and payable and such failure continues for a period of 3 days after written notice thereof has been given to the Borrower; or

(c)     Non-payment of other Amounts. The failure to pay any fee or any other amount under this Agreement (other than the principal of, or interest on the Loans) when the same becomes due and payable and the default continues for a period of 15 days after written notice thereof has been given to the Borrower; or

(d)     Non-payment or Acceleration under the Note Agreements. The failure to pay the principal of, or interest on, any of the Notes, when such principal or interest becomes due and payable (giving effect to any applicable grace periods and any extensions thereof) including at any of the Repayment Dates (as defined in the applicable Note Agreement), or the acceleration of the obligations under any of the Notes following the occurrence of an Event of Default (as defined in the applicable Note Agreement) under any of the Note Agreements; or

(e)     Other Defaults. A default by any Loan Party in the observance or performance of any other covenant or agreement (not specified in Sections 8.01(a), (b), (c), or (d)) contained in this Agreement which default continues for a period of 30 days after the Borrower receives written notice specifying the default (and demanding that such default be remedied) from the Agent; or

(f)     Representations and Warranties. Any representation, warranty, certification or statement of fact made or deemed made by or on behalf of the Borrower, the Guarantor, or any Subsidiary in any Transaction Document, or in any document delivered in connection herewith or therewith shall be incorrect or misleading in any material respect when made or deemed made or shall be breached; provided that such misrepresentation shall not constitute an Event of Default if such condition or circumstance is (i) capable of cure, as determined by the Majority Lenders in their reasonable judgment and (ii) remedied within 30 days after written notice of such misrepresentation from the Agent; or

(g)    Cross-Default. (i) The failure to pay at final stated maturity (giving effect to any applicable grace periods and any extensions thereof) the principal amount of any Indebtedness (other than Indebtedness referred to in Sections 8.01(a), (b), (c), or (d)) of any Loan Party or any Significant Subsidiary, or (ii) any such Indebtedness of any such Person has become due and payable before it would otherwise have been due and payable as a result of, or on the basis of, the occurrence of a default, event of default or other similar condition or event (however described), which acceleration is not rescinded, annulled or otherwise cured within 30 days from the date of acceleration, if the aggregate principal amount of such Indebtedness, together with the principal or other amount of any other such Indebtedness in default for failure to pay principal at final stated maturity or which has been accelerated (in each case with respect to which the 30-day period described above has elapsed), aggregates the Threshold Amount or more at any time; or

(h)    Insolvency Proceedings, Etc. Any Loan Party or any of the Significant Subsidiaries (i) is dissolved (other than pursuant to a consolidation, amalgamation or merger); (ii) becomes insolvent or is unable to pay its debts, or fails generally to pay its debts as they become due, or admits in writing in a judicial, regulatory or administrative proceeding or filing its inability generally to pay its debts as they become due; (iii) makes a general assignment, arrangement or composition with or for the benefit of its creditors; (iv) institutes against itself or has instituted against it a proceeding seeking a judgment of insolvency or bankruptcy or any other relief under any bankruptcy or insolvency law or other similar law affecting creditors' rights, or a petition is presented for its winding up or liquidation, and, in the case of any such proceeding or petition instituted or presented against it by another Person, such proceeding or petition (A) results in a final and non-appealable judgment of insolvency or bankruptcy (*declaración de quiebra*) or *atraso* or the entry of a final and non-appealable order for relief or the making of an order for its winding up or liquidation or (B) is not dismissed, discharged, stayed or restrained in each case within 60 days of the institution or presentation thereof; (v) passes a resolution for its winding up, official management or liquidation (other than pursuant to a consolidation, amalgamation or merger); (vi) seeks or becomes subject to the appointment of an administrator, provisional liquidator, conservator, receiver, *conciliador*, trustee, *síndico*, custodian or other similar official for it or for all or substantially all its assets; (vii) has a secured party take possession of all or substantially all its assets or has a distress, execution, attachment, sequestration or other legal process levied, enforced or sued on or against all or substantially all its assets and such secured party maintains possession, or any such process is not dismissed, discharged, stayed or restrained, in each case within 60 consecutive days thereafter; or (viii) causes or is subject to any event with respect to it which, under the applicable laws of any jurisdiction, has an analogous effect to any of the events specified in clauses (i) to (vii) (inclusive) (subject to the same time periods for such event to be dismissed, discharged, stayed or restrained); or

(i)    Judgments. One or more judgments in an aggregate amount in excess of the Threshold Amount shall have been rendered against any Loan Party or any Significant Subsidiary and such judgments remain undischarged, unpaid, unstayed, unbonded or not suspended by agreement for a period of 60 days after such judgment or judgments become final and nonappealable; or



Case 1:19-cv-02523-PKC   Document 26-4   Filed 04/11/19   Page 52 of 73

(j)      _Invalidity of Transaction Documents_.  Any Transaction Document *(i) shall* cease to be in full force and effect (except as contemplated by the terms thereof), (ii) is declared to be null and void and unenforceable in a judicial proceeding or (iii) is inadmissible in evidence in the courts of Venezuela; or

(k)      _Change of Control_.  There shall have occurred any Change of Control; or

(l)      _Repudiation and Moratorium_.  Any Loan Party (or an authorized officer of any Loan Party) or any Governmental Authority (i) disaffirms, disclaims, repudiates or rejects, in whole or in part, or challenges the validity, lawfulness or enforceability of any Transaction Document or any part thereof; or (ii) unilaterally declares or imposes a moratorium, standstill, roll-over or deferral, whether *de facto* or *de jure*, with respect to any such Indebtedness in an aggregate amount of not less than the Threshold Amount; or (iii) takes any action that has or would reasonably be expected to have an adverse effect on any Disbursement Date, Principal Repayment Date, any Interest Repayment Date or the currency in which any Loan Party shall pay the Obligations; or

(m)      _Immunity_.  Any Loan Party becomes entitled to claim immunity from suit, judgment, execution, attachment or other legal process in any proceedings taken in its jurisdiction of organization or otherwise in any other jurisdiction in relation to any Transaction Document; or

(n)      _Material Adverse Effect_.  There shall have occurred any event which causes a Material Adverse Effect; or

(o)      _Change of Seniority_.  The failure at any time of the Obligations to constitute senior indebtedness that is entitled to the benefits of any subordination provisions relating to Indebtedness of the Borrower or its Subsidiaries; or

(p)      _Termination or Invalidity of Commercial Contract_.  The Commercial Contract or any of the Covered Purchase Orders (i) is terminated by either party thereto pursuant to Article 2.3 of the Commercial Contract or (ii) is or becomes, or any material provision thereof is or becomes, invalid, illegal or unenforceable.

