# EXHIBIT 4B

Case 1:19-cv-02523-PKC   Document 26-5   Filed 04/11/19   Page 2 of 35

11.09    **Survival of Agreement**.   All covenants, agreements, representations and warranties made by the Borrower and the Guarantor herein and in the certificates or other instruments prepared or delivered in connection with or pursuant to this Agreement shall be considered to have been relied upon by the Lenders and shall survive the execution and delivery of this Agreement, regardless of any investigation made by the Lenders or on their behalf, and shall continue in full force and effect as long as the principal of or any accrued interest on the Loans, any fee or any other amount payable under this Agreement is outstanding and unpaid. The provisions of this <u>Section 11.09</u>, and <u>Article III</u>, <u>Section 11.03</u>, and <u>Section 11.06</u> shall remain operative and in full force and effect regardless of the expiration of the term of this Agreement, the consummation of the transactions contemplated hereby, the repayment of the Loans, the invalidity or unenforceability of any term or provision of this Agreement, or any investigation made by or on behalf of the Agent or the Lenders.   Notwithstanding anything herein to the contrary, the provisions of <u>Article III</u>, and <u>Section 11.03</u> shall expire upon the expiration of all applicable statutes of limitations, and the provisions of <u>Section 11.06</u> shall expire on the two year anniversary of the payment in full of all of the Loans.

11.10    **Severability**.   In the event any one or more of the provisions contained in this Agreement should be held invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of the remaining provisions contained herein and therein shall not in any way be affected or impaired thereby (it being understood that the invalidity of a particular provision in a particular jurisdiction shall not in and of itself affect the validity of such provision in any other jurisdiction).   The parties shall endeavor in good-faith negotiations to replace the invalid, illegal or unenforceable provisions with valid provisions the economic effect of which comes as close as possible to that of the invalid, illegal or unenforceable provisions.

11.11    **Governing Law; Jurisdiction; Etc**.

(a)    <u>Governing Law</u>.   THIS AGREEMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HEREUNDER AND THEREUNDER SHALL BE GOVERNED BY, AND SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK (INCLUDING SECTIONS 5-1401 AND 5-1402 OF THE GENERAL OBLIGATIONS LAW OF THE STATE OF NEW YORK, WHICH THE BORROWER, THE GUARANTOR, THE LENDERS AND THE AGENT EXPRESSLY INTEND TO APPLY), WITHOUT REGARD TO CONFLICTS OF LAWS PRINCIPLES THAT WOULD REQUIRE APPLICATION OF ANOTHER LAW.

(b)    <u>Submission to Jurisdiction</u>.   The Borrower and the Guarantor each hereby irrevocably and unconditionally submits, for itself and its property, to the exclusive jurisdiction of any New York State court or federal court of the United States of competent jurisdiction sitting in the County of New York, State of New York, and any appellate court from any thereof, in any action or proceeding arising out of or relating to this Agreement, or for recognition or enforcement of any judgment, and agrees that it will not take any action or proceeding relating to this Agreement in the courts of any other jurisdiction. Each of the Parties hereby irrevocably and unconditionally agrees that all claims in respect of any such action or proceeding may be heard and determined in such New York State or, to the extent permitted by law, in such federal court. Each of the Parties further agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other



manner provided by law. Nothing in this Agreement shall affect any right that the Agent or any Lender may otherwise have to bring any action or proceeding relating to this Agreement against the Borrower, the Guarantor or their respective properties in the courts of any jurisdiction. The Borrower and the Guarantor each hereby irrevocably and unconditionally waives, to the fullest extent it may legally and effectively do so, any objection which it may now or hereafter have to the laying of venue of any suit, action or proceeding arising out of or relating to this Agreement in any New York State or federal court sitting in the County of New York, State of New York. Each of the Parties hereby irrevocably waives, to the fullest extent permitted by law, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court, with the express intent that such provision shall apply.

(c)     Service of Process. The Borrower and the Guarantor each irrevocably appoints the Process Agent as its agent to receive and forward any writs, process and summonses in any suit, action or proceeding brought in connection with this Agreement against the Borrower in any court of the State of New York or any United States federal court sitting in the County of New York, State of New York and has agreed that such appointment shall be for so long as the Obligations remain outstanding in accordance with the terms hereof or until the appointment by the Borrower of a successor agent in the County of New York, State of New York as its agent for such purpose, the acceptance of such appointment by such successor, and written notice of such acceptance to the Agent and each of the Lenders. If for any reason the Process Agent shall cease to be available to act as such (including by reason of the failure of such agent to maintain an office in the County of New York, State of New York), the Borrower agrees promptly to designate a new agent in the County of New York, State of New York, on the terms and for the purposes of this Section. Nothing herein shall in any way be deemed to limit the ability of the Agent or the Lender to serve any such legal process in any other manner permitted by applicable law or to obtain jurisdiction over the Borrower or the Guarantor or bring actions, suits or proceedings against it in such other jurisdictions, and in such manner, as may be permitted by applicable law.

(d)     Immunity. To the extent that the Borrower or the Guarantor has or hereafter may acquire any immunity from jurisdiction of any court or from any legal process, the Borrower and the Guarantor each hereby waives such immunity and hereby agrees not to assert, by way of motion, as a defense or otherwise, in any suit, action or proceeding the defense of sovereign immunity or any claim that it is not personally subject to the jurisdiction of the above-named courts by reason of sovereign immunity or otherwise, or that it is immune from any legal process (whether through service of notice, attachment prior to judgment, attachment in aid of execution, execution or otherwise) with respect to itself or its property or from attachment either prior to judgment or in aid of execution by reason of sovereign immunity, except for the mandatory notice required for Venezuelan state owned entities in accordance with Article 111 of the Law of the Attorney General's Office (*Ley Orgánica de la Procuraduría General de la República*).

(e)     Waiver of Jury Trial. EACH PARTY HERETO HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT. EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE,

AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, *EXPRESSLY OR OTHERWISE*, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT, AS APPLICABLE, BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 11.11(e).

11.12    **Lender Action.**  Each Lender agrees that it shall not take or institute any actions or proceedings, judicial or otherwise, for any right or remedy against any of the Borrower or the Guarantor or any other obligor under this Agreement (including the exercise of any right of setoff, rights on account of any banker's lien or similar claim or other rights of self-help), or institute any actions or proceedings, or otherwise commence any remedial procedures, with respect to any property of any of the Borrower or Guarantor, unless expressly provided for herein, without the prior written consent of the Agent.  The provisions of this Section 11.12 are for the sole benefit of the Agent and shall not afford any right to, or constitute a defense available to the Borrower or the Guarantor.

11.13    **USA PATRIOT Act Notice.**  The Lenders and the Agent (for itself and not on behalf of the Lenders) hereby notifies the Borrower and the Guarantor that pursuant to the requirements of the USA PATRIOT Act, it is required to obtain, verify and record information that identifies the Borrower and the Guarantor, which information includes the name and address of the Borrower and the Guarantor and other information that will allow the Lenders or the Agent, as applicable, to identify the Borrower and the Guarantor in accordance with the USA PATRIOT Act.

11.14    **Use of English Language.**    All certificates, reports, notices and other documents and communications given or delivered pursuant to this Agreement (including any modifications or supplements hereto) shall be in the English language, or accompanied by a certified English translation thereof.

