

Steven F. Molo
MoloLamken LLP
430 Park Avenue
New York, NY 10022
T: 212.607.8160
F: 212.607.8161
smolo@mololamken.com

December 9, 2021

<u>VIA CM/ECF</u>

Hon. Alison J. Nathan
U.S. District Court for the Southern District of New York
Thurgood Marshall United States Courthouse
40 Foley Square
New York, NY 10007

   Re: *Red Tree Investments, LLC v. Petróleos de Venezuela, S.A. et al.*,
     <u>Nos. 19 Civ. 2519 and 19 Civ. 2523 (S.D.N.Y.):  Supplemental Authority</u>

Dear Judge Nathan:

   We represent Red Tree.  We respectfully write to inform the Court of new authority supporting Red Tree's pending motions for summary judgment.  *See* Opinion and Judgment, *Dresser-Rand Co. v. Petróleos de Venezuela, S.A.*, No. 19 Civ. 2689, Dkt. 150 (S.D.N.Y. Dec. 9, 2021) (Ex. A).

   *Dresser-Rand* is another case in this District against Defendants over their unpaid debts. As in this case, Defendants argued in *Dresser-Rand* that paying their debts was impossible because banks had supposedly declined to process their payments after U.S. sanctions were imposed.  Ex. A at 12.  After a bench trial, the *Dresser-Rand* court rejected Defendants' impossibility defense. Ex. A at 19-25.  As the court recognized, to escape contractual duties based on impossibility, a defendant must show that " 'it took virtually every action within its powers to perform.' "  *Id.* at 12 (quoting *Kama Rippa Music, Inc. v. Schekeryk*, 510 F.2d 837, 842 (2d Cir. 1975)).  In other words, no impossibility defense lies if the defendants can " 'render performance that is substantial, taking account of any reasonable substitute performance' " they could render.  *Id.* at 20 (quoting Restatement (2d) of Contracts § 270).

Hon. Alison J. Nathan
December 9, 2021
Page 2

Defendants, the court held, fell "far short" of that standard.  Ex. A at 21.  Even if one or two banks rejected their wire transfers, that fact did "not indicate that **all banks in the business** would have denied the payments" as well.  *Id.* (emphasis added)*.*  Rather, like this case, Defendants had alternative banks they could have – but did not – use to pay.  *Id.* at 20-21; *see also* No. 19 Civ. 2519, Dkt. 124 (Red Tree MSJ Reply), at 7-8; No. 19 Civ. 2523, Dkt. 125 (same), at 7-8 (listing other banks Defendants could have used to pay in this case).  Defendants also could have tried – but did not try – to pay in other currency, Ex. A at 23, work with the banks that refused their payments, ask OFAC to clear the payment, or simply pay by check, *id.* at 25.  Thus, because PDVSA did not show that it took every action within its powers to perform, the court found PDVSA's performance was not impossible.  *Id.*

*Dresser-Rand* forecloses Defendants' impossibility defense in this case.  Here, Defendants have – at most – shown that two banks rejected a total of three payments.  Red Tree MSJ Reply at 7.  Two of those payments, in fact, were rejected only because of administrative mistakes and eventually went through.  *Id.*  But the fact that one bank, Zuma, may have rejected one payment of Red Tree's debt does not excuse Defendants from paying the rest of their obligations, because Defendants cannot show that **every** bank they could have used would have rejected their payments as well.  *Id.* at 7-8.  There is no evidence that, once Zuma rejected Defendants' purported payment, they tried **any other bank** or made any other arrangements to meet their obligations.  *Id.* at 8.  For example, just as in *Dresser-Rand*, Defendants could have sought assistance from OFAC, paid by other means than wire transfer, or worked with banks to facilitate payment.  *Id.*  They did none of those things.  *Id.*  Because Defendants cannot show that they took every action within their powers to perform, their impossibility defense fails.  Red Tree thus respectfully requests that the Court follow *Dresser-Rand* and enter summary judgment against Defendants.

Hon. Alison J. Nathan
December 9, 2021
Page 3

Respectfully submitted,

*/s/ Steven F. Molo*
Steven F. Molo

Cc:  All counsel of record via CM/ECF

Exhibit A

ORIGINAL

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 12 9 21

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

DRESSER-RAND COMPANY,

                    Plaintiff,

          - against -

PETROLEÓS DE VENEZUELA, S.A.,

                    Defendant.

19 Civ. 2689 (LLS)

**OPINION AND JUDGMENT**

## INTRODUCTION

In January 2017, Plaintiff Dresser Rand Company ("D-R") and Defendant Petróleos de Venezuela, S.A. ("PDVSA") entered into a Note and Note Agreement documenting PDVSA's borrowings of approximately $120 million from D-R, and PDVSA's duty to make installment payments of principal and interest until the debt was repaid in January 2020 (the "repayment period").