8.02      **Remedies Upon Event of Default.** _Lenders Remedies_.  If any Event of Default occurs and is continuing, the Majority Lenders may, by notice to the Loan Parties, take any or all of the following actions:

(i)      cancel the Commitment of each Lender;

(ii)      declare all or any portion of the unpaid and outstanding principal amount of the Loan, all interest accrued and unpaid thereon, and all other amounts owing or payable hereunder to be immediately due and payable, without presentment, demand, protest or other notice of any kind, all of which are hereby expressly waived by the Loan Parties; and



Case 1:19-cv-02523-PKC   Document 26-4   Filed 04/11/19   Page 53 of 73

(iii)    exercise any other rights and remedies available to them under this Agreement and instruct the Agent to exercise any rights and remedies available to it under this Agreement or under applicable law;

provided, however, that upon the occurrence of any event with respect to any Loan Party or Significant Subsidiary described in Section 8.01(h), the obligation of the Lenders to make the Loans shall automatically terminate, and the unpaid principal amount of the outstanding Loans and all interest and other amounts as aforesaid shall automatically become due and payable without further act of the Lenders.

8.03    **Rescission.**  Notwithstanding anything contained in this Agreement to the contrary, the Majority Lenders by written notice to the Agent may on behalf of all of the Lenders rescind any acceleration and its consequences under this Agreement with respect to the Commitment and/or the Loans; provided that such rescission would not violate any judgment or order of a court of competent jurisdiction.

8.04    **Application of Funds.**  After the exercise of remedies provided for in Section 8.02 (or after a Loan has automatically become immediately due and payable as set forth in the proviso to Section 8.02), any amounts received on account of the Obligations shall be applied by the Agent in the following order:

First, to payment of that portion of the Obligations constituting fees, expenses, indemnities and other amounts payable to the Agent (including fees, charges and disbursements of counsel to the Agent and amounts payable under Article III);

Second, to payment of that portion of the Obligations constituting fees, expenses, indemnities and other amounts (other than principal and interest) payable to the Lenders (including fees, charges and disbursements of counsel to the Lenders and amounts payable under Article III);

Third, to payment of that portion of the Obligations constituting accrued and unpaid interest on the Loans and other Obligations, payable to the Lenders on a *pro rata* basis;

Fourth, to payment of that portion of the Obligations constituting unpaid principal of the Loans payable to the Lenders on a *pro rata* basis;

Last, the balance, if any, after all of the Obligations have been indefeasibly paid in full, to the Borrower or as otherwise required by law.

8.05    **Cross-Event of Default.**  The happening of an Event of Default (as defined hereunder) under this Agreement shall constitute an Event of Default (as defined in the applicable Note Agreement) under the Note Agreements.



## ARTICLE IX

## INTRALENDER PROVISIONS

9.01    **Appointment of the Agent.**

(a)    Each of the Lenders appoints the Agent to act as its agent under and in connection with this Agreement.

(b)    Each of the Lenders authorizes the Agent to perform the duties, obligations and responsibilities and to exercise the rights, powers, authorities and discretions specifically given to the Agent under or in connection with this Agreement together with any other incidental rights, powers, authorities and discretions.

9.02    **Instructions.**

(a)    The Agent shall:

(i)    unless a contrary indication appears in this Agreement, exercise or refrain from exercising any right, power, authority or discretion vested in it as Agent in accordance with any instructions given to it by:

(A)    all Lenders if this Agreement stipulates the matter is an all Lender decision; and

(B)    in all other cases, the Majority Lenders; and

(ii)    not be liable for any act (or omission) if it acts (or refrains from acting) in accordance with paragraph (a) above.

(b)    The Agent shall be entitled to request instructions, or clarification of any instruction, from the Majority Lenders (or, if this Agreement stipulates the matter is a decision for any other Lender or group of Lenders, from that Lender or group of Lenders) as to whether, and in what manner, it should exercise or refrain from exercising any right, power, authority or discretion and the Agent may refrain from acting unless and until it receives those instructions or that clarification.

(c)    Save in the case of decisions stipulated to be a matter for any other Lender or group of Lenders under this Agreement and unless a contrary indication appears in this Agreement, any instructions given to the Agent by the Majority Lenders shall override any conflicting instructions given by any other Parties and will be binding on the Agent and Lenders.

(d)    The Agent may refrain from acting in accordance with any instructions of any Lender or group of Lenders until it has received any indemnification and/or security that it may in its discretion require (which may be greater in extent than that contained in this Agreement and which may include payment in advance) for any cost, loss or liability which it may incur in complying with those instructions.



(e)    In the absence of instructions, the Agent may act (or refrain from acting) as it considers to be in the best interest of the Lenders.

(f)    The Agent is not authorized to act on behalf of a Lender (without first obtaining that Lender's consent) in any legal or arbitration proceedings relating to this Agreement.

9.03    **Duties of the Agent.**

(a)    The Agent's duties under this Agreement are solely mechanical and administrative in nature.

(b)    The Agent shall promptly forward to a Party the original or a copy of any document which is delivered to the Agent for that Party by any other Party. The Agent shall promptly forward to the Borrower any Assignment Agreement it receives that has been duly executed by both an assigning Lender and an assignee.

(c)    Except where this Agreement specifically provides otherwise, the Agent is not obliged to review or check the adequacy, accuracy or completeness of any document it forwards to another Party.

(d)    If the Agent receives notice from a Party referring to this Agreement, describing a Default and stating that the circumstance described is a Default, it shall promptly notify the Lenders.

(e)    If the Agent is aware of the non-payment of any principal, interest or fee payable to a Lender under this Agreement, it shall promptly notify the other Lenders.

(f)    The Agent shall provide to the Borrower within 10 Business Days of a request by the Borrower (but no more frequently than once per calendar month), a list (which may be in electronic form) setting out the names of the Lenders as at the date of that request, their respective Commitments, the address and fax number (and the department or officer, if any, for whose attention any communication is to be made) of each Lender for any communication to be made or document to be delivered under or in connection with this Agreement, the electronic mail address and/or any other information required to enable the sending and receipt of information by electronic mail or other electronic means to and by each Lender to whom any communication under or in connection with this Agreement may be made by that means and the account details of each Lender for any payment to be distributed by the Agent to that Lender under this Agreement.

(g)    The Agent shall have only those duties, obligations and responsibilities expressly specified in this Agreement (and no others shall be implied).

9.04    **No Fiduciary Duties.**

(a)    Nothing in this Agreement constitutes the Agent or the Lenders as a trustee or fiduciary of any other person.

(b)     None of the Agent or the Lenders shall be bound to account to any Lender for any sum or the profit element of any sum received by it for its own account.

9.05     **Business with the Group**.  The Agent and the Lenders may accept deposits from, lend money to and generally engage in any kind of banking or other business with any member of the Group.

9.06     **Rights and Discretions**.

(a)     The Agent may:

(i)     rely on any representation, communication, notice or document believed by it to be genuine, correct and appropriately authorized;

(ii)     assume that:

(A)     any instructions received by it from the Majority Lenders, any Lenders or any group of Lenders are duly given in accordance with the terms of this Agreement; and

(B)     unless it has received notice of revocation, that those instructions have not been revoked; and

(iii)     rely on a certificate from any person:

(A)     as to any matter of fact or circumstance which is reasonably likely to be within the knowledge of that person; or

(B)     to the effect that such person approves of any particular dealing, transaction, step, action or thing, as sufficient evidence that that is the case and, in the case of this paragraph (iii), may assume the truth and accuracy of that certificate.