11.15    **Payment Suspension or Cessation.**  A Lender shall have the right, but not obligation, and for its account only, to issue written instructions to the Borrower to suspend or cease payment of amounts due under this Agreement if the payment obligations of the Borrower to such Lender under this Agreement violates applicable law.  Upon receipt of any such instructions, the Borrower shall reserve any such payments that are so suspended or ceased (collectively, the "Reserved Payments").  Notwithstanding any provision of this Agreement to the contrary, failure to make such Reserved Payments in accordance with the written instruction of the Lender shall not be deemed a Default or an Event of Default or a breach or violation in any respect of the Loans or this Agreement nor entitle the Lender or the Agent to exercise any remedies with respect to the Loans or this Agreement.  Notwithstanding the foregoing, such suspension or cessation of the Reserved Payments shall not be construed as relieving, cancelling or otherwise forgiving the Reserved Payments so suspended or ceased or otherwise relieve the Borrower of its other obligations under this Agreement and to such Lender; provided, that, notwithstanding any provision of this Agreement to the contrary, for so long as such suspension or cessation continues, the rate at which interest under this Agreement shall accrue with respect to the amount of the Reserved Payments shall be adjusted to be equal to the lesser of (i) 7.5% per annum, or (ii) a variable rate per annum equal to the "Money market, annual yield" as may from

time to time be published in the Wall Street Journal (currently published under "Bonds, Rates and Yields") or if such information is no longer published, another comparable rate as shall be mutually agreed upon by the Borrower and such Lender, acting reasonably. The Lender shall have the right at its sole discretion to revoke such instructions and require the Borrower to pay all amounts then due and owing, in which case, the Reserved Payments and interest thereon at the applicable rate set forth in the immediately preceding sentence shall be due to such Lender not later than 10 Business Days following the Borrower's receipt of a written notice of revocation of such instructions from such Lender.

11.16    **Interest Rate Limitation**. Notwithstanding anything herein to the contrary, if at any time the interest rate applicable to the Loans, together with all fees, charges and other amounts which are treated as interest on such Loans under applicable law (collectively the "Charges"), shall exceed the maximum lawful rate (the "Maximum Rate") which may be contracted for, charged, taken, received or reserved by the Lenders in accordance with applicable law, the rate of interest payable in respect of the Loans, together with all Charges payable in respect thereof, shall be limited to the Maximum Rate and, to the extent lawful, the interest and Charges that would have been payable in respect of such Loans but were not payable as a result of the operation of this Section 11.16 shall be cumulated and the interest and Charges payable to the Lender in respect of other periods shall be increased (but not above the Maximum Rate therefor) until such cumulated amount, together with interest thereon at the Maximum Rate to the date of repayment, shall have been received by the Lenders.

11.17    **Entire Agreement**. This Agreement constitutes the entire contract between the Parties relative to the subject matter hereof. Any other previous agreement among the Parties with respect to the subject matter hereof is superseded by this Agreement. Nothing in this Agreement, expressed or implied, is intended to confer upon any Person (other than the Parties, their respective successors and assigns permitted hereunder and, to the extent expressly contemplated hereby, the Related Parties of each of the Agent and the Lender) any rights, remedies, obligations or liabilities under or by reason of this Agreement.

[Signature page follows.]



- 69 -

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed as of the date first above written.

PETRÓLEOS DE VENEZUELA, S.A.
as Borrower

By: _____
Name: Eulogio Del Pino
Title: Authorized Signatory

[Signature Page to Credit Agreement]

**PDVSA PETRÓLEO, S.A.**
as Guarantor

By: _____
Name: Emir Manrique
Title: Authorized Signatory

[Signature Page to Credit Agreement]

INDEX NO. 651006/2019
Case 1:19-cv-02523-PKC  Document 26-5  Filed 04/11/19  Page 8 of 35
RECEIVED NYSCEF: 02/15/2019

**GE CAPITAL EFS FINANCING, INC.**
as Agent

By: _____

    Name: Cristopher N. Matteson
    Title:   Vice President

[Signature Page to Credit Agreement]



**GE CAPITAL EFS FINANCING, INC.**
as Lender

By: _____

Name: Cristopher N. Matteson
Title:   Vice President

[Signature Page to Credit Agreement]



By their execution in the spaces provided below, the Seller and Purchaser hereby accept and agree that this Agreement shall be considered, for all legal purposes, to be the "Financing Agreement" referenced in the Commercial Contract, and to the provisions of Sections 2.01(b), (c), and (d), Section 2.02 and Section 6.08 of this Agreement.

**Accepted and Agreed:**

**NUOVO PIGNONE, S.p.A.**

By: _____

Name:

Title:

Oil & Gas
Michele Stangarone
Vice Presidente
Nuovo Pignone S.p.A

[Signature Page to Credit Agreement]



**Accepted and Agreed:**

**BARIVEN, S.A.**

By: _____

Name: Erin Manrique

Title: Authorized Signatory

[Signature Page to Credit Agreement]

**SCHEDULE 2.01**
**LENDER COMMITMENT; DISBURSEMENT DATES AND AMOUNTS;**
**AMORTIZATION SCHEDULES**

**Part 1 - Lender Commitments**

| Name of Lender | Lending Office | Commitment |
|---|---|---|
| GE Capital EFS Financing, Inc. | New York, NY | $96,942,347.19 |

**Part 2 - Disbursement Dates and Disbursement Amounts**

| Disbursement | Disbursement Date | Disbursement Amount | Maximum Disbursement Amount | Number of Days to Loan Final Maturity Date |
|---|---|---|---|---|
| Disbursement 1 | December 29, 2016 | 5,000,000 | 5,000,000 | 547 |
| Disbursement 2 | December 29, 2016 | 32,000,000 | 32,000,000 | 639 |
| Disbursement 3 | February 15, 2017 | To be set forth in Disbursement Notice | 38,979,000 | 638 |
| Disbursement 4 | May 15, 2017 | To be set forth in Disbursement Notice | 20,963,347.19 | 641 |

**Part 3 – Amortization and Interest Payment Schedules**

| Disbursement 1 | | | |
|---|---|---|---|
| Repayment Date | Interest ($) | Principal ($) | Total Payment ($) | Residual Value ($) |
|---|---|---|---|---|
| March 29, 2017 | 93,750.00 | 833,333.33 | 927,083.33 | 4,166,666.67 |
| June 29, 2017 | 79,861,11 | 833,333.33 | 913,194,44 | 3,333,333.33 |
| September 29, 2017 | 63,888.89 | 833,333.33 | 897,222.22 | 2,500,000.00 |
| December 29, 2017 | 47,395.83 | 833,333.33 | 880,729.17 | 1,666,666.67 |



| March 29, 2018 | 31,250.00 | 833,333.33 | 864,583.33 | 833,333.33 |
| June 29, 2018 | 15,972.22 | 833,333.33 | 849,305.56 | 0.00 |
| Total | 332,118.06 | 5,000,000.00 | 5,332,118.06 | - |

| Disbursement 2 | | | | |
|---|---|---|---|---|
| Repayment Date | Interest ($) | Principal ($) | Total Payment ($) | Residual Value ($) |
| March 29, 2017 | 0.00 | - | - | 32,000,000.00 |
| June 29, 2017 | 613,333.33 | 5,333,333.33 | 5,946,666.67 | 26,666,666.67 |
| September 29, 2017 | 511,111.11 | 5,333,333.33 | 5,844,444.44 | 21,333,333.33 |
| December 29, 2017 | 404,444.44 | 5,333,333.33 | 5,737,777.78 | 16,000,000.00 |
| March 29, 2018 | 300,000.00 | 5,333,333.33 | 5,633,333.33 | 10,666,666.67 |
| June 29, 2018 | 204,444.44 | 5,333,333.33 | 5,537,777.78 | 5,333,333.33 |
| September 29, 2018 | 102,222.22 | 5,333,333.33 | 5,435,555.56 | 0.00 |
| Total | 2,135,555.56 | 32,000,000.00 | 34,135,555.56 | - |

| Disbursement 3[1] | | | | |
|---|---|---|---|---|
| Repayment Date | Interest ($) | Principal ($) | Total Payment ($) | Residual Value ($) |
| May 15, 2017 | 0.00 | - | - | 38,979,000.00 |
| August 15, 2017 | 747,097.50 | 6,496,500.00 | 7,243,597.50 | 32,482,500.00 |
| November 15, 2017 | 622,581.25 | 6,496,500.00 | 7,119,081.25 | 25,986,000.00 |
| February 15, 2018 | 498,065.00 | 6,496,500.00 | 6,994,565.00 | 19,489,500.00 |
| May 15, 2018 | 361,367.81 | 6,496,500.00 | 6,857,867.81 | 12,993,000.00 |
| August 15, 2018 | 249,032.50 | 6,496,500.00 | 6,745,532.50 | 6,496,500.00 |
| November 15, 2018 | 124,516.25 | 6,496,500.00 | 6,621,016.25 | 0.00 |
| Total | 2,602,660.31 | 38,979,000.00 | 41,581,660.31 | - |
| Disbursement 4[2] | | | | |

[1] The numbers in the table have been calculated using the Maximum Disbursement Amount and the final Disbursement Amounts with respect to the third Disbursement may vary once calculated in accordance with Section 2.01.