On October 20, 2017, PDVSA did not make the scheduled third interest payment. Nor did it make any of the succeeding payments required by the Note Agreement.

This case presents the sole question of whether the doctrine of impossibility discharged PDVSA from performing those contractual obligations.

For the reasons that follow, after a three-day bench trial it is clear that timely payment under the Agreement was not impossible. Accordingly, PDVSA is obliged to pay USD $166,082,240.21 to D-R, plus post-judgment interest at the rate

of 8.5% per annum as provided in Section 2.04 the Note
Agreement.

**FACTUAL FINDINGS**

The major facts comprising the background to the issue of
impossibility of performance have been resolved on Summary
Judgment or agreed by the parties in advance of trial. The
findings of facts and conclusions of law necessary to resolve
the impossibility issue are made as follows.

**Note Agreement**

On January 20, 2017, the parties entered into a Note
Agreement with D-R as Note Holder and Administrative Agent and
PDVSA as Issuer. Dkt. No. 121 (Consent Pre-Trial Order, Agreed
Fact 1); JX-1 (Note Agreement); JX-2 (Note).  In the Note
Agreement, PDVSA agreed to pay D-R the amount reflected in the
corresponding Note—a principal sum of $119,645,069.70, with an
annual interest rate of 6.5% and a default interest rate of
8.5%. Dkt. No. 12 (Agreed Fact 1 & 2); JX-1; JX-2.

The Note Agreement set forth a twelve-part payment
schedule. JX-1. Commencing on April 20, 2017, PDVSA was required
to make quarterly interest payments for one year. Id. Then, from
April 20, 2018 to January 20, 2020, PDVSA was to make payments
on the principal and interest. Id. All payments were to be made
in U.S. Dollars to either D-R's offices at West Tower, Suite
1000, 10205 Westheimer Road, Houston TX 77042, or to D-R's

designated bank account with Citibank. Id. §§ 2.05, 2.08, Sch. 2.08.

PDVSA completed the first two quarterly interest payments but failed to make the third quarterly interest payment or any of the remaining payments. Dkt. No. 12 (Agreed Fact 4). PDVSA claims U.S. sanctions imposed on transactions with Venezuela and banks' internal "risk-adverse" policies adopted in response to those sanctions made the payments impossible.

### Office of Foreign Assets Control ("OFAC") Sanctions

On August 25, 2017, the Trump Administration issued Executive Order 13808 ("E.O. 13808"), which prohibits transactions of new debt with the government of Venezuela, including its nationally owned oil company, PDVSA. JX-41. E.O. 13808, 82 Fed. Reg. 41155, states:

> **Section 1.** (a) All transactions related to, provision of financing for, and other dealings in the following by a United States person or within the United States are prohibited:
> (i) new debt with a maturity of greater than 90 days of Petroleos de Venezuela, S.A. (PdVSA);
> (ii) new debt with a maturity of greater than 30 days, or new equity, of the Government of Venezuela, other than debt of PdVSA covered by subsection (a)(i) of this section; ....
>
> JX-41.

OFAC expounded upon the meaning and scope of E.O. 13808 in its responses to a series of Frequently Asked Questions ("FAQs"). JX-53. FAQ 553 states:

> OFAC considers "new debt" to be debt created on or after August 25, 2017. . . . OFAC does not consider debt that was created prior to August 25, 2017 to be "new debt" for purposes of E.O. 13808 so long as the terms of the debt instrument (including, for example, the length of the repayment period or any interest rate applied) agreed to by the parties do not change on or after August 25, 2017. Such preexisting debt does not need to conform to the 30- or 90-day tenors imposed under E.O. 13808, and U.S. persons may collect and accept payment for such debt regardless of whether the relevant segment of the Government of Venezuela, including PdVSA, pays during the agreed-upon payment period.

JX-53.

### Banks' Risk-Adverse Policies

E.O. 13808 set only regulatory minimums. In response, banks adopted internal compliance policies to ensure foreign transactions conformed with OFAC standards, violation of which carried heavy penalties. Their policies, which varied in accordance with the individual bank's acceptance of business risks, combined the threshold regulatory requirements with the banks' unique risk tolerance factors. Tr. 172:3-173:3. As some banks are more risk adverse than others, some policies were more restrictive than E.O. 13808. Tr. 172:3-14.