(b)   .  The Agent may assume (unless it has received notice to the contrary in its capacity as agent for the Lenders) that:

(i)     no Default has occurred (unless and until written notice thereof is given to the Agent by the Borrower, the Guarantor or a Lender);

(ii)     any right, power, authority or discretion vested in any Party or any group of Lenders has not been exercised; and

(iii)     any notice or request made by the Borrower is made on behalf of and with the consent and knowledge of the Loan Parties.

(c)     The Agent may engage and pay for the advice or services of any lawyers, accountants, tax advisers, surveyors or other professional advisers or experts.

- 48 -



(d)     Without prejudice to the generality of _Section 9.06(c)_ or _Section 9.06(e)_, the Agent may at any time engage and pay for the services of any lawyers to act as independent counsel to the Agent (and so separate from any lawyers instructed by the Lenders) if the Agent in its reasonable opinion deems this to be desirable.

(e)     The Agent may rely on the advice or services of any lawyers, accountants, tax advisers, surveyors or other professional advisers or experts (whether obtained by the Agent or by any other Party) and shall not be liable for any damages, costs or losses to any person, any diminution in value or any liability whatsoever arising as a result of its so relying.

(f)     The Agent may act in relation to this Agreement through its officers, employees and agents and the Agent shall not:

(i)     be liable for any error of judgment made by any such person; or

(ii)     be bound to supervise, or be in any way responsible for any loss incurred by reason of misconduct, omission or default on the part, of any such person,

unless such error or such loss was directly caused by the Agent's gross negligence or willful misconduct.

(g)     Unless this Agreement expressly provides otherwise, the Agent may disclose to any other Party any information it reasonably believes it has received as agent under this Agreement.

(h)     Without prejudice to the generality of _Section 9.06(g)_, the Agent:

(i)     may disclose; and

(ii)     on written request of the Borrower or the Majority Lenders shall, as soon as reasonably practicable, disclose the identity of a Defaulting Lender to the Borrower and to the Lenders.

(i)     Notwithstanding any other provision of this Agreement to the contrary, none of the Agent or the Lenders is obliged to do or omit to do anything if it would or might in its reasonable opinion constitute a breach of any law or regulation or a breach of a fiduciary duty or duty of confidentiality.

(j)     Notwithstanding any provision of this Agreement to the contrary, the Agent is not obliged to expend or risk its own funds or otherwise incur any financial liability in the performance of its duties, obligations or responsibilities or the exercise of any right, power, authority or discretion if it has grounds for believing the repayment of such funds or adequate indemnity against, or security for, such risk or liability is not reasonably assured to it.

9.07     **Responsibility for Documentation.**  The Agent is not responsible or liable for:



(a)    the adequacy, accuracy or completeness of any information (whether oral or written) supplied by the Agent, the Lenders, a Loan Party or any other person in or in connection with this Agreement or any reports or the transactions contemplated in this Agreement or any other agreement, arrangement or document entered into, made or executed in anticipation of, under or in connection with this Agreement;

(b)    the legality, validity, effectiveness, adequacy or enforceability of this Agreement or any other agreement, arrangement or document entered into, made or executed in anticipation of, under or in connection with this Agreement; or

(c)    any determination as to whether any information provided or to be provided to any Lender is non-public information the use of which may be regulated or prohibited by applicable law or regulation relating to insider dealing or otherwise.

9.08    **No Duty to Monitor**.  The Agent shall not be bound to inquire:

(a)    whether or not any Default has occurred;

(b)    as to the performance, default or any breach by any Party of its obligations under this Agreement; or

(c)    whether any other event specified in this Agreement has occurred.

9.09    **Exclusion of Liability**.

(a)    Without limiting Section 9.09(b) (and without prejudice to any other provision of this Agreement excluding or limiting the liability of the Agent) the Agent will not be liable for (unless directly caused by its gross negligence or willful misconduct):

(i)    any damages, costs or losses to any person, any diminution in value, or any liability whatsoever arising as a result of taking or not taking any action under or in connection with this Agreement;

(ii)    exercising, or not exercising, any right, power, authority or discretion given to it by, or in connection with, this Agreement or any other agreement, arrangement or document entered into, made or executed in anticipation of, under or in connection with, this Agreement; or

(iii)    without prejudice to the generality of paragraphs (i) and (ii) above, any damages, costs or losses to any person, any diminution in value or any liability whatsoever arising as a result of:

(A)    any act, event or circumstance not reasonably within its control; or

(B)    the general risks of investment in, or the holding of assets in, any jurisdiction,

- 50 -



including (in each case and without limitation) such damages, costs, losses, diminution in value or liability arising as a result of: nationalization, expropriation or other governmental actions; any regulation, currency restriction, devaluation or fluctuation; market conditions affecting the execution or settlement of transactions or the value of assets; breakdown, failure or malfunction of any third party transport, telecommunications, computer services or systems; natural disasters or acts of God; war, terrorism, insurrection or revolution; or strikes or industrial action.

(b)    No Party (other than the Agent) may take any proceedings against any officer, employee or agent of the Agent in respect of any claim it might have against the Agent in respect of any act or omission of any kind by that officer, employee or agent in relation to this Agreement and any officer, employee or agent of the Agent may rely on this Section 9.09.

(c)    The Agent will not be liable for any delay (or any related consequences) in crediting an account with an amount required under this Agreement to be paid by the Agent if the Agent has taken all necessary steps as soon as reasonably practicable to comply with the regulations or operating procedures of any recognized clearing or settlement system used by the Agent for that purpose.

(d)    Nothing in this Agreement shall oblige the Agent to carry out:

(i)    any "know your customer" or other checks in relation to any person; or

(ii)    any check on the extent to which any transaction contemplated by this Agreement might be unlawful for any Lender,

on behalf of any Lender and each Lender confirms to the Agent that it is solely responsible for any such checks it is required to carry out and that it may not rely on any statement in relation to such checks made by the Agent.

(e)    Without prejudice to any provision of this Agreement excluding or limiting the Agent's liability, any liability of the Agent arising under or in connection with this Agreement shall be limited to the amount of actual loss which has been finally judicially determined to have been suffered (as determined by reference to the date of default of the Agent or, if later, the date on which the loss arises as a result of such default) but without reference to any special conditions or circumstances known to the Agent at any time which increase the amount of that loss. In no event shall the Agent be liable for any loss of profits, goodwill, reputation, business opportunity or anticipated saving, or for special, punitive, indirect or consequential damages, whether or not the Agent has been advised of the possibility of such loss or damages.

9.10    **Lenders' Indemnity to the Agent.**

(a)    Each Lender shall (in proportion to its share of the total Commitments or, if the total Commitments are then zero, to its share of the total Commitments immediately prior to their reduction to zero) indemnify the Agent, within three Business Days of demand, against any cost, loss or liability (including, without limitation, for negligence or any other category of

liability whatsoever) incurred by the Agent (otherwise than by reason of the Agent's gross negligence or willful misconduct) notwithstanding the Agent's negligence, gross negligence or any other category of liability whatsoever but not including any claim based on the fraud of the Agent in acting as Agent under this Agreement (unless the Agent has been reimbursed by a Loan Party).

      (b)    Subject to Section 9.10(c) and Article III, the Borrower shall immediately on demand reimburse any Lender for any payment that Lender makes to the Agent pursuant to Section 9.10(a).