[2] The numbers in the table have been calculated using the Maximum Disbursement Amount and the final Disbursement Amounts with respect to the fourth Disbursement may vary once calculated in accordance with Section 2.01.

[Signature Page to Credit Agreement]



| Repayment Date | Interest ($) | Principal ($) | Total Payment ($) | Residual Value ($) |
|---|---|---|---|---|
| August 15, 2017 | 0.00 | - | - | 20,963,347.19 |
| November 15, 2017 | 401,797.49 | 3,493,891.20 | 3,895,688.69 | 17,469,455.99 |
| February 15, 2018 | 334,831.24 | 3,493,891.20 | 3,828,722.44 | 13,975,564.79 |
| May 15, 2018 | 259,130.26 | 3,493,891.20 | 3,753,021.46 | 10,481,673.60 |
| August 15, 2018 | 200,898.74 | 3,493,891.20 | 3,694,789.94 | 6,987,782.40 |
| November 15, 2018 | 133,932,50 | 3,493,891.20 | 3,627,823.69 | 3,493,891.20 |
| February 15, 2019 | 66,966.25 | 3,493,891.20 | 3,560,857.45 | 0.00 |
| **Total** | **1,397,556.48** | **20,963,347.19** | **22,360,903.67** | - |

[Signature Page to Credit Agreement]



Case 1:19-cv-02523-PKC   Document 26-5   Filed 04/11/19   Page 15 of 35

**SCHEDULE 5.08**
**SUBSIDIARIES**

[Signature Page to Credit Agreement]



ESTRUCTURA ACCIONARIA DE PETRÓLEOS DE VENEZUELA, S.A.

PDVSA

PETRÓLEOS DE VENEZUELA, S.A.

JUNIO 2016
VICEPRESIDENCIA DE FINANZAS

UBICACIÓN GEOGRÁFICA

PREPARADO POR: GERENCIA CORPORATIVA DE PRESUPUESTO Y CONTROL DE GESTIÓN  Y GERENCIA CORPORATIVA DE ASUNTOS JURÍDICOS CORPORATIVOS