Generally, the policies worked as follows. A bank would flag a payment from or to PDVSA, check it for

compliance with E.O. 13808, analyze it under the terms of
the bank's risk assessment practices, and process the
transaction if the bank concluded the payment did not
violate its practices or E.O. 13808. Tr. 172:3-173:3. Some
banks, like Citibank and Deutsche Bank Trust Co. Americas
("Deutsche Bank"), would refuse to process transactions
involving PDVSA on risk assessment grounds even though the
transaction was legally permissible under E.O. 13808. JX-
31; JX-10.

For Citibank specifically, starting September 25,
2017, all incoming or outgoing payments from or to PDVSA to
or from Citibank clients were automatically rejected,
unless Citi, at its own discretion, approved the client for
manual processing of that transaction. Tr. 149:14-21; JX-
65. To be approved for manual processing, Citibank clients
were required to sign a standardized document, the
Sanctions Compliance Certification, and submit individual
profiles of the prospective transactions. Tr. 149:14-21,
151:3-9; JX-18, JX-20.

Through November and December 2017, D-R, a Citibank
client, worked with Citibank reviewing the Sanctions
Compliance Certification and providing written comments to
adapt it to D-R. JX-16 at 6; Tr. 85:6-9, 87:3-4. However,
on December 19, 2017 Citibank changed its views, deciding

that under its own risk avoidance standards it would not
process PDVSA's payments even with the Sanctions Compliance
Certification in effect. JX-16 at 2; Tr. 91:6-20. Informed
of Citibank's new risk calculation, D-R did not send
Citibank the finalized certification form. Tr. 59:2-7.

### PDVSA's Payment Attempts

On October 20, 2017, the third quarterly interest payment
of $1,960,212.37 became due under the Note Agreement. Dkt. No.
12 (Agreed Fact 6). No payment or payment attempt was made on
that date. Id.

Over the course of the next four months, PDVSA attempted
but failed on three occasions to transmit payments to D-R's
Citibank account.

First, on November 21, 2017, PDVSA attempted to wire funds
from its China CITIC Bank ("China CITIC") account to D-R's
Citibank account by way of an intermediary bank, Deutsche Bank.
JX-10. Deutsche Bank rejected the transfer as a violation of its
internal "risk-adverse" policies and returned the funds to China
CITIC. Id.

On November 29, 2017, PDVSA, in an email correspondence
with D-R, reaffirmed its "intention and ability to comply with
all of its commitments under the Note Agreement" and requested
an additional thirty days in order to "remedy the delay" of the
third quarterly interest payment due on October 20, 2017. JX-13.

In response, D-R agreed to accept on or before December 29, 2017 the already past due third quarterly interest payment. JX-13; JX-21 at 1. The parties did not make a written modification or amendment to the Note or Note Agreement, as required by Section 9.08 of the Note Agreement for any amendment to it. JX-1 § 9.08(b).

On December 18, 2017, PDVSA asked D-R for an alternative bank account to which it could make payments. JX-15 at 2. On December 27, 2017, D-R informed PDVSA of a Commerzbank AG ("Commerzbank") account held by Siemens AG, D-R's parent company, and thus accessible by D-R. JX-15 at 1. Although the Commerzbank Account was in Munich, Germany, it could accept payments in U.S. Dollars. Id. No payment was made to it on or before December 29, 2017. Dkt. No. 12 (Agreed Fact 10 & 11).

On January 19, 2018, D-R followed up with PDVSA and reiterated that the Commerzbank account was "active for making transfers in USD." JX-23 at 1. PDVSA did not respond.

Instead, on January 31, 2018, PDVSA made its second attempt to pay $1,960,187.37 into D-R's account at Citibank through its account with Dinosaur Merchants Bank Limited ("DMBL"). JX-25. Citibank, however, denied receiving these funds, and told D-R that "the originator of the payment will need to have this investigated from their side in order to determine why the funds have not transmitted" to Citibank. JX-28.

Thereafter, on February 12, 2018, PDVSA made its third attempt to pay D-R's Citibank account. JX-30; JX-31. Once again, PDVSA used its account at DMBL. The payment was transmitted to an intermediary bank, JP Morgan Chase Bank ("JP Morgan"), which processed the payment on the same day and forwarded it to Citi. JX-30; JX-31. On February 14, 2018, Citibank rejected the transfer and returned the funds. Citibank's rejection of the funds was based on Citi's "risk-adverse" policy and not on E.O. 13808 or rules promulgated by the Office of Foreign Assets Control ("OFAC"). JX-31.

On February 20, 2018, PDVSA requested that D-R open a bank account at Novo Bank, with which PDVSA had a preexisting relationship. JX-32; JX-33. Payment via Novo Bank would require D-R to accept payment in Euros. JX-33 at 2-3.