      (c)    Section 9.10(b) shall not apply to the extent that the indemnity payment in respect of which the Lender claims reimbursement relates to a liability of the Agent to a Loan Party.

9.11    **Resignation of the Agent.**

      (a)    The Agent may resign and appoint one of its Affiliates acting through an office in the United States as successor by giving notice to the Lenders and the Borrower.

      (b)    Alternatively the Agent may resign by giving 30 days' advance notice to the Lenders and the Borrower, in which case the Majority Lenders (after consultation with the Borrower) may appoint a successor Agent that is a bank, financial institution, trust company or another company primarily engaged in providing agency or administrative services (acting through an office in the United States).

      (c)    If the Majority Lenders have not appointed a successor Agent in accordance with Section 9.11(b) within 20 days after notice of resignation was given, the retiring Agent (after consultation with the Borrower) may appoint a successor Agent that is a bank, financial institution, trust company or another company primarily engaged in providing agency or administrative services (acting through an office in the United States).

      (d)    If the Agent wishes to resign because (acting reasonably) it has concluded that it is no longer appropriate for it to remain as agent and the Agent is entitled to appoint a successor Agent under Section 9.11(c), the Agent may (if it concludes (acting reasonably) that it is necessary to do so in order to persuade the proposed successor Agent to become a party to this Agreement as Agent) agree with the proposed successor Agent amendments to this Article IX and any other term of this Agreement dealing with the rights or obligations of the Agent consistent with then current market practice for the appointment and protection of corporate trustees together with any reasonable amendments relating to the establishment and payment of any agency fee payable under this Agreement which are consistent with the successor Agent's normal fee rates and those amendments will bind the Parties.

      (e)    The retiring Agent shall, at its own cost, make available to the successor Agent such documents and records and provide such assistance as the successor Agent may reasonably request for the purposes of performing its functions as Agent under this Agreement.

      (f)    The Agent's resignation notice shall only take effect upon the appointment of a successor.

(g)    Upon the appointment of a successor, the retiring Agent *shall be* discharged from any further obligation in respect of this Agreement (other than its obligations under Section 9.11(e)) but shall remain entitled to the benefit of Section 11.03(f) and this Article IX (and, if any have been established, any agency fees for the account of the retiring Agent shall cease to accrue from (and shall be payable on) that date).  Any successor and each of the other Parties shall have the same rights and obligations amongst themselves as they would have had if such successor had been an original Party.

9.12    **Replacement of the Agent**.

(a)    After consultation with the Borrower, the Majority Lenders may, by giving 30 days' advance notice to the Agent (or, at any time the Agent is an Impaired Agent, by giving any shorter notice determined by the Majority Lenders) replace the Agent by appointing a successor Agent that is a bank, financial institution, trust company or another company primarily engaged in providing agency or administrative services (acting through an office in the United States).

(b)    The retiring Agent shall (at its own cost if it is an Impaired Agent and otherwise at the expense of the Lenders) make available to the successor Agent such documents and records and provide such assistance as the successor Agent may reasonably request for the purposes of performing its functions as Agent under this Agreement.

(c)    The appointment of the successor Agent shall take effect on the date specified in the notice from the Majority Lenders to the retiring Agent.  As from this date, the retiring Agent shall be discharged from any further obligation in respect of this Agreement (other than its obligations under Section 9.12(b)) but shall remain entitled to the benefit of Section 11.03(f) and this Article IX (and, if any have been established, any agency fees for the account of the retiring Agent shall cease to accrue from (and shall be payable on) that date).

(d)    Any successor Agent and each of the other Parties shall have the same rights and obligations amongst themselves as they would have had if such successor had been an original Party.

9.13    **Confidentiality**.

(a)    In acting as agent for the Lenders, the Agent shall be regarded as acting through its agency division which shall be treated as a separate entity from any other of its divisions or departments.

(b)    If information is received by another division or department of the Agent, it may be treated as confidential to that division or department and the Agent shall not be deemed to have notice of it.

9.14    **Relationship with the Lenders**.

(a)    Subject to Section 11.05(f), the Agent may treat the person shown in its records as Lender at the opening of business (in the place of the Agent's principal office as notified to the Lenders from time to time) as the Lender acting through its Lending Office:

        (i)      entitled to or liable for any payment due under this Agreement on that day; and

        (ii)     entitled to receive and act upon any notice, request, document or communication or make any decision or determination under this Agreement made or delivered on that day,

unless it has received not less than five Business Days' prior notice from that Lender to the contrary in accordance with the terms of this Agreement.

        (b)     Any Lender may by notice to the Agent appoint a person to receive on its behalf all notices, communications, information and documents to be made or dispatched to that Lender under this Agreement. Such notice shall contain the address, fax number and electronic mail address and/or any other information required to enable the sending and receipt of information by that means (and, in each case, the department or officer, if any, for whose attention communication is to be made) and be treated as a notification of a substitute address, fax number, electronic mail address, department and officer by that Lender for the purposes of Section 11.02 and the Agent shall be entitled to treat such person as the person entitled to receive all such notices, communications, information and documents as though that person were that Lender.

      9.15     **Credit Appraisal by the Lenders**. Without affecting the responsibility of any Loan Party for information supplied by it or on its behalf in connection with any this Agreement, each Lender confirms to the Agent that it has been, and will continue to be, solely responsible for making its own independent appraisal and investigation of all risks arising under or in connection with this Agreement including but not limited to:

        (a)     the financial condition, status and nature of each member of the Group;

        (b)     the legality, validity, effectiveness, adequacy or enforceability of this Agreement and any other agreement, arrangement or document entered into, made or executed in anticipation of, under or in connection with this Agreement;

        (c)     whether that Lender has recourse, and the nature and extent of that recourse, against any Party or any of its respective assets under or in connection with this Agreement, the transactions contemplated by this Agreement or any other agreement, arrangement or document entered into, made or executed in anticipation of, under or in connection with this Agreement; and

        (d)     the adequacy, accuracy or completeness of the reports and any other information provided by the Agent, any Party or by any other person under or in connection with this Agreement, the transactions contemplated by this Agreement or any other agreement, arrangement or document entered into, made or executed in anticipation of, under or in connection with this Agreement.

      9.16     **Deduction from Amounts Payable by the Agent**. If any Party owes an amount to the Agent under this Agreement the Agent may, after giving notice to that Party,

Case 1:19-cv-02523-PKC   Document 26-4   Filed 04/11/19   Page 63 of 73

deduct an amount not exceeding that amount from any payment to that Party which the Agent would otherwise be obliged to make under this Agreement and apply the amount deducted in or towards satisfaction of the amount owed.  For the purposes of this Agreement that Party shall be regarded as having received any amount so deducted.

9.17    **Conduct of Business by the Lenders**.  No provision of this Agreement will:

(a)    interfere with the right of any Lender to arrange its affairs (tax or otherwise) in whatever manner it thinks fit;

(b)    oblige any Lender to investigate or claim any credit, relief, remission or repayment available to it or the extent, order and manner of any claim; or

(c)    oblige any Lender to disclose any information relating to its affairs (tax or otherwise) or any computations in respect of Tax.