# PARTICIPACIÓN ACCIONARIA DE EMPRESAS CON CAPITAL MIXTO (Ver Estructura)

2 4% PDVSA SOCIAL, S.A, 12% OPER. PRODUC. Y EXPLORA. NACIONALES OPEN S.A., 28% CARTERA DE INVERSIONES PETROLERAS C.I.P, C.A
3 4% PDVSA SOCIAL, S.A, 39,2% CHEVRON BOSCAN B.V, 0,8% INEMAKA EXPLORATION & PRODUCTION COMPANY LTD.
4 4% PDVSA SOCIAL, S.A., 22,667% INEMAKA EXPLOTATION & PRODUCTION COMPANY LTD, 17,333% INVERSIONES POLAR, S. A.
5 29,2% PETROBRAS ENERGÍA VENEZUELA, S.A., 10,8% COROIL, S.A.
6 40% VINCCLEAR OIL AND GAS, C.A.
7 4% PDVSA SOCIAL, S.A, 25,20% CHEVRON LAGO MARACAIBO B.V
8 4% PDVSA SOCIAL, 17,5% BUIZUM SERVICIOS DE CONSULTORIA, S.L, 5% PFC OIL AND GAS, C.A., 17,5% PERENCO OIL AND GAS INTERNATIONAL LIMITED
9 4% PDVSA SOCIAL, S.A, 29,2% PETROBRAS ARGENTINA, S. A., 10,8% INVERSORA MATA, S.A.
10 4% PDVSA SOCIAL, S.A, 40% PERENCO VENEZUELA PETRÓLEO Y GAS ETVE, S.L
11 4% PDVSA SOCIAL, S.A, 40% REPSOL VENEZUELA, S.A
12 4% PDVSA SOCIAL, S.A, 26,004% COMPAÑÍA GENERAL DE COMBUSTIBLES, S.A, 8,356% EMPRESA PUBLICA DE HIDROCARBUROS DEL ECUADOR, 5,640% KOREA NATIONAL OIL CORPORATION,
13 36% PETROBRAS ENERGÍA VENEZUELA, S. A., 4% WILIAM INTERNATIONAL OIL & GAS VENEZUELA LIMITED.
14 4% PDVSA SOCIAL, S.A., 40% D.Z.O HOLDINGS B.V
15 4% PDVSA SOCIAL, S.A., 26,66% BOQUERON HOLDINGS B.V, 13,334% PEI VENEZUELA GMBH
16 4% PDVSA SOCIAL, S.A., 40% SUELOPETROL EXPLORATION & PRODUCTION, C.A.
17 4% PDVSA SOCIAL, S.A., 22% PETROBRAS ARGENTINA, S. A., 18% VENEZUELA US S.R.L
18 4% PDVSA SOCIAL, S.A., 30% TEIKOKU OIL & GAS VENEZUELA, C.A
19 4% PDVSA SOCIAL, S.A., 40% HNR FINANCE B.V.
20 4% PDVSA SOCIAL, S.A., 25% CNPC VENEZUELA B.V.
21 4% PDVSA SOCIAL, S.A., 40% SHELL EXPLORATION AND PRODUCTION INVESTMENTS B.V
22 4% PDVSA SOCIAL, S.A, 3,10% ENCOPEX PETRÓLEO S.A, 26,35% MAUREL & PROM VENEZUELA 1,55% CARTERAS DE INVERSIONES PETROLERAS II, C.A
23 4% PDVSA SOCIAL, S.A., 30% CHEVRON ORINOCO HOLDINGS B.V
24 4% PDVSA SOCIAL, S.A, 9,68% STATOIL SINCOR NETHERLANDS B. V, 30,32%, TOTAL VENEZUELA, S.A
25 4% PDVSA SOCIAL, S.A, 40% ROSNEFT ENERGIA GMBH
26 4% PDVSA SOCIAL, S.A., 40% UNION DE EMPRESAS PRODUCTORAS BELARUSNEFT
27 32% SINOPEC INTERNATIONAL PETROLEUM EXPLORATION AND PRODUCTION CORPORATION (SIPC), 8% INE OIL & GAS
28 4% PDVSA SOCIAL, S.A ACCIONES CLASE A, 25% ENI VENEZUELA B.V ACCIONES CLASE B, 1% CVP ACCIONES CLASE C
29 4% PDVSA SOCIAL, S.A., 40% CNPC VENEZUELA B.V
30 19,50% ENI VENEZUELA B.V, 1% CVP, 16,25% INE OIL & GAS
31 4% PDVSA SOCIAL, S.A., 40% ONGC NILE GANGA B.V
32 4% PDVSA SOCIAL, S.A, 40% CNPC VENEZUELA B.V
33 11% REPSOL EXPLORACION, S.A, 11%PC VENEZUELA LTD (PETRONAS), 11% PETROCARABOBO GANGA B.V (OVL), 7% INDOIL NETHERLANDS B.V
34 40% CONSORCIO NACIONAL PETROLERO S.R.L
35 40% CNPC VENEZUELA B.V
36 40% PETROVIETNAM EXPLORATION PRODUCTION CORPORATION LTD
37 40% GAZPROMBANK
38 40% ENI LASMO PLC
39 45,9% CVP ACCIONES CLASE A, 4% PDVSA SOCIAL, S.A., 50,1% CVP ACCIONES CLASE B
40 40% ENI LASMO PLC
41 20% CUPETSA, 20% SONANGOL
42 40% COMERCIAL CUPET S.A.
43 34% CHEVRON CARABOBO HOLDINGS APS, 5% JAPAN CARABOBO UK LTD (JCU), 1% SUELOPETROL INTERNATIONAL, S.A
44 40% OJSC OIL COMPANY ROSNEFT
45 4% PDVSA SOCIAL, S.A., 40% ODEBRECHT E&P ESPAÑA S.L
46 60% FABRICA DE CABLES TINAQUILLO, C.A
47 60% SERVICIOS Y CONSTRUCCIONES RORAIMA, C.A
48 40% PROSELMEC 3J, C.A., 40% COOPERATIVA SERVICIOS SANTA BARBARA, S.R, C.A
49 60% REPRESENTACIONES PETROLEO, GAS Y ENERGIA 2021, C.A
50 60% SERVIMECA SAND CONTROL, C.A
51 60% ECOLOGICAL, C.A
52 60% INVERSIONES Y DESARROLLOS ZAMORA, C.A
53 65% SUMAP PROCURA Y SERVICIOS, C.A., 15% OBRA LUX, C.A
54 60% TRANSERNAC, C.A
55 60% AIMEN'S SOLUCIONES, C.A
56 60% INGENIERIA Y CONSTRUCCIONES LC 2015, C.A
57 40% CONSORCIO CORPORATIVO LITOL, C.A., 40% INVERSIONES JOEVANA, C.A
58 60% H&G INGENIERIA, C.A
59 60% IDEAS INVERSORAS INTERNACIONAL, C.A
60 60% GRUPO GLOBAL INTERNATIONAL, C.A
61 60% SBS ORIENTE, C.A
62 60% RODANOL, C.A
63 45% TORCAT PRODUCTS, C.A. 45% FRAZZAIN SPORT, C.A
64 60% INTERCONCRET, C.A
72 1,18% SOCIOS MINORITARIOS
75 2,43% A TERCEROS
77 40% MINISTERIO DEL PODER POPULAR PARA LA DEFENSA (MPPD)
80 45% TECNICAS REUNIDAS, S.A
83 40% BELGAZTROL S.A
85 70% TEIKOKU OIL & GAS VENEZUELA, C.A
86 40% REPSOL YPF VENEZUELA, S.A
91 40% ORGANISMO DE INTEGRACION PETROVENEZOLANA DE SERVICIOS, R.S
92 40% EEU "UNIÓN DE EMPRESAS PRODUCTORAS BELORUSNEFT
93 40% DIRECTIONAL PLUS INTERNATIONAL, LTD
94 1% INTERVEN VENEZUELA, S.A
96 1% TRADECAL, S.A
97 1% TRADECAL, S.A
98 2% TARDECAL, S.A
99 1% TRADECAL, S.A
106 50% PETROCHINA INTERNATIONAL COMPANY LIMITED
117 60% LA CORPORACION VENEZOLANA AGRARIA (CVA) 20% OFICINA COORDINADORA DE LOS SERVICIOS AGROPECUARIOS (OCSA),DEL MINISTERIO PARA LA DEFENSA Y LA CORPORACION DE ABASTECIMIENTO Y SERVICIOS AGRICOLAS (CASA)
121 30% PLETS ZRT
122 30% DIEN QUANG LAMP JOINT STOCK COMPANY
124 15% CHINA PETROLEUM TECHNOLOGY & DEVELOPMENT CORPORATION (CPTDC)
126 10% RC2 INGENIERIA Y DISEÑO S.L
129 49% ALBET INGENIERIA Y SISTEMAS, S.A
131 40% UNION DE EMPRESAS DE RECUPERACION DE MATERIAS PRIMAS (UERMP)
133 50% CARIBBEAN DRYDOCK COMPANY INC (CDC)
140 30% CORPORACION DE DESARROLLO DE LA REGION ZULIANA (CORPOZULIA)
142 10% LEIRIMETAL LDA
147 49% GOBERNACION DEL ESTADO BARINAS
148 51% PROTINAL
154 45% BELIZE PETROLEUM AND ENERGY LIMITED
155 45% SAINT VINCENT ELECTRICITY SERVICES LIMITED
156 40% ENERGIA PARA EL SALVADOR (ENEPASA)
158 51% JAMAICA PETROLEUM CORPORATION
159 49% EMPRESA NICARAGUENSE DEL PETROLEO (PETRONIC)
160 49% INSTITUTO AUTONOMO CORPORACION VENEZOLANA AGRARIA
161 45% DOMINICA NATIONAL PETROLEUM COMPANY LTD.
162 45% PETROCARIBE GRENADA, LTD
163 45% ST. KITTS NEVIS ENERGY COMPANY LTD.
164 51% ESTADO DOMINICANO
165 50% SURINAME FUEL IMPORT & DISTRIBUTION N.V
166 1% PDVSA AMERICA,S.A.
167 49% ESTADO HAITIANO
168 51% GRUPO EMPRESARIAL DE LA INDUSTRIA QUIMICA, 35% PEQUIVEN, S.A
170 51,00% COMERCIAL CUPET, S.A.
171 50% VARIATION LIMITED
172 50% WAGONER INTERNATIONAL LIMITED
173 50% INTERNACIONAL MARÍTIMA, S.A
176 1% PDVSA AMERICA,S.A.
177 70% PETROECUADOR
178 51% PETROECUADOR
179 5,90% COMMERCHAMP, S.A. Y 5,00 % DELTAVEN, S.A.
180 60% YACIMIENTOS PETROLÍFEROS FISCALES BOLIVIANOS (YPFB)
181 60% EMPRESA NACIONAL DE ELECTRICIDAD, S. A. (ENDE)
182 1% DELTAVEN, 1% COMMERCHAMP
183 1% PDVSA BOLIVIA, S.A
186 90,70% ADMINISTRACION NACIONAL DE COMBUSTIBLES, ALCOHOL Y PORTLAND (ANCAP)
187 2% PDV ANDINA, S.A
188 10% PDV ANDINA, S.A., 1,10% DELTAVEN S.A
189 40% ENERGÍA ARGENTINA, S. A.
190 48% ANCSOL, S. A. F. I. Y 8% BOLSA DE COMERCIO DE BUENOS AIRES.
191 40% FLUVIOMAR HOLDING LIMITED
192 0,01% TRAFLUEM COMPAÑÍA ARMADORA
193 [illegible]% FLUVIALBA INTERNATIONAL LIMITED
194 5% FLUVIALBA INTERNATIONAL LIMITED
195 25% FLUVIALBA INTERNATIONAL (LIMITED) [illegible]
[illegible] 2,50% FLUVIALBA
[illegible] 1% FLUVIALBA PARAGUAY, S.A
[illegible] [illegible] FLUVIALBA INTERNATIONAL LIMITED
[illegible] 10% UNION FEDERAL
[illegible] [illegible] VICENTE BAYARD PRIETO
[illegible] 50% HESS OIL VIRGIN ISLANDS CORPORATION
[illegible] 50% PHILLIPS PETROLEUM COMPANY
[illegible] 1% SWEENY COKER, L. L. C., 49% PDV SWEENY INC.
[illegible] [illegible] SUNOCO PIPELINE L.P
[illegible] 36,1% CONOCO INC, 13,4% VISTA CHEMICAL COMPANY Y 1% GULF STATES UTILITIES
[illegible] [illegible] CITGO INVESTEMENT COMPANY
[illegible] 1% CITGO CAYMAN INVESTMENT, LLC
[illegible] 1% CITGO CAYMAN INVESTMENT LLC
[illegible] 1% CITGO PETROLEUM CORPORATION
[illegible] 1% CUMENE ASSOCIATES, INC.
[illegible] [illegible] GENERAL ELECTRIC, 2% JLM INC.
[illegible] [illegible] TRANSMONTAIGNE PIPELINE INC/12,91% MARATHON OIL COMPANY, 10,52% AMOCO PIPELINE HOLDING COMPANY/[illegible] TRIM HOLDINGS INC, [illegible] MIDWEST PIPELINE COMPANY, [illegible],75% MOBIL PIPELINE 8,64% EQUILON PIPELINE COMPANY LLC, 2,06% EXXON PIPELINE COMPANY
[illegible] 10% CITGO EAST COAST OIL CORPORATION [illegible]
[illegible] [illegible] NESTE OY [illegible]
[illegible] [illegible]