On March 2, 2018, D-R agreed to open a Novo Bank account and proposed an amendment to the Note Agreement that would permit payment in Euros. JX-33 at 2-3; Dkt. No. 12 (Agreed Fact 13). The amendment did not include any Novo Bank account information because D-R had not yet actually opened it.

PDVSA did not respond. Nor did it respond to D-R's additional correspondence on March 9, 2018, April 2, 2018, and April 4, 2018. JX-34. D-R finalized opening an account with Novo Bank in October 2018, JX-37, but PDVSA never followed through

with using it, Tr. 35:10-12. The Note Agreement was never
amended.

Neither PDVSA nor its Guarantor, Petróleo, made or
attempted to make Note payments after February 2018. On February
14, 2019, D-R sent PDVSA a Notice of Default, JX-39, and on
February 21, 2019, sent them a Notice of Acceleration declaring
the entire principal balance of the Note, together with all
applicable interest, to be due and payable in full, JX-40.

### E.O. 13850

On November 1, 2018, the U.S. government issued Executive
Order 13850, 83 Fed. Reg. 55243, which provides that:

> All property and interests in property that are in
> the United States, that hereafter come within the
> United States, or that are or hereafter come within
> the possession or control of any United States person
> of the following persons are blocked and may not be
> transferred, paid, exported, withdrawn, or otherwise
> dealt in . . . except to the extent provided by
> statutes, or in regulations, orders, directives, or
> licenses that may be issued pursuant to this order.

JX-42.

On January 28, 2019, the Secretary of Treasury designated
PDVSA as subject to E.O. 13850's blocking sanctions. JX-55.

Concurrently, the U.S. government issued General License 9,
which permits "all transactions and activities . . . ordinarily
incident and necessary to dealings in any debt" issued by PDVSA
prior to August 25, 2017. JX-44. That allows PDVSA to pay debts
that existed prior to August 25, 2017.

Later versions of General License 9 have continued to authorize transactions and activities ordinarily incident and necessary to dealings in debt issued by PDVSA prior to August 25, 2017. JX-46; JX-47; JX-48; JX-4; JX-50.

## Procedural History

D-R brought this suit to recover the outstanding balance and interest due on the Note, which is governed by the laws of New York. JX-1 § 9.07. Upon D-R's motion for summary judgment, this Court ruled that D-R established a prima facie case for recovery. Dkt. No. 59 at 5.

A bench trial was held on September 21-23, 2021 to resolve whether PDVSA can establish the only defense available to it under the Note Agreement: that PDVSA's duty to make payments under the Note was discharged because its performance was impossible.

## DISCUSSION

### I.   Standards

"[I]mpossibility . . . is treated synonymously with impracticability" under New York law. Lantino v. Clay LLC, No. 18-cv-12247, 2020 WL 2239957, at *7 (S.D.N.Y. May 8, 2020) (internal citation omitted).

New York courts construe the impossibility defense narrowly because, in part, of "judicial recognition that the purpose of contract law is to allocate risks." See, e.g., Clarex Ltd. v.

Natixis Sec. Americas LLC, 988 F. Supp. 2d 381, 392 (S.D.N.Y. 2013) (quoting Kim Corp. v. Cent. Markets, Inc., 70 N.Y.2d 900 (1987)).

A party's duty to perform a contract will only be discharged if extraordinary circumstances, "the non-occurrence of which was a basic assumption on which the contract was made," RESTATEMENT (SECOND) OF CONTRACTS § 261 (1981), make performance "so vitally different from what was reasonably to be expected as to alter the essential nature of that performance." Id. Intro. Note; See, e.g., Dow Chem. Pac. Ltd. v. Rascator Mar. S.A., 782 F.2d 329, 339 (2d Cir. 1986).

Such extraordinary circumstances include, under New York law, "'the destruction of the means of performance by act of God, vis major, or by law.'" Ebert v. Holiday Inn, 628 F. App'x 21, 23 (2d Cir. 2015) (quoting 407 E. 61st Garage, Inc. v. Savoy Fifth Ave. Corp., 23 N.Y.2d 275, 281 (1968)). Impossibility thus excuses a party's performance "when the destruction of . . . the means of performance makes performance objectively impossible." Clarex Ltd. v. Natixis Sec. Americas LLC, 988 F. Supp. 2d 381, 394 (S.D.N.Y. 2013) (quoting Kim Corp. v. Cent. Markets, Inc., 70 N.Y.2d 900(1987)). The difference between objective and subjective impossibility "has been described as that between 'the thing cannot be done' and 'I cannot do it.'" RESTATEMENT (SECOND) OF CONTRACTS § 261, Comment e (1981).