## ARTICLE X

## GUARANTEE

10.01    **Guarantee**.  The Guarantor hereby agrees that it is jointly and severally liable for, and, as primary obligor and not merely as surety, absolutely, irrevocably and unconditionally guarantees to the Agent and each of the Lenders the prompt payment when due, whether at stated maturity, upon acceleration or otherwise, and at all times thereafter, of the Obligations and all costs and expenses including all court costs and attorneys' and paralegals' fees (including allocated costs of in-house counsel and paralegals) (which obligation in respect of counsel shall be limited to one counsel for the Agent and one counsel for the Lenders, as well as, in each case, other special and local counsel) and expenses paid or incurred by the Agent and the Lenders in endeavoring to collect all or any part of the Obligations from, or in prosecuting any action against, the Borrower or any other guarantor of all or any part of the Obligations (such costs and expenses, together with the Obligations, collectively the "Guaranteed Obligations").    The Guarantor further agrees that the Guaranteed Obligations may be extended or renewed in whole or in part without notice to or further assent from it, and that it remains bound upon its guarantee notwithstanding any such extension or renewal.  All terms of this Guarantee apply to and may be enforced by or on behalf of any domestic or foreign branch or Affiliate of the Lenders.  The Guarantor shall not assign or transfer any part of its rights or obligations under this Guarantee without the prior written consent of the Agent and the Lenders, and any attempted assignment without such consent shall be null and void.  Each Lender shall be entitled to assign its rights under this Guarantee to any Person or Persons to whom it assigns all or a portion of its interests, rights and obligations under this Agreement in compliance with the terms and conditions hereof, with notice to, but without the prior written consent of, the Borrower, the Guarantor and the Agent.

10.02    **Guarantee of Payment**.  This Guarantee is a guarantee of payment and not of collection.  The Guarantor waives any right to require the Agent or the Lenders to sue the Borrower, the Guarantor, any other guarantor or any other person obligated for all or any part of the Guaranteed Obligations (each, an "Obligated Party").

10.03    **No Discharge or Diminishment of Guarantee.**

(a)    <u>Unconditional</u>. Except as otherwise provided herein, the obligations of the Guarantor hereunder are unconditional and absolute and not subject to any reduction, limitation, impairment or termination for any reason (other than the indefeasible payment in full in cash of the Guaranteed Obligations), including (i) any claim of waiver, release, extension, renewal, settlement, surrender, alteration or compromise of any of the Guaranteed Obligations, by operation of law or otherwise; (ii) any change in the corporate existence, structure or ownership of the Borrower or any other guarantor of or other person liable for any of the Guaranteed Obligations; (iii) any insolvency, bankruptcy, reorganization or other similar proceeding affecting any Obligated Party, or their assets or any resulting release or discharge of any obligation of any Obligated Party; or (iv) the existence of any claim, setoff or other rights which the Guarantor may have at any time against any Obligated Party, the Agent, the Lenders or any other person, whether in connection herewith or in any unrelated transactions.

(b)    <u>No Setoff, Etc</u>. The obligations of the Guarantor hereunder are not subject to any defense or setoff, counterclaim, recoupment or termination whatsoever by reason of the invalidity, illegality or unenforceability of any of the Guaranteed Obligations or otherwise, or any provision of applicable law or regulation purporting to prohibit payment by any Obligated Party, of the Guaranteed Obligations or any part thereof.

(c)    <u>No Diminishment</u>. Further, the obligations of the Guarantor hereunder are not discharged or impaired or otherwise affected by (i) the failure of the Agent or the Lenders to assert any claim or demand or to enforce any remedy with respect to all or any part of the Guaranteed Obligations; (ii) any waiver or modification of or supplement to any provision of any agreement relating to the Guaranteed Obligations; (iii) any release, non-perfection or invalidity of any indirect or direct security for the obligations of the Borrower for all or any part of the Guaranteed Obligations or any obligations of any other guarantor of or other person liable for any of the Guaranteed Obligations; or (iv) any default, failure or delay, willful or otherwise, in the payment or performance of any of the Guaranteed Obligations, or any other circumstance, act, omission or delay that might in any manner or to any extent vary the risk of such Guarantor or that would otherwise operate as a discharge of the Guarantor as a matter of law or equity (other than the indefeasible payment in full in cash of the Guaranteed Obligations).

10.04    **Defenses Waived.**    To the fullest extent permitted by applicable law, the Guarantor hereby waives any defense based on or arising out of any defense of the Borrower or the Guarantor or the unenforceability of all or any part of the Guaranteed Obligations from any cause, or the cessation from any cause of the liability of the Borrower or the Guarantor, other than the indefeasible payment in full in cash of the Guaranteed Obligations. Without limiting the generality of the foregoing, the Guarantor irrevocably waives acceptance hereof, presentment, demand, protest and, to the fullest extent permitted by law, any notice not provided for herein, as well as any requirement that at any time any action be taken by any person against any Obligated Party or any other person. The Agent may, at its election, compromise or adjust any part of the Guaranteed Obligations, make any other accommodation with any Obligated Party or exercise any other right or remedy available to it against any Obligated Party, without affecting or impairing in any way the liability of such Guarantor under this Guarantee except to the extent the Guaranteed Obligations have been fully and indefeasibly paid in cash. To the fullest extent

- 56 -

permitted by applicable law, the Guarantor waives any defense arising out of any such election even though that election may operate, pursuant to applicable law, to impair or extinguish any right of reimbursement or subrogation or other right or remedy of the Guarantor against any Obligated Party or any security.

10.05    **Rights of Subrogation**.  The Guarantor will not assert any right, claim or cause of action, including a claim of subrogation, contribution or indemnification that it has against any Obligated Party until the Borrower and the Guarantor have fully performed all their obligations to the Agent and the Lenders.

10.06    **Reinstatement**.  If at any time any payment of any portion of the Guaranteed Obligations is rescinded or must otherwise be restored or returned upon the insolvency, bankruptcy or reorganization of the Borrower or otherwise, the Guarantor's obligations under this Guarantee with respect to that payment shall be reinstated at such time as though the payment had not been made and whether or not the Agent and the Lenders are in possession of this Guarantee.  If acceleration of the time for payment of any of the Guaranteed Obligations is stayed upon the insolvency, bankruptcy or reorganization of the Borrower, all such amounts otherwise subject to acceleration under the terms of any agreement relating to the Guaranteed Obligations shall nonetheless be payable by the Guarantor forthwith on demand by the Agent.

10.07    **Release**.  The Guarantor will be released from its obligations under this Article X upon the indefeasible payment in full of the Obligations.  Upon the indefeasible payment in full of the Obligations, the Agent shall promptly execute any release documents giving effect to the immediately preceding sentence upon the request of the Borrower, without the consent or further agreement of Agent or the Lenders.

## ARTICLE XI

## MISCELLANEOUS

11.01    **Waivers; Amendments**.

(a)    No failure or delay of the Agent or the Lenders in exercising any power or right hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any such right or power, or any abandonment or discontinuance of steps to enforce such a right or power, preclude any other or further exercise thereof or the exercise of any other right or power. The rights and remedies of the Agent and the Lenders hereunder are cumulative and are not exclusive of any rights or remedies that they would otherwise have.  No waiver of any provision of this Agreement or consent to any departure by the Borrower or the Guarantor therefrom shall in any event be effective unless the same shall be permitted by paragraph (b) below, and then such waiver or consent shall be effective only in the specific instance and for the purpose for which given.  No notice or demand on the Borrower or the Guarantor in any case shall entitle the Borrower or the Guarantor to any other or further notice or demand in similar or other circumstances.