PREPARADO POR: GERENCIA CORPORATIVA DE PRESUPUESTO Y CONTROL DE GESTIÓN Y GERENCIA CORPORATIVA DE ASUNTOS JURÍDICOS CORPORATIVOS

REVISADO POR:

MARITZA ROBO
GERENTE CORPORATIVO DE
PRESUPUESTO Y CONTROL DE GESTIÓN

VICKY ZARATE
GERENTE CORPORATIVO DE
ASUNTOS JURÍDICOS CORPORATIVOS

APROBADO POR:

MARLENE BASTIANI
DIRECTORA EJECUTIVA DE
PRESUPUESTO Y CONTROL DE GESTIÓN

EDOARDO ORSONI
CONSULTOR JURÍDICO

**SCHEDULE 5.09**
**LITIGATION**

*Helmerich & Payne International Drilling Co. and Helmerich & Payne de Venezuela C.A.*

On September 23, 2011, Helmerich & Payne International Drilling Co. ("H&P-IDC") and Helmerich & Payne de Venezuela C.A. ("H&P-V", together with H&P-IDC, the "Plaintiffs"), filed a lawsuit against the Bolivarian Republic of Venezuela, PDVSA and PDVSA Petróleo (collectively, the "Defendants") before the United States District Court for the District of Columbia (the "District Court"), seeking recovery of damages for the alleged expropriation of H&P-V's assets in Venezuela (the "expropriation claim") and for breach of contract for the alleged failure to make payments under ten drilling contracts entered into between H&P-V and PDVSA Petróleo (the "contractual claims"). The complaint alleges that payments are due under the contracts in the amount of U.S.$32 million and seeks damages for an unspecified amount on all claims. On August 31, 2012, Defendants filed motions to dismiss the complaint; on February 22, 2013, Plaintiffs filed their opposition; and on April 15, 2013, Defendants filed their reply. On July 15, 2013, the District Court heard oral argument, and on September 20, 2013, it rendered its decision, dismissing H&P-V's expropriation claim but refusing to dismiss H&P-IDC's expropriation claim and H&P-V's contractual claims.

Both the Plaintiffs and the Defendants appealed to the United States Court of Appeals for the District of Columbia Circuit (as used in this paragraph, the "Court of Appeals"), and both appeals were subsequently consolidated. In accordance with an order by the Court of Appeals; on May 12, 2014, Defendants filed their opening brief; on July 11, 2014, Plaintiffs filed their opening brief; on August 25, 2014, Defendants filed their reply brief; and on September 24, 2014, Plaintiffs filed their reply brief. On January 26, 2015, the Court of Appeals held oral argument, and on May 1, 2015, it rendered its decision, reversing the dismissal of H&P-V's expropriation claim and affirming the refusal to dismiss H&P-IDC's expropriation claim but dismissing H&P-V's contractual claims. Subsequently, Defendants sought rehearing and rehearing en banc, and the Court of Appeals denied those petitions on July 30, 2015.

Thereafter, both the Plaintiffs and the Defendants filed petitions for certiorari with the Supreme Court of the United States (the "Supreme Court"). On February 29, 2016, the Supreme Court invited the Solicitor General of the United States (the "Solicitor General") to file briefs expressing the views of the United States as to whether the petitions for certiorari should be granted. On May 24, 2016, the Solicitor General filed amicus briefs recommending that the Supreme Court partially grant Defendants' petition for certiorari and deny Plaintiffs' petition for certiorari in its entirety.

In the interim, on October 19, 2015, the District Court issued an order, establishing a schedule for jurisdictional discovery and further briefing. In accordance with that schedule, from November 2015 until June 28, 2016, the parties engaged in jurisdictional discovery.



On June 28, 2016, the Supreme Court partially granted Defendants' petition for certiorari, but did not decide Plaintiffs' petition for certiorari, which petition remains pending. In light of the Supreme Court's grant of certiorari, on June 28, 2016, the District Court stayed all proceedings before it, including jurisdictional discovery, until after the Supreme Court renders a decision on the issues before it.

On August 19, 2016, Defendants filed their opening brief on the merits with the Supreme Court. On August 26, 2016, the United States filed an amicus curiae brief in support of the Defendants' position. On September 26, 2016, Plaintiffs filed their opposition. On October 3, 2016, certain former U.S. State Department attorneys filed an amicus curiae brief in support of the Plaintiffs' position. On October 21, 2016, Defendants filed their reply. The Supreme Court held oral argument on November 2, 2016, and has yet to issue its decision.

### *Crystallex International Corp. v. Bolivarian Republic of Venezuela*

On November 23, 2015, Crystallex International Corporation ("Crystallex") filed a complaint against PDVSA, PDV Holding, Inc. ("PDVH") and CITGO Holding, Inc., f/k/a PDV America, Inc. (collectively, the "Defendants"), in the United States District Court for the District of Delaware, asserting claims under the Delaware Uniform Fraudulent Transfer Act and for civil conspiracy in connection with a US$2.8 billion financing by CITGO Holding, Inc. in February 2015. Crystallex is seeking an order of the court requiring the Defendants to return the US$2.8 billion to CITGO Holding, Inc. or, in the event they do not do so, a money judgment in that amount. On February 3, 2016, PDV Holding, Inc. and CITGO Holding, Inc. (the "CITGO Defendants") moved to dismiss the Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) and oral argument on the motion to dismiss was held on July 12, 2016. On May 24, 2016, PDVSA was served with the Complaint pursuant to the Hague Convention. PDVSA filed a motion to dismiss on July 25, 2016 pursuant to Federal Rules of Civil Procedure 12(b)(1), (2) and (6) for lack of subject matter and personal jurisdiction under the Foreign Sovereign Immunities Act of 1976, 28 U.S.C. § 1602, et seq. and for failure to state a claim upon which relief can be granted. Oral argument on PDVSA's motion to dismiss has been scheduled for December 20, 2016. On September 30, 2016, the court issued a Memorandum Opinion granting in part and denying in part the CITGO Defendants' motion to dismiss. The court dismissed CITGO Holding, Inc. from the action and dismissed the civil conspiracy claim against PDVH but declined to dismiss the fraudulent transfer claim against PDVH. PDVH has filed a motion for certification of an interlocutory appeal to the United States Court of Appeals for the Third Circuit pursuant to 28 U.S.C. § 1292(b). PDVH has also filed a Notice of Appeal to the United States Court of Appeals for the Third Circuit. Discovery in the district court is currently stayed at least until the decision on PDVSA's motion to dismiss.

### *Phillips 66 v. Petróleos de Venezuela, S.A. and PDVSA Petróleo, S.A.*

On March 24, 2015, Phillips 66 filed a request for arbitration with the ICC against PDVSA and PPSA, seeking an award which declares that Phillips 66 is entitled to a Lookback Adjustment for the



second half of 2008 and the first and second halves of 2009, in the amount of approximately US$250 million, to be deducted from the aggregate purchase price of future shipments of crude oil. On June 18, 2015, PDVSA and PPSA submitted their answer to the request for arbitration. On November 9, 2015, the parties, the ICC and the Tribunal agreed to the Terms of Reference and Procedural Order No.1. On December 10, 2015, the parties exchanged their First Memorials, witness statements, expert reports and proposed awards. On January 25, 2016, the parties exchanged Reply Memorials and supplemental witness statements and expert reports. Phillips 66 is seeking a total Lookback Adjustment for the requested periods in the amount of US$244.35 million. PDVSA and PPSA believe that Phillip 66 is entitled to a total Lookback Adjustment for the requested periods in the amount of US$66.82 million. A *conference* call with the Tribunal was held on February 2, 2016 and hearings were held on April 4 through April 6, 2016 and the parties exchanged their cost submissions on April 20, 2016. The Tribunal issued a final award on August 26, 2016 accepting the PDVSA Parties' proposed award. Accordingly, the Lookback Adjustment for the requested periods is US$66.82 million which is to be deducted from the aggregate purchase price of future crude oil deliveries to Phillips 66. In addition, the Tribunal ordered Phillips 66 to reimburse the PDVSA Parties their attorneys' fees, expert fees as well as their costs and expenses which total US$1,897,833.