The defendant has the burden to prove that its performance was "objectively impossible." See Inter-American Dev. Bank v. NextG Telecom Ltd., 503 F. Supp. 2d 687, 696 (S.D.N.Y. 2007). PDVSA, as the party pleading impossibility as a defense, "must demonstrate that it took virtually every action within its powers to perform its duties under the contract." Kama Rippa Music, Inc. v. Schekeryk, 510 F.2d 837, 842 (2d Cir. 1975).

PDVSA claims that it was objectively impossible to render payment under the Note Agreement for two independent reasons: United States sanctions prohibited payment, and banks declined to process payments, erring on the side of caution under their individual internal risk policies.

The evidence at trial fails to carry PDVSA's burden on either account. On the contrary, it tends to show that payment was probably feasible.

**II. OFAC Sanctions Did Not Prohibit PDVSA's Payments Because the Note Agreement Was Not New Debt**

E.O. 13808 prohibits U.S. entities and PDVSA from entering into "transactions related to, provision of financing for, and other dealings in . . . new debt." JX-41.

E.O. 13808 does not define new debt. However, OFAC's FAQ 553 clarifies that:

> OFAC does not consider debt that was created prior to August 25, 2017 to be "new debt" for purposes of E.O. 13808 so long as the terms of the debt instrument

(including, for example, the length of the repayment
period or any interest rate applied) agreed by the
parties does not change on or after August 25, 2017.

JX-53.

Because the Note Agreement was entered into on January
20, 2017—long before August 25th—in its original form, it is
preexisting debt. Thus, PDVSA was not prohibited by E.O.
13808 from making the third interest payment when it became
due on October 20, 2017.

Nevertheless, PDVSA argues that the terms of the Note
Agreement were modified on November 29, 2017 when PDVSA
requested, and D-R consented to "a waiver of 30 additional days
[to December 29, 2019] . . . in order to remedy the delay in the
payment of interest." JX-13.

According to PDVSA, this post August 25, 2017 waiver
created new debt because it (1) changed the Note Agreement's
repayment date for the third interest payment (the repayment
period term) and (2) relieved PDVSA from default and thus
changed the Agreement's interest rate as applied to the third
payment (interest rate term). PDVSA Post-Trial Reply Br. at 16.

But that argument mischaracterizes the significance of the
November 29th waiver on both counts.

**1. The November 29, 2017 Waiver Did Not Affect or Alter the
Length of the Repayment Period**

According to FAQ 553, if the length of the repayment period on a preexisting note is altered after August 25, 2017, then the altered note is considered new debt and prohibited by E.O. 13808. The crux of the issue is the meaning of "length of the repayment period," which FAQ 553 does not define.

PDVSA claims that the repayment period refers to any single payment deadline under the term of the Note Agreement. Under this interpretation, the November 29, 2017 waiver to accept the third interest payment on or before December 29, 2017 changed the payment's due date, altered the length of the repayment period, and converted the Note into new debt.

A holistic reading of FAQ 553's text indicates otherwise. In interpreting regulations, courts "are required to read the statute or regulation as a whole, since the meaning of statutory language, plain or not, depends on context." See, e.g., United States CFTC v. Byrnes, 53 F. Supp. 3d 319, 323–24 (S.D.N.Y. 2014). Further, in interpreting FAQ 553, the Court is "guided by the maxim that 'the meaning of doubtful terms or phrases may be determined by reference to their relationship with other associated words of phrases (noscitur a sociis).'" Id. (quoting United States v. Dauray, 215 F.3d 257, 262 (2d Cir. 2000)). Courts rely on this canon of construction "to avoid ascribing to one word," or phrase, "a meaning so broad that it is inconsistent with its accompanying words." United States v.

- 14 -

Rowland, 826 F.3d 100, 109 (2d Cir. 2016) (quoting Yates v.
United States, 574 U.S. 528, 543 (2015)).

If, as PDVSA alleges, the acceptance of one late payment
constituted a change to the length of the repayment period, then
the last sentence of FAQ 553 would serve no purpose. Tr. 126:13-
20. FAQ 553 concludes by saying: "U.S. persons may collect and
accept payment for such [preexisting] debt regardless of whether
. . . PdVSA pays under the agreed upon payment period." JX-53.
FAQ 553 allows U.S. parties to accept late payments on
preexisting debt without causing a change in the terms of the
note. Tr. 125:9-126:3.

Accordingly, the length of the repayment period is not
defined by a singular payment date. Rather, as D-R's expert
witness explained, it describes the term of maturity on the
note, the time between the date of issuance and the final date
on which the debt is fulfilled. Tr. 125:18-25.