(b)    Neither this Agreement nor any provision hereof may be waived, amended or modified except pursuant to an agreement or agreements in writing entered into by the

Borrower and the Lenders; _provided_, that no such agreement shall amend, modify or otherwise affect the rights or duties of the Agent hereunder without the prior written consent of the Agent.

    11.02    **Notices; Effectiveness; Electronic Communication.**

    (a)    <u>Notice Addresses</u>. Notices and other communications provided for herein shall be in writing and shall be delivered to the applicable Party by hand or overnight courier service, or sent by fax or electronic mail, at such Party's address (or fax number or electronic mail address) set forth in <u>Schedule 11.02</u>.

    (b)    <u>Effectiveness</u>. All notices and other communications given to any Party hereto in accordance with the provisions of this Agreement shall be deemed to have been given on the date of receipt if delivered by hand or overnight courier service or sent by fax or electronic mail, in each case delivered, or sent (properly addressed) to such party as provided in this <u>Section 11.02</u> or in accordance with the latest unrevoked direction from such party given in accordance with this <u>Section 11.02</u>.

    (c)    <u>Electronic Delivery</u>. The Borrower hereby agrees, unless the electronic mail address referred to below has not been provided by the Agent or the Lenders to the Borrower, that it will, or will cause its Subsidiaries to, provide to the Agent and the Lender all information, documents and other materials that it is obligated to furnish to the Agent and the Lenders pursuant to this Agreement, including all financial statements, financial and other reports, certificates and other information materials (all such communications being referred to herein collectively as "Communications"), by transmitting the Communications in an electronic/soft medium that is properly identified in a format acceptable to the Agent and the Lenders to an electronic mail address as directed by the Agent and the Lenders.

    (d)    <u>Change of Address. Etc.</u> Each Loan Party, the Agent and each Lender may change its address, facsimile number or email address for notices and other communications hereunder by notice to the other Parties; _provided_ that no Loan Party may change its address, facsimile number or email address for purposes of this Agreement without the prior written consent of the Agent, such consent not to be unreasonably withheld, conditioned or delayed.

    (e)    <u>Reliance by the Lenders and the Agent</u>. The Lenders and the Agent shall be entitled to rely and act upon any notices purportedly given by or on behalf of any Loan Party even if (i) such notices were not made in a manner specified herein, were incomplete or were not preceded or followed by any other form of notice specified herein or (ii) the terms thereof, as understood by the recipient, varied from any confirmation thereof. Each Loan Party shall indemnify the Lenders, the Agent and their respective Related Parties from all losses, costs, expenses and liabilities resulting from the reliance by such Person on each notice purportedly given by or on behalf of such Loan Party; _provided_ that such indemnity shall not, as to any Lender, the Agent, and their respective Related Parties, be available to the extent that such losses, costs, expenses or liabilities are determined by a court of competent jurisdiction by final and non-appealable judgment to have resulted from the gross negligence or willful misconduct of such party.

    11.03    **Expenses; Indemnity; Damage Waiver.**



(a)    Costs and Expenses. Each Party shall be responsible for all out-of-pocket expenses incurred by it in connection with the preparation and administration of this Agreement except that the Borrower agrees to pay the fees, charges and disbursements of Norton Rose Fulbright, counsel for the Agent, up to an amount not to exceed Fifty Thousand Dollars ($50,000) in the aggregate (whether or not the transactions hereby or thereby contemplated shall be consummated). The Borrower agrees to pay all out-of-pocket expenses incurred by the Agent and the Lenders in connection with the enforcement or protection of the Agent's and the Lenders' rights in connection with this Agreement and, in connection with any such enforcement or protection, the fees, charges and disbursements of any counsel for the Agent or the Lenders.

(b)    Payments. All payments by the Borrower of principal, interest and other Obligations shall be made solely and exclusively in Dollars, as currency of payment, in same day funds, without setoff, counterclaim, deduction (except as provided for in Article III) or other defense, free of any restriction or condition, and delivered to the Lender or the Agent, as applicable, not later than 12:00 (noon), New York City time, on the date due at the account of the applicable Lender or the Agent. If it becomes necessary to convert into Dollars any amount in any other currency, then that conversion shall be made at the rate of exchange quoted in the interbroker market by the Agent for the spot purchase of such original currency at the close of business on the day immediately preceding the day such payment was made. The Borrower agrees that its obligation to make payments in Dollars shall be enforceable as a separate cause of action if the amount received by the Lender or the Agent, as applicable, shall fall short of the full amount of Dollars payable hereunder, and shall not be affected by judgment being obtained for other sums due hereunder.

(c)    Indemnification by the Loan Parties. The Loan Parties shall, jointly and severally, indemnify each Lender and the Agent and each Related Party of each Lender and the Agent (each such Person being called an "Indemnitee") against, and hold each Indemnitee harmless from, any and all losses, claims, damages, liabilities (including Environmental Liabilities) and related expenses (including the reasonable and documented fees, charges and disbursements of any counsel for any Indemnitee) of any kind or nature whatsoever incurred by any Indemnitee or asserted against any Indemnitee at any time (including at any time following repayment of the Obligations or the replacement of any Lender) by any third party or by any Loan Party arising out of, in connection with, or as a result of (i) the execution or delivery of this Agreement or any agreement or instrument contemplated hereby or thereby, the performance by the parties hereto of their respective obligations hereunder or thereunder, or the consummation of the transactions contemplated hereby or thereby, (ii) the Loans or the use or proposed use of the proceeds therefrom, (iii) any actual or prospective claim, demand, action, cause of action, litigation, investigation or proceeding relating to any of the foregoing, whether based on contract, tort or any other theory, whether brought by a third party or by any Loan Party, and regardless of whether any Indemnitee is a party thereto, and (iv) any and all liabilities (including liabilities under indemnities), losses, costs or expenses (including reasonable and documented fees and disbursements of counsel) that any Indemnitee suffers or incurs as a result of the assertion of any foregoing claim, demand, action, cause of action, litigation, investigation or proceeding, or as a result of the preparation of any defense in connection with any foregoing claim, demand, action, cause of action, litigation, investigation or proceeding, in all cases, and whether or not an Indemnitee is a party to such claim, demand, action, cause of action, litigation, investigation or proceeding; provided that such indemnity shall not, as to any Indemnitee, be available to the

extent that such losses, claims, damages, liabilities or related expenses are determined by a court of competent jurisdiction by final and non-appealable judgment to have resulted from the gross negligence or willful misconduct of such Indemnitee; and <u>provided</u> <u>further</u> that such indemnity shall exclude any indemnity related to Excluded Taxes.

        (d)    <u>Currency Indemnity</u>.