### *Frescati Shipping, et al. v. CITGO et al.*

In November 2004, the Athos I, a merchant tanker, struck a submerged anchor in the public channel of the Delaware River near Paulsboro, New Jersey and released crude oil owned by CITGO Asphalt Refining Company ("CARCO"), a wholly-owned subsidiary of CITGO. Frescati Shipping Company Ltd. ("Frescati"), the owner of the Athos I, filed suit against CARCO in the U.S. District Court for the Eastern District of Pennsylvania for over U.S.$125 million in oil spill recovery and cleanup costs. In 2008, CITGO was also sued in the same court by the U.S. federal government, which was seeking to recover U.S.$87 million it paid out of the Oil Spill Liability Trust Fund to Frescati for its costs in responding to the oil spill. The cost of the entire cleanup and damages was approximately U.S.$268 million.

Although CITGO does not believe CARCO had any liability for the oil spill, it entered into an agreement with the U.S. federal government to cap CITGO's potential damages at U.S.$124 million if it were to lose the Frescati lawsuit, with interest the amount is approximately U.S.$210 million.

On April 12, 2011, the U.S. District Court found that neither CARCO nor CITGO was liable for any damages or cleanup expenses. On June 10, 2011, the plaintiffs filed an appeal of the verdict in CARCO's favor with the U.S. Court of Appeals for the Third Circuit. The U.S. Court of Appeals issued its decision on May 16, 2013 in which it reversed the trial court's decision and remanded the case for additional findings of fact. On July 1, 2013, CITGO filed a petition for rehearing with the U.S. Court of Appeals, which was denied on July 12, 2013. CITGO then filed an appeal of that decision with the U.S. Supreme Court, and on February 24, 2014, the U.S. Supreme Court denied CITGO's petition for a writ of certiorari.



The trial on remand was held in the U.S. District Court in 2015, and in July 2016, the judge ruled in favor of Frescati and the U.S. federal government for U.S.$100 million plus U.S.$20 million of interest. CITGO has appealed the judgment to the Third Circuit. Legal proceedings over insurance coverage for these damages, which had been stayed pending this decision, will resume this year. CITGO does not believe that the resolution of this matter will have a material adverse effect on its financial condition or results of operations.

### *Phillips Petroleum Company Venezuela Limited and ConocoPhillips Petrozuata B.V.*

On October 10, 2014, Phillips Petroleum Company Venezuela Limited, an indirect wholly-owned subsidiary of ConocoPhillips, commenced an ICC arbitration proceeding against PDVSA and Corpoguanipa, S.A. under the arbitration agreement in the Hamaca Association Agreement and the guaranty issued by PDVSA in connection therewith. At the same time, ConocoPhillips Petrozuata B.V., a wholly-owned subsidiary of ConocoPhillips, commenced a separate ICC arbitration proceeding against PDVSA and PDVSA Petróleo, S.A. under the arbitration agreement in the Petrozuata Association Agreement and the guaranty issued by PDVSA in connection therewith. The cases have since been consolidated. Each of the cases arises out of the June 2007 nationalization pursuant to Decree-Law 5.200 and certain events that preceded the nationalization. Each claimant is alleging that the respondents engaged in conduct constituting a willful breach of contract or a tortious interference, giving rise to liability for the entirety of the purported damages suffered, and that, at a minimum, they must partially indemnify the claimant in accordance with the terms of the applicable Association Agreement and related guaranty. Respondents submitted an answer on February 5, 2015. On July 17, 2015, claimants submitted their statement of claim and supporting materials, alleging damages in the amount of US$17.14 billion for the alleged breach of the Hamaca and Petrozuata Association Agreements and the PDVSA guaranties related thereto, and at a minimum, US$7.24 billion pursuant to the compensation provisions in Article XIV of the Hamaca Association Agreement and Section 9.07 of the Petrozuata Association Agreement, in each case plus interest and costs. Respondents submitted their Statement of Defense on February 12, 2016. Respondents have asserted substantial legal and factual defenses against such claims, and have also asserted that, in any event, the amounts claimed are grossly exaggerated. On May 27, 2016, claimants submitted their reply and defense to counterclaim, and on September 9, 2016, respondents filed their rejoinder. A hearing on all issues commenced on November 28, 2016.

On October 6, 2016, ConocoPhillips Petrozuata B.V., Phillips Petroleum Company Venezuela Limited, ConocoPhillips Gulf of Paria B.V. and ConocoPhillips Hamaca B.V. (collectively, the "ConocoPhillips Parties") filed a complaint against PDVSA, PDV Holding, Inc., CITGO Holding, Inc. and CITGO Petroleum Corporation (collectively, the "PDVSA Parties") in the United States District Court for the District of Delaware, asserting claims under the Delaware Uniform Fraudulent Transfer Act ("DUFTA") in connection with a US$2.8 billion financing by CITGO Holding, Inc. in February 2015 and a 2016 bond swap transaction. The ConocoPhillips Parties are seeking an order of the court declaring that the transactions at issue are fraudulent under DUFTA, directing the PDVSA Parties to return any assets fraudulently



transferred, awarding money damages, invalidating any security interests or other obligations, and enjoining the PDVSA Parties from further disposing of assets. PDV Holding, Inc., CITGO Holding, Inc. and CITGO Petroleum Corporation have been served with the complaint and their answer or motion to dismiss is due on November 23, 2016. PDVSA has not yet been served with the complaint.

### *Other Claims; Allowances for Contingencies*

As of December 31, 2015, we were subject to other legal claims and procedures in the ordinary course of business having an aggregate amount of U.S.$3,159 million.

As of December 31, 2015 and December 31, 2014, we registered allowances for contingences having an aggregate amount of U.S.$1,244 million and U.S.$4,274 million, respectively.

Schedule 5.09



Case 1:19-cv-02523-PKC   Document 26-5   Filed 04/11/19   Page 23 of 35

## SCHEDULE 5.17
## ENVIRONMENTAL MATTERS

**Environment and Occupational Health.**  We and our subsidiaries are subject to a complex environmental and occupational health regulation framework.  Under this framework, we and our subsidiaries may be required to make significant expenditures to modify our facilities and to prevent or remedy the effects of waste disposal, pollutant spills, and accidents on the environment and the population's health.

We are taking important steps to prevent risks to the environment, the population's health, and the integrity of our installations.  During 2012 and 2013, we continued the implementation of our company-wide Integral Risk Management System (SIR-PDVSA®).  The system is based on international practices and standards, such as ISO 14001 for Environmental Management, ISO 18000 and British Standard BUSINESS 8800 for health, and the Occupational Safety and Health Administration (OSHA)'s and American Petroleum Institute (API) for process safety.

We have invested $42 million to complete the implementation of SIR-PDVSA®.  In addition, we are undertaking an investment plan to comply with Venezuelan environmental laws under which $88 million was invested during 2011, $115 million was invested during 2012 and $32 million during the six months ended June 30, 2013.  In addition, CITGO plans to invest approximately $291 million for projects managing environmental risks between 2013 and 2017.

As part of our environmental responsibility initiative, we have also instituted a plan to recover oil pits that were left behind from oil exploration and production activities until 2004. Oil pits are excavations made on the soil surface to store oil sludge and drilling cuts.  The plan includes the recovery, recycling and transformation of the disposed waste, including abandoned installations, in order to convert them into financial and environmental assets.  The plan was first implemented in 2001 and has an expected duration of twelve years.  Since 2005, a total of 3,223 oil pits have been closed and restored.  In 2012, 565 oil pits were closed and restored.  As of December 31, 2012, the total amount of restored oil pits are 5,081.  In 2012, 2011 and 2010, we registered remediation and restoration expenses having an aggregate amount of $176 million, $217 million and $164 million, respectively.