That definition of repayment period aligns with the common
understanding of the term across financial sectors. See Jacobs
v. Citibank, N.A., 01-cv-8436, 2005 U.S. Dist. LEXIS 17495, at
*3-4 (S.D.N.Y. Aug. 4, 2005) ("During the Repayment Period,
[debtors] were required to make monthly payments to Citibank of
principal and interest . . . The principal portion of the
monthly payments made during the Repayment Period remained
fixed."); Gen. Elec. Capital Fin. v. Bank Leumi Tr. Co., 95 Civ.

- 15 -

9224, 1999 U.S. Dist. LEXIS 485, at *3–4 (S.D.N.Y. Jan. 19, 1999) ("After the Draw Period, [debtor] would have fifteen years in which to repay the loan through monthly payments of principal and interest ('Repayment Period').").

That understanding conforms with the underlying purpose of E.O. 13808. In interpreting regulations, courts "must 'carefully consider' [the regulation's] 'text, structure, history and purpose.'" United States v. Nejad, 18-CR-224, 2019 WL 6702361, at *8 (S.D.N.Y. Dec. 6, 2019) (quoting Kisor v. Wilkie, 139 S. Ct. 2400 (2019)).

As D-R's experienced and knowledgeable expert witness, Stephanie Rice, explained, the policy objective underlying OFAC sanctions "is to deprive the foreign target of resources and punish the foreign target while not punishing the U.S. parties." Tr. 132:3-11. It would reverse that policy to allow a foreign party, by delaying a monthly payment on an "old" debt, to convert the debt into a forbidden "new" debt and thus avoid repayment of the whole principal because of the sanctions. Tr. 136:5-20.

OFAC's concern was to protect U.S. entities by allowing them to collect on preexisting debt, while, in the words of PDVSA's expert, prohibiting U.S. creditors from "negotiating away or providing a discount" on preexisting debt without the approval of the U.S. government. Tr. 339:25-340:4.

Under the Note Agreement, the length of the repayment period remained the full term of the Note: January 20, 2017 to January 20, 2020. That term was not affected by D-R's waiver on November 29, 2017 to accept late payment of an interest installment.

The terms of the Note were not changed after August 25, 2017 and the Note is not considered new debt on that ground.

2. **The November 29, 2017 Waiver Did Not Affect the Default Status of PDVSA or the Interest Rate Applicable Under the Note.**

PDVSA alleges that the November 29, 2017 extension of the third interest payment's deadline changed the terms of the Note Agreement because PDVSA was relieved of its default and of the application of the default interest rate of 8.5%.

The record does not support those assertions.  No evidence in the record supports a finding that D-R agreed to not hold PDVSA in default. D-R's Head of Credit and Collections testified that as soon as PDVSA missed the October 20, 2017 payment deadline, D-R considered PDVSA to be in technical default. Tr. 73:9-17. D-R elected not to invoke a formal Event of Default under the Note Agreement because PDVSA reiterated "its intention and ability to comply with all commitments under the Note Agreement." JX-13.

The forbearance did not waive D-R's right to enter a default. The Note Agreement explicitly provides that "[n]o failure or delay of [D-R] or any Noteholder in exercising any power or right hereunder . . . shall operate as a waiver thereof." JX-1 § 9.08. See, e.g., Exp.-Import Bank of the United States v. Agricola del Mar BCS, S.A. de C.V., 536 F. Supp. 2d 345, 351 (S.D.N.Y. 2008) (holding a stipulation in the Note "that no conduct by the Note holder or its successors shall constitute a waiver of any rights" is "sufficient to preclude" the waiver argument); S. Fed. Sav. & Loan Ass'n v. 21-26 E. 105th St. Assoc., 145 B.R. 375, 383 (S.D.N.Y. 1991) (enforcing the contract provision that "no failure on the part of the Bank to exercise, and delay in exercising, any right shall operate as a waiver thereof").

The parties never changed the default interest rate in the Note Agreement. Tr. 223:20-224:11; JX-53. Section 2.04 of the Note Agreement provides that upon default of payment of "interest on any Note . . . for so long as such Event of Default is continuing . . . all amounts outstanding under this Agreement . . . shall bear interest . . . at a rate per annum equal to eight and one-half percent (8.50%)". JX-1 § 2.04. Until the default is rectified, the interest rate of 8.5% automatically applies. Thus, the rate of 8.5% applied when PDVSA failed to make the third interest payment on October 20, 2017.

D-R's nonmention of the application of the default interest rate in the November 29, 2017 correspondence does not alter that fact. PDVSA in no way indicated to D-R that it was disavowing its commitment to pay the default interest rate. JX-13 (confirming PDVSA's intention to "comply with all of its commitments under the Note Agreement" and making clear it would "remedy any delay in the payment of unpaid interest as soon as possible").