        (i)    If any sum due from a Loan Party under this Agreement (a "Sum"), or any order, judgment or award given or made in relation to a Sum, has to be converted from the currency (the "<u>First Currency</u>") in which that Sum is payable into another currency (the "<u>Second Currency</u>") for the purpose of:

        (A)    making or filing a claim or proof against that Loan Party; or

        (B)    obtaining or enforcing an order, judgment or award in relation to any litigation or arbitration proceedings,

that Loan Party shall as an independent obligation, within three Business Days of demand, indemnify the Lenders to whom that Sum is due against any cost, loss or liability arising out of or as a result of the conversion including any discrepancy between (A) the rate of exchange used to convert that Sum from the First Currency into the Second Currency and (B) the rate or rates of exchange available to that person at the time of its receipt of that Sum.

        (ii)    Each Loan Party waives any right it may have in any jurisdiction to pay any amount under this Agreement in a currency or currency unit other than that in which it is expressed to be payable.

        (e)    <u>Other Indemnities</u>.

        (i)    The Borrower shall (or shall procure that a Loan Party will), within 3 Business Days of demand, indemnify the Lenders against any cost, loss or liability incurred by it as a result of:

        (A)    the occurrence of any Event of Default; or

        (B)    a failure by a Loan Party to pay any amount due under this Agreement on its due date, including without limitation, any cost, loss or liability arising as a result of <u>Section 2.09</u>.

        (f)    <u>Indemnity to the Agent</u>.    The Borrower shall promptly indemnify the Agent against:

        (i)    any cost, loss or liability incurred by the Agent (acting reasonably) as a result of:

- 60 -



(A)    investigating any event which it reasonably believes is a Default;

(B)    acting or relying on any notice, request or instruction which it reasonably believes to be genuine, correct and appropriately authorized; or

(C)    instructing lawyers, accountants, tax advisers, surveyors or other professional advisers or experts as permitted under this Agreement; and

(ii)    any cost, loss or liability incurred by the Agent (otherwise than by reason of the Agent's gross negligence or willful misconduct) in acting as Agent under this Agreement.

(g)    <u>Waiver of Consequential Damages. Etc.</u>  To the fullest extent permitted by applicable law, no Loan Party shall assert, and each Loan Party hereby waives, any claim against any Indemnitee, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Agreement or any agreement or instrument contemplated hereby, the transactions contemplated hereby or thereby, the Loans or the use of the proceeds thereof.

(h)    <u>Payment of Indemnified Amounts</u>.    All amounts due under Sections <u>11.03(c)</u>, <u>11.03(d)</u>, <u>11.03(e)</u>, and <u>11.03(f)</u> shall be payable not later than three (3) Business Days after demand therefor.

(i)    <u>Survival</u>.  Subject to <u>Section 11.09</u>, the provisions of this <u>Section 11.03</u> shall remain operative and in full force and effect regardless of the expiration of the term of this Agreement, the consummation of the transactions contemplated hereby, the repayment of the Loans, the invalidity or unenforceability of any term or provision of this Agreement, or any investigation made by or on behalf of the Agent or the Lender.  All amounts due under this <u>Section 11.03</u> shall be payable on written demand therefor.

11.04    **Payments Set Aside.**  To the extent that any payment by or on behalf of a Loan Party is made to any Lender or the Agent, or any Lender exercises its right of setoff, and such payment or the proceeds of such setoff or any part thereof is subsequently invalidated, declared to be fraudulent or preferential, set aside or required (including pursuant to any settlement entered into by a Lender in its discretion) to be repaid to a trustee, receiver or any other party, in connection with any proceeding under any bankruptcy or insolvency law or otherwise, then to the extent of such recovery, the obligation or part thereof originally intended to be satisfied shall be revived and continued in full force and effect as if such payment had not been made or such setoff had not occurred.

11.05    **Successors and Assigns**

(a)    <u>References to Parties</u>.  Whenever in this Agreement any of the parties hereto is referred to, such reference shall be deemed to include the permitted successors and assigns of such party; and all covenants, promises and agreements by or on behalf of the Borrower, the Agent or the Lenders that are contained in this Agreement shall bind and inure to the benefit of their respective successors and assigns.

Case 1:19-cv-02523-PKC   Document 26-4   Filed 04/11/19   Page 70 of 73

(b)    Assignment by Lenders.  A Lender may assign to any Person or Persons (other than an Ineligible Transferee) all or a portion of its interests, rights and obligations under this Agreement, with notice to, but without the prior written consent of, the Borrower and the Agent.  In the event of an assignment made by a Lender without the prior written consent of the Borrower, the obligation of the Borrower under Article III shall not be increased as a result of any such assignment.

Notwithstanding Sections 11.05(a) or 11.05(b), upon the occurrence and continuance of an Event of Default, a Lender may effect such assignment to any Person or Persons, with notice to, but without the prior written consent of, the Borrower and the Agent; provided, that the parties to each assignment shall execute and deliver to each of the Borrower and the Agent a copy of the Assignment Agreement.  From and after the effective date specified in each Assignment Agreement, (i) the assignee thereunder shall be a party hereto and, to the extent of the interest assigned by such Assignment Agreement, have the rights and obligations of such Lender under this Agreement, and (ii) the assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment Agreement, be released from its obligations under this Agreement (and, in the case of an Assignment Agreement covering all or the remaining portion of an assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto but shall continue to be entitled to the benefits of Article III and Section 11.03 and be subject to the provisions of Section 11.06).

By executing and delivering an Assignment Agreement, the assigning Lender thereunder and the assignee thereunder shall be deemed to confirm to and agree with each other and the other Parties as follows: (i) such assigning Lender warrants that it is the legal and beneficial owner of the interest being assigned thereby free and clear of any adverse claim and the outstanding balance of the Loans, in each case without giving effect to assignment thereof which have not become effective, are as set forth in such Assignment Agreement; (ii) except as set forth in (i) above, such assigning Lender makes no representation or warranty and assumes no responsibility with respect to any statements, warranties or representations made in or in connection with this Agreement, or the execution, legality, validity, enforceability, genuineness, sufficiency or value of this Agreement, any other Transaction Document or any other instrument or document furnished pursuant hereto, or the financial condition of the Borrower, the Guarantor or any of their Subsidiaries or the performance or observance by the Borrower, the Guarantor or any of their Subsidiaries of any of its obligations under this Agreement, any other Transaction Document or any other instrument or document furnished pursuant hereto; (iii) such assignee represents and warrants whether it is or is not an Eligible Institution and that it is a Person legally authorized to enter into such Assignment Agreement and that is not an Ineligible Transferee; (iv) such assignee confirms that it has received a copy of this Agreement, together with copies of the most recent financial statements referred to in Section 5.05 or delivered pursuant to Section 6.04 and such other documents and information as it has deemed appropriate to make its own credit analysis and decision to enter into such Assignment Agreement; (v) such assignee will independently and without reliance upon the Agent, such assigning Lender or any other Lender, if applicable, and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking action under this Agreement; (vi) such assignee appoints and authorizes the Agent to take such action as agent on its behalf and to exercise such powers under this Agreement as are delegated to the Agent by the terms hereof, together with such powers as are

Case 1:19-cv-02523-PKC   Document 26-4   Filed 04/11/19   Page 71 of 73

reasonably incidental thereto; and (vii) such assignee agrees that it will perform in accordance with their terms all the obligations which by the terms of this Agreement are required to be performed by it as the Lender.