Our subsidiary CITGO has received several notices of violation from the Environmental Protection Agency of the United States and other government authorities, which include notices of violation under the Federal Clean Air Act that may lead to CITGO being deemed liable, jointly with other companies, for remediation of contamination in respect of certain properties pursuant to the Comprehensive Environmental Response, Compensation and Liability Act.  Such notices of violation are currently being analyzed by CITGO and, in certain cases, remediation actions are being performed.  CITGO is committed to negotiate and settle with the governmental authorities in respect of such matters.



As of December 31, 2012, CITGO's non-current liabilities included an environmental accrual of $135 million compared with $127 million as of December 31, 2011. CITGO estimates a possible additional loss of $72 million as of December 31, 2012 in connection with environmental matters.

On February 4, 2012, two surface pipelines in the Venezuelan state of Monagas ruptured, resulting in a spill of light crude oil. The resulting oil spill spread over a distance of approximately 0.5 km to the Guarapiche River. A water treatment plant that treats water from the Guarapiche River and provides such water to residents of certain areas of the state of Monagas was temporarily shut down while Petróleos de Venezuela, S.A. ("PDVSA") contained and conducted a clean-up of the oil spill. During such shut down, PDVSA distributed potable water to residents of the affected areas. In consultation with experts, PDVSA deployed containment barriers and equipment for purposes of containing and removing the oil. After containing the spill, PDVSA worked to remediate the affected water and soil. The clean-up of the spill and the restoration of the water supply to affected residents was completed within forty days of the incident.

Since May 2012, the following changes to PDVSA's environmental safety initiatives have occurred: (i) PDVSA has increased the number of environmental indicators certified by KPMG; (ii) PDVSA has engaged in the development of the subsoil injection of waste, which has allowed PDVSA to safely dispose of approximately 650,000 barrels of mud and industrial water; (iii) PDVSA has designed and implemented new plans to address oil spills; (iv) PDVSA has commenced 174 environmental projects in different facilities throughout Venezuela; and (v) PDVSA has incorporated additional environmental policies to seven projects to be developed by PDVSA.

At the beginning of 2015 PDVSA initiated a process of certifying 12 environmental management progress indicators, which were included in the 2015 Memorandum of Balance of Environmental Management, with the support of the auditing firm KPMG. The 12 indicators in process of certification are: Authorization Procedures, Sanctioning Procedures, Environmental Conservation, Natural Resources Monitoring, Effluent Liquids Management, Production Waters, Atmospheric Emissions, Air Quality Monitoring, Waste Management, Hydrocarbon and other Contaminating Substances Spills, Social-Environmental Formation and Environmental Cure and Restoration.



Schedule 5.17



## SCHEDULE 11.02
## NOTICE DETAILS

**BORROWER:**

> **Petróleos de Venezuela, S.A.**
> Avenida Libertador
> Edificios Petróleos de Venezuela, Torre Este, Piso 8
> La Campiña
> Caracas, Venezuela
>
> **Attention:** Ana María España and Emir Manrique
> Facsimile: +58 212 708 1441
> Email: espanaam@pdvsa.com and manriqueej@pdvsa.com
>
> **Attention:** Edoardo Orsoni
> Facsimile: +58 212 708 4989
> Email: orsonie@pdvsa.com

**GUARANTOR:**

> **PDVSA Petróleo, S.A.**
> Avenida Libertador
> Edificios Petróleos de Venezuela, Torre Este, Piso 8
> La Campiña
> Caracas, Venezuela
>
> **Attention:** Ana María España and Emir Manrique
> Facsimile: +58 212 7081441
> Email: espanaam@pdvsa.com and manriqueej@pdvsa.com
>
> **Attention:** Edoardo Orsoni
> Facsimile: +58 212 708 4989
> Email: orsonie@pdvsa.com

**AGENT:**

> **GE Capital EFS Financing, Inc.**
> 800 Long Ridge Road
> Stamford, CT 06927
> Fax: +1-203-357-4890
> Email: Gerald.Friel@ge.com

**LENDER:**

> **GE Capital EFS Financing, Inc.**



¡Error! Nombre

800 Long Ridge Road
Stamford, CT 06927
Fax: +1-203-357-4890
Email: Gerald.Friel@ge.com


**SELLER:**

**Nuovo Pignone, S.p.A.**
Via Felice Matteucci 2
Florence 50127
Italy
Fax: +39-055-4232800
Email: Alberto.dasmi1@ge.com

**PURCHASER:**

**Bariven, S.A.**
Edificio PDVSA La Campiña
Torre Este, Piso 6
Oficina Principal Gerencia Bariven
La Campiña
Caracas, Venezuela

**Attention**: Francisco Jimenez
Facsimile: +58 212 708 3990
Email: jimenezfz@pdvsa.com



# EXHIBIT A

## COVERED PURCHASE ORDERS

| | Rfq | Offer | Solped | Offer Amount ($) |
|---|---|---|---|---|
| **East** | 6000470245 | 1408974-1 | UP63083613 | $ 423,153.16 |
| | 6000470246 | 1408974-2 | UP63083615 | $ 230,405.19 |
| | 6000470247 | 1408974-3 | UP63083616 | $ 2,218,736.04 |
| | 6000470248 | 1408974-4 | UP63083617 | $ 3,301,285.87 |
| | 6000470249 | 1408974-5 | UP63083618 | $ 1,644,986.45 |
| | 6000470250 | 1408974-6 | UP63083619 | $ 2,126,243.10 |
| | 6000470251 | 1408974-7 | UP63083614 | $ 397,003.55 |
| | 6000470252 | 1408974-8 | UP63083621 | $ 10,768,486.27 |
| | 6000470253 | 1408974-9 | UP63083622 | $ 1,052,628.54 |
| | 6000470254 | 1408974-10 | UP63083623 | $ 371,763.32 |
| | 6000470256 | 1408974-11 | UP63083624 | $ 493,368.98 |
| | 6000470261 | 1408974-12 | UP63083625 | $ 344,090.71 |
| | 6000470264 | 1408974-13 | UP63083627 | $ 1,117,677.34 |
| | 6000470265 | 1408974-14 | UP63083628 | $ 3,300,191.20 |
| | 6000470266 | 1408974-15 | UP63083629 | $ 983,539.35 |
| | 6000470267 | 1408974-44 | UP63083630 | $ 6,172,425.94 |
| | 6000470268 | 1408974-16 | UP63083634 | $ 635,129.62 |
| | 6000470269 | 1408974-17 | UP63083636 | $ 435,917.74 |
| | 6000470270 | 1408974-18 | UP63083638 | $ 155,630.68 |
| | 6000470271 | 1408974-19 | UP63083639 | $ 334,643.60 |

INDEX NO. 651006/2019
RECEIVED NYSCEF: 02/15/2019

|  | 6000470272 | 1408974-20 | UP63083641 | $ | 1,041,817.10 |
|--|------------|------------|------------|---|--------------|
|  | 6000470273 | 1408974-21 | UP63083643 | $ | 2,679,139.33 |
|  | 6000470274 | 1408974-22 | UP63083646 | $ | 2,740,477.91 |
|  | 6000470275 | 1408974-23 | UP63083647 | $ | 473,622.23 |
|  | 6000470276 | 1408974-24 | UP63083662 | $ | 420,739.15 |
|  | 6000470277 | 1408974-25 | UP63083663 | $ | 157,937.36 |
|  | 6000470278 | 1408974-26 | UP63083664 | $ | 277,179.51 |
|  | 6000470279 | 1408974-27 | UP63083665 | $ | 503,921.69 |
|  | 6000470280 | 1408974-28 | UP63083666 | $ | 202,206.08 |
|  | 6000470281 | 1408974-29 | UP63083667 | $ | 192,249.48 |
|  | 6000470282 | 1408974-30 | UP63083668 | $ | 324,639.87 |
|  | 6000470283 | 1408974-31 | UP63083670 | $ | 846,513.90 |
|  | 6000470284 | 1408974-43 | UP63083671 | $ | 2,969,872.31 |
|  | 6000470285 | 1408974-32 | UP63083672 | $ | 184,842.21 |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  | 6000470288 | 1408974-33 | UW63083674 | $ | 1,003,303.61 |
|  | 6000470289 | 1408974-34 | UW63083675 | $ | 4,598,241.77 |
|  | 6000470290 | 1408974-35 | UW63083676 | $ | 3,897,164.84 |
|  | 6000470292 | 1408974-36 | UW63083677 | $ | 3,686,898.39 |
| West | 6000470294 | 1408974-37 | UW63083678 | $ | 2,435,378.50 |
|  | 6000470295 | 1408974-38 | UW63083679 | $ | 1,600,248.61 |
|  | 6000470297 | 1408974-39 | UW63083680 | $ | 4,625,308.23 |
|  | 6000470298 | 1408974-40 | UW63083681 | $ | 332,172.24 |
|  | 6000470300 | 1408974-41 | UW63083685 | $ | 21,025,241.03 |