PDVSA'S own expert witness, John Barker, concured. When asked, Barker confirmed "that when the payment was missed, default interest is due. And . . . PDVSA did not ask for relief from default interest and Dresser did not grant relief." Tr. 380:9-13.

D-R's waiver of the third interest payment deadline on November 29, 2017 did not change the terms of the Note Agreement. It did not alter the length of the repayment period, the default status of PDVSA, or the applicable interest rate. The Note Agreement is preexisting debt whose payment is not prevented by E.O. 13808.

### III.  Banks' Internal Risk-Adverse Policies Did Not Prevent PDVSA's Payment

Finally, PDVSA alleges that, even if payment under the Note Agreement was not prohibited by E.O. 13808, it was prevented by banks' own internal, risk-adverse policies. PDVSA's claim is

supported by the fact that it thrice attempted to make the third interest payment to D-R's Citibank account, only to have the payment rejected on each occasion by Citibank or the intermediary bank, Deutsche Bank, on risk-adverse grounds. Tr. 355:10-18.

But, even if payment via Citibank or Deutsche Bank was rendered impossible, "[w]here only part of an obligor's performance is impracticable, his duty to render the remaining part is unaffected if . . . it is still practicable for him to render performance that is substantial, taking account of any reasonable substitute performance that he is under a duty to render[.]" RESTATEMENT (SECOND) CONTRACTS § 270.

As the party pleading impossibility, PDVSA must demonstrate that it took "virtually every action within its powers to perform its duties under the contract." Transfield ER Cape Ltd. v. STX Pan Ocean Co., No. 09 CIV. 1250, 2009 WL 691273, at *3 (S.D.N.Y. Mar. 16, 2009); see also Local 338, RWDSU v. Farmland Dairies, Inc., 2003 U.S. Dist. LEXIS 3676, at *13-14 (S.D.N.Y. Mar. 14, 2003) ("The party pleading impossibility as a defense must demonstrate that it took virtually every action within its powers to perform its duties under the contract. Although Farmland Dairies took substantial steps to perform its duties under the Collective Bargaining Agreement, it cannot claim that

it took virtually every action within its power to perform its duties.").

PDVSA falls far short. The rejections of the transactions by Citibank and Deutsche Bank do not indicate that all banks in the business would have denied the payments on risk0adverse grounds. On the contrary, PDVSA's own expert witness agreed that "bank risk policies differ from bank to bank" and that "there is certainly no such thing as a global or even a national policy for risk appetite for all banks." Tr. 398:1-6.

In fact, China CITIC, DMBL, and JPMorgan, which were all likewise subject to E.O. 13808, did actually process PDVSA's third interest payment to D-R. China CITIC, acting as PDVSA's originating bank, processed an attempted payment to Citibank on November 21, 2017. JX-10. DMBL, likewise acting as PDVSA's originating bank, processed an attempted payment on February 12, 2018. JX-30 at column Q.

JPMorgan, operating as intermediary bank, received the February 12, 2018 payment attempt from DMBL and processed the payment and sent it to Citibank. JX-31 at 2. When PDVSA's expert witness was asked about the transaction, he could not say on this record that JPMorgan did so by mistake. Tr. 391:2-7. The truth is that reasonable banks could differ about the degree of risk that OFAC would view the processing of a particular payment transaction as a violation. D-R's expert, Stephani Rice,

experienced in OFAC's procedures, was persuasive that in this instance OFAC would not. Tr. 125:9-126:20, 129:23-133:2, 136:3-137:19. It is a fair inference, from its processing the payment to Citibank, that JP Morgan came to the same conclusion.

Commerzbank, where D-R told PDVSA it had an alternative bank account available to accept payment, and Novo Bank, where D-R complied with PDVSA's request to open an alternative bank account available to accept payment in Euros, also could have likely processed the payments if PDVSA had pursued the options.

PDVSA claims that it did "everything reasonably within its power to make the required payments," PDVSA Tr. Br. 9, and that it "need not show that it took every action that had only a remote chance of succeeding," Harriscom Svenska, A.B. v. Harris Corp., 3 F.3d 576 (2d Cir.1993). But this argument misconstrues Harriscom. The issue in Harriscom was not that the action "had only a remote chance of succeeding," it was that the action itself was prohibited by the United States government, which "had undoubted power to compel compliance." Id. at 580.