(c)    Participations.  A Lender may without the consent of the Borrower or the Agent sell participations to one or more banks or other Persons in all or a portion of its rights and obligations under this Agreement held by it; provided, however, that (i) such Lender's obligations under this Agreement shall remain unchanged, (ii) such Lender shall remain solely responsible to the other Parties for the performance of such obligations, and (iii) the Borrower, the Agent and the other Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement, and such Lender shall retain the sole right to enforce the obligations of the Borrower relating to this Agreement held by it and to approve any amendment, modification or waiver of any provision of this Agreement.

To the extent permitted by law, each participating bank or other Person also shall be entitled to the benefits of Section 11.07 as though it were a Lender, provided that in order for such participating bank or other Person to be subject to Section 11.07 as though it were a Lender, the Borrower shall have been notified of the identity of such participating bank or other Person prior to such participating bank or other Person exercising any setoff rights against the Borrower.

Any Lender or participant may, in connection with any assignment or participation or proposed assignment or participation pursuant to this Section 11.05, disclose to the assignee or participant or proposed assignee or participant any information relating to the Borrower in respect of this transaction furnished to such Lender by or on behalf of the Borrower; provided that, prior to any such disclosure of information designated by the Borrower as confidential, each such assignee or participant or proposed assignee or participant shall execute an agreement enforceable by the Borrower and the Guarantor whereby such assignee or participant shall agree to preserve the confidentiality of such confidential information on terms no less restrictive than those applicable to the Lenders pursuant to Section 11.06.

(d)    Security Interests.  Any Lender may at any time pledge or assign a security interest in all or any portion of its rights under this Agreement and the other Obligations owed to such Lender to secure obligations owed by such Lender; provided that no such pledge or assignment shall release a Lender from any of its obligations hereunder or substitute any such assignee for such Lender as a party hereto.

(e)    Assignment by Borrower.  The Borrower shall not assign or delegate any of its rights or duties hereunder without the prior written consent of the Agent and the Majority Lenders, and any attempted assignment without such consent shall be null and void.

(f)    Pro rata Interest Settlement.

(i)    If the Agent has notified the Lenders that it is able to distribute interest payments on a "*pro rata* basis" to assigning Lenders and assignees thereof then

Case 1:19-cv-02523-PKC    Document 26-4    Filed 04/11/19    Page 72 of 73

(in respect of any assignment the Transfer Date of which, in each case, is after the date of such notification and is not on the last day of an Interest Period):

(A)    any interest or fees in respect of the relevant participation which are expressed to accrue by reference to the lapse of time shall continue to accrue in favor of the assigning Lender up to but excluding the Transfer Date ("Accrued Amounts") and shall become due and payable to the assigning Lender (without further interest accruing on them) on the last day of the current Interest Period (or, if the Interest Period is longer than 90 days, on the next of the dates which falls at 90-day intervals after the first day of that Interest Period); and

(B)    the rights assigned by the assigning Lender will not include the right to the Accrued Amounts so that, for the avoidance of doubt:

(I)    when the Accrued Amounts become payable, those Accrued Amounts will be payable for the account of the assigning Lender; and

(II)    the amount payable to the assignee on that date will be the amount which would, but for the application of this Section 11.05, have been payable to it on that date, but after deduction of the Accrued Amounts.

(ii)    In this Section 11.05(f), references to "Interest Period" shall be construed to include a reference to any other period for accrual of fees.

(g)    Register.

(i)    The Agent, acting solely for this purpose as a non-fiduciary agent of the Borrower for tax purposes only, shall maintain a copy of each Assignment Agreement delivered to it and a register for the recordation of the names and addresses of each Lender, and the Commitment of, the principal amount of the Loans owing to, and each payment of the principal and interest of the Loans of, each Lender pursuant to the terms hereof from time to time (the "Register"). The entries in the Register shall be conclusive absent manifest error and the Borrower and the Lenders may treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement, notwithstanding notice to the contrary. The Register shall be available for inspection by each of the Borrower and any Lender, at any reasonable time and from time to time upon reasonable prior notice.

(ii)    Upon its receipt of a duly completed, properly executed, Assignment Agreement executed by an assigning Lender and an assignee, the Agent shall promptly record the information contained therein in the Register. No assignment shall be effective unless it has been recorded in the Register as provided in this paragraph. Prior to such recordation all amounts owing to the assigning Lender with respect to its Commitment and the Loans shall remain owing to such assigning Lender.



11.06 **Confidentiality**. The Agent and each of the Lenders agrees to maintain the confidentiality of the Information (as defined below), except that Information may be disclosed (a) to its and its Affiliates' officers, directors, employees and agents, including accountants, legal counsel and other advisors (it being agreed that the Persons to whom such disclosure is made will be informed of the confidential nature of such Information and instructed to keep such Information confidential, and that the Agent or Lender disclosing Information to such Affiliates shall be responsible for a disclosure of Information by such Affiliates in contravention of this Section 11.06), (b) to the extent requested by any regulatory authority or quasi-regulatory authority, (c) to the extent required by applicable laws or regulations or by any subpoena or similar legal process, provided that if legally permissible, such Lender or the Agent, as applicable, shall use commercially reasonable efforts to provide prompt notice to the Borrower prior to such disclosure and if not possible, promptly thereafter, (d) in connection with the exercise of any remedies hereunder or any suit, action or proceeding relating to the enforcement of its rights hereunder, (e) subject to an agreement containing provisions substantially the same as those of this Section 11.06, to (i) any actual or prospective assignee of or participant in any of its rights or obligations under this Agreement or (ii) any actual or prospective counterparty (or its advisors) to any swap or derivative transaction relating to the Borrower, the Guarantor or any of their Subsidiaries or any of their respective obligations, (f) with the consent of the Borrower or (g) to the extent such Information becomes publicly available other than as a result of a breach of this Section 11.06.

For the purposes of this Section, "Information" shall mean all information received from the Borrower or the Guarantor and related to the Borrower or the Guarantor or their business, other than any such information that was available to the Agent or the Lenders on a nonconfidential basis prior to its disclosure by the Borrower or the Guarantor. Any Person required to maintain the confidentiality of Information as provided in this Section 11.06 shall be considered to have complied with its obligation to do so if such Person has exercised the same degree of care to maintain the confidentiality of such Information as such Person would accord its own confidential information.

11.07 **Right of Setoff**. The Borrower acknowledges that if an Event of Default shall have occurred and be continuing, the Lenders are entitled to whatever statutory or common law provisions relating to banker's liens, rights of set off or similar rights and remedies as to deposit accounts or other funds maintained with depository institutions that are available to the Lender.

11.08 **Counterparts; Integration; Effectiveness**. This Agreement may be executed in counterparts (and by different Parties on different counterparts), each of which shall constitute an original but all of which when taken together shall constitute a single contract. Delivery of an executed signature page to this Agreement by facsimile transmission shall be as effective as delivery of a manually signed counterpart of this Agreement. This Agreement shall become effective on the Signing Date, but the obligation of the Lenders to make Loans and Disbursements under this Agreement shall become effective on the Effective Date. Delivery of an executed counterpart of a signature page of this Agreement by facsimile or as a ".pdf" attachment to email shall be effective as delivery of a manually executed counterpart of this Agreement.