Case 1:19-cv-02523-PKC   Document 26-5   Filed 04/11/19   Page 30 of 35

| | | | | |
|---|---|---|---|---|
| 6000470302 | 1408974-42 | UW63083688 | $ | 2,695,756.10 |
| 6000470303 (Tbd) | 1408974-45 | UW63083689 (tbd) | $ | 1,309,082.25 |



Case 1:19-cv-02523-PKC   Document 26-5   Filed 04/11/19   Page 31 of 35

**EXHIBIT B**

**FORM OF**
**ASSIGNMENT AGREEMENT**

This Assignment Agreement (this "Assignment") is dated as of the Effective Date set forth below and is entered into by and between [**Insert name of Assignor**] (the "Assignor") and [**Insert name of Assignee**] (the "Assignee"). All capitalized terms used but not otherwise defined herein have the meanings given to them in the Credit Agreement identified below (the "Credit Agreement"), receipt of a copy of which is hereby acknowledged by the Assignee. The Standard Terms and Conditions set forth in Annex 1 attached hereto (the "Standard Terms and Conditions") are hereby agreed to and incorporated herein by reference and made a part of this Assignment as if set forth herein in full.

For an agreed consideration, the Assignor hereby irrevocably sells and assigns to the Assignee, and the Assignee hereby irrevocably purchases and assumes from the Assignor, subject to and in accordance with the Standard Terms and Conditions and the Credit Agreement, as of the Effective Date set forth below, the interest in and to all of the Assignor's rights and obligations under the Credit Agreement and any other agreements, documents or instruments delivered pursuant thereto or for the benefit of the Lenders relating thereto that represents the amount identified below of all of the Assignor's [undisbursed commitment balance] [and] [unpaid disbursed principal balance] (collectively, the "Assigned Interest"). Such sale and assignment is without recourse to the Assignor and, except as expressly provided in this Assignment, without representation or warranty by the Assignor.

| | | |
|---|---|---|
| (a) | Assignor: | _____ |
| (b) | Assignee: | _____ |
| (c) | Borrower: | Petróleos de Venezuela, S.A. |
| (d) | Agent: | GE Capital EFS Financing, Inc., as agent under the Credit Agreement |
| (e) | Credit Agreement: | Credit Agreement, dated as of December 27, 2016 (as the same may be amended, restated, supplemented or otherwise modified from time to time in accordance with its terms), by and among Petróleos de Venezuela, S.A. as Borrower, PDVSA Petróleo, S.A., as Guarantor, GE Capital EFS Financing, Inc., as Agent, and the Lenders from time to time party thereto. |
| (f) | Assigned Interest: | [Undisbursed commitment balance of $_____] [and] [Unpaid principal balance of $_____]. |
| (g) | Account for Payments: | [_____] |

**Effective Date: _____ ___, 20___**



Case 1:19-cv-02523-PKC   Document 26-5   Filed 04/11/19   Page 32 of 35

[*The remainder of this page intentionally left blank; signature page immediately follows.*]



The terms set forth in this Assignment are hereby agreed to:

**ASSIGNOR**
[**NAME OF ASSIGNOR**]


By:_____
Name:
Title:


**ASSIGNEE**
[**NAME OF ASSIGNEE**]


By:_____
Name:
Title:



CREDIT AGREEMENT, DATED AS OF DECEMBER 27, 2016 (AS THE SAME MAY BE AMENDED, RESTATED, SUPPLEMENTED OR OTHERWISE MODIFIED FROM TIME TO TIME IN ACCORDANCE WITH ITS TERMS), BY AND AMONG PETRÓLEOS DE VENEZUELA, S.A. AS BORROWER, PDVSA PETRÓLEO, S.A., AS GUARANTOR, GE CAPITAL EFS FINANCING, INC., AS AGENT, AND THE LENDERS FROM TIME TO TIME PARTY THERETO

STANDARD TERMS AND CONDITIONS FOR ASSIGNMENT AGREEMENT

1.    **Representations and Warranties**

1.1.    **Assignor**

The Assignor (a) represents and warrants that (i) it is the legal and beneficial owner of the Assigned Interest, (ii) the Assigned Interest is free and clear of any lien, encumbrance or other adverse claim and (iii) it has full power and authority, and has taken all action necessary, to execute and deliver this Assignment Agreement and to consummate the transactions contemplated hereby; and (b) assumes no responsibility with respect to (i) any statements, warranties or representations made in or in connection with the Credit Agreement or any other agreement, instrument or document delivered pursuant thereto or for the benefit of the Lenders relating thereto, other than this Assignment Agreement (collectively, the "Loan Documents"), (ii) the execution, legality, validity, enforceability, genuineness, sufficiency or value of the Loan Documents, (iii) the financial condition of the Borrower, the Guarantor, any of their respective Subsidiaries or any of their respective Affiliates in respect of any Loan Document, or (iv) the performance or observance by the Borrower, the Guarantor, any of their respective Subsidiaries or any of their respective Affiliates of any of their respective obligations under any Loan Document.

1.2.    **Assignee**

The Assignee (a) represents and warrants that (i) it has full power and authority, and has taken all action necessary, to execute and deliver this Assignment Agreement and to consummate the transactions contemplated hereby and to become a Lender under the Credit Agreement, (ii) it is [an Eligible Institution / not an Eligible Institution]1 and is not an Ineligible Transferee, (iii) from and after the Effective Date, it shall be bound by the provisions of the Credit Agreement and, to the extent of the Assigned Interest, shall have the obligations of a Lender thereunder, and (iv) it has received a copy of the Credit Agreement, together with copies of the most recent financial statements delivered pursuant to Section 6.04 thereof and such other documents and information as it has deemed appropriate to make its own credit analysis and decision to enter into this Assignment Agreement and to purchase the Assigned Interest on the basis of which it has

---

[1] Select one as applicable.



INDEX NO. 651006/2019

Case 1:19-cv-02523-PKC   Document 26-5   Filed 04/11/19   Page 35 of 35

RECEIVED NYSCEF: 02/15/2019

made such analysis and decision; and (b) agrees that (i) it will, *independently and without* reliance on the Agent, the Assignor or any other Lender, and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking action under the Loan Documents, and (ii) it will perform in accordance with their terms all of the obligations which by the terms of the Loan Documents are required to be performed by it as a Lender.

2.  **Payments**

From and after the Effective Date, the Agent shall make all payments in respect of the Assigned Interest (including payments of principal, interest and other amounts) to the Assignor for amounts which have accrued up to but excluding the Effective Date and to the Assignee for amounts which have accrued from and after the Effective Date.

3.  **General Provisions**

This Assignment Agreement shall be binding upon, and inure to the benefit of, the parties hereto and their respective successors and permitted assigns.  This Assignment may be executed in any number of counterparts, which together shall constitute one instrument. Delivery of an executed counterpart of a signature page of this Assignment Agreement by telecopy and electronic mail shall be equally effective to the delivery of a manually executed counterpart of this Assignment.  THIS ASSIGNMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HEREUNDER SHALL BE GOVERNED BY, AND SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE INTERNAL LAWS OF THE STATE OF NEW YORK (INCLUDING SECTION 5-1401 OF THE GENERAL OBLIGATIONS LAW OF THE STATE OF NEW YORK), WITHOUT REGARD TO CONFLICTS OF LAWS PRINCIPLES.

*[The remainder of this page intentionally left blank.]*