Commerzbank or Novo Bank would have likely been successful alternatives.[1] Novo Bank told D-R's parent organization, Siemens,

---

[1] PDVSA argues that Novo Bank should be considered a remote alternative because D-R was slow to open an account and failed to share the account information once it was finalized. However, that does not excuse PDVSA's failure to utilize the substitute payment method. D-R had conveyed to PDVSA that it was willing and able to open the account. JX-33. PDVSA responded with silence.

that "there are not grounds for the rejection of transactions to and from Venezuela" during the relevant time period. JX-36 at 7-8. Each parties' expert witnesses also concluded that nothing within Commerzbank's internal risk-adverse policies indicated that PDVSA's payment would not have been processed. Tr. 206:15-20; Tr. 396:1-6; JX-64 § 3.3 (Commerzbank's "Bolivarian Republic of Venezuela: Business Policy Restrictions") (prohibiting transactions with "indications for a connection to the financial system or jurisdiction of the United States" only to PDVSA and not from PDVSA).

The United States government did not prohibit using Commerzbank or Novo Bank. PDVSA argues that using either Commerzbank or Novo Bank would have transformed the Note Agreement into new debt prohibited by E.O. 13808 because Section 2.08 of the Note Agreement requires payment to be sent in U.S. Dollars to either D-R's Administrative Agent located in Houston, Texas or to D-R's Citibank account. JX-1. But changing the receiving account to Commerzbank or Novo Bank or accepting payment in Euros does not change the underlying terms of the debt instrument in a way prohibited by the U.S. government.

Preexisting debt, like the Note Agreement, is transformed into new debt if the terms that define the underlying debt

_____

had conveyed to PDVSA that it was willing and able to open the account. JX-33. PDVSA responded with silence.

administrative handling of the preexisting debt does not transform the instrument or the transaction into new debt.

The examples laid out in FAQ 553 are clear. The length of the repayment period and applicable interest rate, changes to the character of the debt, are both examples of changes that would convert the instrument into new debt. JX-53. In contrast, an administrative decision like allowing a late payment, does not transform the instrument into new debt. JX-53 ("U.S. persons may collect and accept payment for such debt regardless of whether . . . PdVSA pays during the agreed-upon payment period."). Payment in Euros rather than Dollars and payment to a non-Citibank account fall into the latter category of how to process the payment administratively.

That is confirmed by E.O. 13808's purpose to prevent the sanctioned party from gaining access to new credit or funds originating in the United States. Tr. 132:3-11; Tr. 136:5-20. E.O. 13808 is not designed to prevent U.S. parties from collecting on outstanding debts. If an inconsequential, administrative change to the Note Agreement, like a change in the Administrative Agent's address or to the designated account receivable, would cause payment to be prohibited as new debt, then the sanction would cost the U.S. party a heavy, undeserved loss and give a windfall to the foreign target.

PDVSA also argues it did not have to resort to using Commerzbank or Novo Bank because D-R rendered use of Citibank impossible when it abandoned the procedure for manual certification required by Citibank's risk-adverse policies. See Hammond v. Toy Indus. Ass'n, Inc., 8 F. Supp. 3d 484, 496 (S.D.N.Y. 2014) ("A promisee who prevents the promisor from being able to perform the promise cannot maintain suit for nonperformance; he discharges the promisor from duty.").

D-R's inaction did not cause the third payment attempt to be rejected by Citibank. D-R made efforts to complete the certification process, reviewing Citibank's Sanctions Compliance Certification and providing comments to it. JX-16 at 6. When Citi advised D-R that it "most likely . . . will be unable to process" the payments from PDVSA regardless of D-R's actions, D-R did not submit the form. JX-16 at 2, 6.

Accordingly, PDVSA fails to show it took "virtually every action within its powers" to perform under the Note Agreement. Kama Rippa Music, Inc., 510 F.2d at 842. In addition to having banks available to process the payments under their risk-adverse policies, there is no showing PDVSA remonstrated to Citibank or attempted to have OFAC clear the payment. Nor does the record show that PDVSA attempted to pay D-R's Administrative Agent by check as prescribed by Section 2.08 of the Note Agreement.

**CONCLUSION**

For the foregoing reasons, PDVSA's duties under the Note Agreement were not discharged by the doctrine of impossibility.

Accordingly, judgment will be entered in favor of D-R and against PDVSA in the amount of USD $166,082,240.21, plus post-judgment interest at the rate of 8.5% per annum pursuant to Section 2.04 of the Note Agreement.

In addition, PDVSA is liable to D-R for costs and attorneys' fees pursuant to Section 9.05 of the Note Agreement. The amount is to be determined in an inquest before Magistrate Judge Robert W. Lehrburger in accordance with Federal Rule of Civil Procedure 54(d).

The Clerk is directed to enter judgment accordingly.

So ordered.

Dated:     December 8, 2021
           New York, New York

                                   _Louis L. Stanton_
                                   LOUIS L. STANTON
                                        U.S.D.J.